IN RE: John Joseph Louis JOHNSON,
III, Debtor.

Case No. 14–57104

United States Bankruptcy Court,
S.D. Ohio, Eastern Division,
at **Columbus.**

Signed February 26, 2016

Daniel A. DeMarco, Rocco I. Debitetto, Cleveland, OH, Marc J. Kessler, Hahn Loeser & Parks LLP, Columbus, OH, for Debtor.

*OPINION AND ORDER DENYING MOTION OF THE DEBTOR AND DEBTOR IN POSSESSION SEEKING TO CONVERT HIS CHAPTER 11 CASE TO CHAPTER 7 (DOC. 167)*

John E. Hoffman, Jr., United States Bankruptcy Judge

### Table of Contents

I. Introduction ... 88

II. Jurisdiction and Constitutional Authority ... 90

III. Procedural Background ... 90

IV. Findings of Fact ... 98

A. The Primary Nature of the Debtor's Debt ... 99

1. Background ... 99

2. Debt Owed to Creditors Other than the Objecting Creditors... 102

3. Debt Owed to the Objecting Creditors ... 102

4. The Testimony of the Debtor and the Johnsons Generally ... 103

5. Specific Testimony Relating to the Intent of the Debtor and the Johnsons/the Provisions of the Loan Documents Regarding the Purpose of the Loans ... 105

6. The Use of the Loan Proceeds ... 109

a. Amounts Predating the First Loan from an Objecting Creditor ... 112

b. Inaccurate Transcription and Duplication of Amounts from the Bank Statements ... 113

c. Unwarranted Assumption that Withdrawals Resulted in Expenditures ... 114

d. Unwarranted Assumption that Certain Payments Were Made for Consumer Goods or Services ... 115

 i. Diamonds and Gold/Finished Jewelry ... 116

 ii. Mrs. Johnson's Other Business Venture ... 117

 iii. Business Investments by Mr. Johnson ... 117

e. Synopsis of Schedule 1's Shortcomings ... 118

f. An Additional Gross Overstatement by the Objecting Creditors ... 119

7. Summary of the Court's Findings Concerning the Primary Nature of the Debtor's Debt ... 120

B. The Debtor's Bad Faith ... 122

C. The Debtor's Bad Faith During the Case ... 122

1. Failure to Retain Forensic Accountant Before Filing the Conversion Motion ... 124

2. Failure to Object to the Claims of the Objecting Creditors Before Filing the Conversion Motion ... 125

3. Failure to Negotiate with the Objecting Creditors in Good Faith ... 129

4. Failure to Promptly Sell Depreciating Assets ... 137

5. Failure to Disclose Transfers to or on Behalf of the Debtor's Parents and to Fully Investigate Assets of the Parents ... 138

 a. Failure to Disclose Transfers ... 138

 b. Failure to Fully Investigate Assets of the Johnsons ... 140

6. Postpetition Support of the Debtor's Parents and Brother Using Resources of the Bankruptcy Estate ... 142

7. Failure of the Debtor to Control His Own Expenses ... 146

D. The Debtor's Prepetition Conduct ... 152

E. Summary of the Court's Findings Relating to the Debtor's Bad Faith ... 155

V. Legal Analysis ... 156

A. Section 707(a) of the Bankruptcy Code ... 156

B. Application of the Relevant Factors ... 161

1. The Debtor's Conduct Prior to Bankruptcy ... 161

2. The Debtor's Conduct After Bankruptcy ... 161

C. The Connection Between the Court's Bad–Faith Analysis and the Debtor's Request to Convert His Chapter 11 Case to Chapter 7 ... 166

D. Section 707(b) of the Bankruptcy Code ... 166

VI. Conclusion ... 172

## I. Introduction

John Joseph Louis "Jack" Johnson, III (the "Debtor"), a professional hockey player with the Columbus Blue Jackets, filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code more than a year ago. Since then, he has owed the creditors of his bankruptcy estate the same fiduciary duties that, absent the appointment of an independent trustee, are imposed on all Chapter 11 debtors—from small businesses to Fortune 500 companies, and from individuals with moderate incomes to those who, like the Debtor, are highly compensated. But if the Debtor commenced this bankruptcy case intending to comply with his fiduciary duties and use his income to provide creditors with a meaningful recovery, at some point he went astray. Indeed, this case was in its

early stages when the Debtor's attorneys began researching issues bearing on the conversion of the case to Chapter 7, including whether any of the Debtor's substantial post-bankruptcy earnings would be available to his creditors if the case were converted.

Before the Court is the Debtor's motion seeking to convert his case from Chapter 11 to a Chapter 7 case under which (in his view) all of his post-bankruptcy earnings—including those he earned before conversion—would be shielded from the creditors of his bankruptcy estate. A group of creditors asserting claims in the aggregate amount of approximately $14 million objected to the conversion motion, arguing that the Court should decline to convert the Debtor's case for two reasons. The objecting creditors first contend that if his case were converted it would be subject to dismissal as an "abuse" of the provisions of Chapter 7 within the meaning of § 707(b) of the Bankruptcy Code. A case may be dismissed for abuse under § 707(b) only if the debtor has primarily consumer debts. But the objecting creditors have grossly misconstrued certain evidence relating to the nature of the Debtor's indebtedness and have failed to carry their burden of proving that he has primarily consumer debts.

The creditors objecting to conversion also contend that the Debtor has exhibited bad faith and that the Court should deny his request for that reason. Attempting to place the blame for his financial predicament on the objecting creditors, the Debtor alleges that their claims arose out of predatory lending practices involving his parents. He also contends that the objecting creditors have refused to accept anything less than full or nearly full payment on their claims, purportedly blocking his path to a successful reorganization. In light of those allegations, an effort by the Debtor to obtain the disallowance of these creditors' claims would have served multiple purposes: (1) gaining leverage in his negotiations with the objecting creditors; (2) forging a path to confirmation of a Chapter 11 plan without their consent if the negotiations failed to garner the agreement of those necessary to confirm a consensual plan; and (3) facilitating the Debtor's proposal of a plan providing for a significant distribution to those creditors holding millions of dollars of other claims that he concedes are legitimate. Despite the strategic benefits of seeking the disallowance of the objecting creditors' claims, the Debtor had chosen not to do so at the time he moved for conversion. Nor had he engaged in good-faith negotiations with these creditors before seeking conversion. At that time, the Debtor also had failed to employ a forensic accountant to undertake the analysis that his own attorney represented to the Court was necessary to formulate a plan of reorganization.

Furthermore, the Debtor neglected to take other steps that are necessary to reorganize his financial affairs. The Debtor's postpetition earnings are property of his bankruptcy estate, and his future income clearly constitutes the single-most important source of funding for the repayment of creditors' claims—including claims that the Debtor concedes are legitimate. Yet by making unnecessary and excessive expenditures, he has failed to conserve this estate property. In addition, the Debtor has not promptly disposed of depreciating assets that he said he intended to sell and thus has unnecessarily imposed the costs of retaining those assets on the bankruptcy estate. And in spite of his contention that his parents are partly to blame for his financial distress, he has made payments to or on behalf of his parents and younger brother using cash belonging to the bankruptcy estate, while at the same time failing to observe his obligation to disclose the

nature and extent of his prepetition transfers to his parents. The Debtor's failure to conserve estate resources has not been limited to making inappropriate expenditures on behalf of others. He also has continued to devote an inordinate amount of his postpetition earnings to personal expenditures. The Debtor's conduct during this case is. consistent with his pre-bankruptcy laissez-faire approach to his finances. Before bankruptcy, the Debtor engaged in excessive spending and permitted his parents to use his income or loan proceeds to fund their own lavish expenditures even after he knew that he was having difficulty servicing the debt he had incurred.

In short, after failing to reduce his expenses in an effort to repay his debt before bankruptcy, the Debtor filed a Chapter 11 case in which he has neglected his fiduciary duties and has failed to administer his case in a manner that might have resulted in a significant distribution to·his creditors. Instead, he seeks to keep for himself millions of dollars of post-bankruptcy income, while leaving his creditors with a small recovery (if any) from his unencumbered, non-exempt assets. Because the evidence demonstrates the Debtor's bad faith, the Court denies his motion to convert this case·to Chapter 7.

## II. Jurisdiction and Constitutional Authority

■ The Court has jurisdiction to hear and determine this contested matter pursuant to 28 U.S.C. §§ 157 and 1334 and the general order of reference entered in this district. This is a core proceeding. *See* 28 U.S.C. § 157(b)(2)(A) and (O).

There is some question whether an order denying a Chapter 11 debtor's motion to convert his case to Chapter 7 is a final order. *Compare United Phosphorus Ltd. v. Fox (In re Fox)*, 241 B.R. 224, 229–30 (10th Cir. BAP 1999) (holding that an order denying a creditor's motion to convert an individual Chapter 11 debtor's case to Chapter 7 was not final) *with Copper v. Copper (In re Copper)*, 314 B.R. 628, 630 (6th Cir. BAP 2004) (holding that an order denying a debtor's request to convert a Chapter 7 case to Chapter 13 is a final order), *aff'd*, 426 F.3d 810 (6th Cir.2005). But even if this order is final, the Court has the constitutional authority to enter it after *Stern v. Marshall*, 564 U.S. 462, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011), because the decision whether or not to convert a case "stems from the bankruptcy itself." *Stern*, 131 S.Ct. at 2618. As a result, in an opinion affirming an order converting a Chapter 11 case to Chapter 7, one federal court of appeals stated that "nothing in *Stern v. Marshall* . . . affects our analysis." *In re USA Baby, Inc.*, 674 F.3d 882, 883 (7th Cir.2012). "The Supreme Court held in [*Stern*] that bankruptcy judges may not enter final judgments on common law· claims that are independent of federal bankruptcy law; we cannot fathom what bearing that principle might have on the present case." *Id.* at 883–84. The Court therefore concludes that it has the constitutional authority to adjudicate the Debtor's conversion motion.

## III. Procedural Background

On October 7, 2014 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Five months later, on March 5, 2015, he filed a motion under § 1112(a) of the Bankruptcy Code (the "Conversion Motion") (Doc. 167) seeking to convert his Chapter 11 case to Chapter 7 *"nunc pro tunc* as of [the date] of the filing [of the Conversion Motion]." Conversion Mot. at 1.

Objections to the Conversion Motion and joinders in those objections were filed by the creditors whose claims the Debtor has

repeatedly referred to as "illegitimate": RFF Family Partnership, LP ("RFF") (Doc. 184); Capital Holdings Enterprises, LLC ("Capital Holdings") (Doc. 185); Capital Financial Holdings, LLC ("Capital Financial") (Docs. 186 & 188); Rodney Blum ("Blum") (Doc. 187); Pro Player Funding, LLC ("Pro Player") (Doc. 191); Cobalt Sports Capital, LLC ("Cobalt") (Doc. 192); and EOT Advisors, LLC ("EOT") (Doc. 193). The Court will refer to each of RFF, Capital Holdings, Capital Financial, Blum, Pro Player, Cobalt and EOT as an "Objecting Creditor" and collectively will refer to them as the "Objecting Creditors." The Debtor filed a consolidated reply (the "Reply") (Doc. 197) to their objections as well as an objection by the United States Trustee (the "UST").[1]

After the Debtor filed the Conversion Motion, Capital Financial filed a motion under § 1104(a) of the Bankruptcy Code for the appointment of a Chapter 11 trustee (the "Trustee Motion") (Doc. 189). Cobalt filed a joinder in the Trustee Motion (Doc. 192), and the Debtor filed a response to the Trustee Motion (Doc. 220).

During a scheduling conference held on the Conversion Motion and the Trustee Motion, the Court suggested that mediation might facilitate the resolution of the disputes between the Debtor and the Objecting Creditors. The Debtor and the Objecting Creditors agreed to mediation, and the Court entered an order (Doc. 256) appointing the Honorable Randall Newsome (Retired) as mediator. In particular, the Court ordered mediation of the issues raised in the Conversion Motion and the Trustee Motion, as well as the issues raised by the Objecting Creditors' proofs of claim. The Court was hopeful that the mediation would result in a consensual plan of reorganization for the Debtor. The Trustee Motion was held in abeyance pending a resolution as a result of the mediation or, if necessary, a decision on the Conversion Motion. Unfortunately, the mediation was not successful, and the Debtor and the Objecting Creditors did not otherwise resolve their disputes.

At the time it scheduled the mediation, the Court also scheduled an evidentiary hearing on the Conversion Motion. With

---

1. The UST filed a limited objection to the Conversion Motion (Doc. 183) stating that he "does not oppose the conversion of the case to Chapter 7 as sought in the [Conversion] Motion; however, the [UST] objects to the Debtor's request for a *nunc pro tunc* order because such a request is not supported by statute or case law." Doc. 183 at 1. The UST and the Debtor later entered into a stipulation (Doc. 340) under which the Debtor withdrew his request for *nunc pro tunc* relief. His limited objection to the Conversion Motion having been mooted by the Debtor's withdrawal, the UST stipulated that he "has no other objection to the [Conversion] Motion or to the conversion of the Debtor's case from chapter 11 to chapter 7." Doc. 340 at 2. The Debtor repeats, mantra-like, that the lack of an objection by the UST provides a reason to grant the Conversion Motion. *See* Conversion Mot. at 3; Reply at 31, 68; Debtor's prehearing brief (the "Debtor Pre–Hearing Brief") (Doc. 367) at 1; Doc. 432 (defined

*infra* at Part III) ¶¶ 2, 45, 55, 102. During the hearing on the Conversion Motion, counsel for the Debtor even advised the Court that "[p]erhaps the best evidence that you will see [of a lack of bad faith on the part of the Debtor] is that the U.S. Trustee has not objected to the conversion." Doc. 417 at 17. The Court is not persuaded by this argument. True, Congress intended for the UST to play an important role in bankruptcy cases, *see McDermott v. Davis (In re Davis)*, 538 B.R. 368, 390 n.14 (Bankr.S.D.Ohio 2015), and the UST is a party in interest with a right to be heard in every Chapter 11 case. But the Court simply has not heard from the UST in this matter. The attorney for the UST did not enter an appearance during the hearing on the Conversion Motion, and the UST has never explained why he believes that conversion of this case to Chapter 7 is appropriate. Thus, the UST's failure to object to the Conversion Motion provides no support for the Debtor's position.

**92**

the hearing on the Conversion Motion looming, the Objecting Creditors filed a motion to compel the Debtor's attendance at a deposition (Doc. 286), and the Debtor filed a motion for a protective order (Doc. 288). After it heard those motions, the Court rescheduled the hearing on the Conversion Motion at the request of the parties, and the Objecting Creditors deposed the Debtor.

A number of other disputes relating to discovery also arose. First, the Objecting Creditors filed and served a notice of deposition (Doc. 301) on certain of the Debtor's bankruptcy attorneys (the "Attorneys"). The deposition notice stated that the Objecting Creditors would depose the Attorneys about certain statements the Debtor had made in the Conversion Motion and the Reply. The Debtor and the Attorneys filed a motion for a protective order barring the depositions of the Attorneys (Doc. 309), contending that all of the information about which the Objecting Creditors would seek to depose the Attorneys was obtainable from other sources or was protected either by the attorney-client privilege or the work-product doctrine. In their objection to the motion for a protective order (Doc. 316), the Objecting Creditors argued that the Debtor had waived the protections of the attorney-client privilege and the work-product doctrine. The Court then entered an order granting the motion for a protective order barring the depositions of the Attorneys. *See In re Johnson*, 535 B.R. 223 (Bankr.S.D.Ohio 2015) (the *"Attorney Protective Order"*) (holding that the Debtor had not waived the protections of the attorney-client privilege or the work-product doctrine). In so holding, however, the Court noted that if the Objecting Creditors "adduce evidence

during the hearing on the Conversion Motion supporting the allegations they have made in their objections [to conversion that relate to the Debtor's alleged failure to negotiate in good faith], the Court finds it difficult to conceive how the Debtor could rebut that evidence without delving into matters shielded by the attorney-client privilege, the work-product doctrine and the settlement privilege." *Attorney Protective Order*, 535 B.R. at 228.

The Objecting Creditors then filed and served a notice of deposition on the Debtor's parents (the "Parent Deposition Notice") (Doc. 350), John Joseph Louis Johnson, II and Kristina Johnson.[2] In response, the Johnsons filed a motion for a protective order (Doc. 351) in which they sought to limit the scope of their depositions. Their motion pointed out that the Court's Attorney Protective Order had "referenced and quoted the various objections of the Objecting Creditors, and indicated that 'the [Objecting Creditors] have argued that the Debtor may not be a debtor under Chapter 7 because he has exhibited a lack of good faith *since the Petition Date.*' [Attorney Protective] Order, pg. 6 (emphasis added)." Doc. 351 at 9. Based on this language, the Johnsons' motion went on to argue that because "the Objecting Creditors claim that the Debtor did not in good faith investigate alleged claims against the Johnsons[,] [t]hat issue is all that needs to be examined at the [d]epositions." *Id.* Relying on the same language from the Attorney Protective Order that his parents had cited, the Debtor filed a motion (Doc. 353) joining his parents' request to prohibit the Objecting Creditors from questioning them about events occurring before the Petition Date. Doc. 353 at 4–6. The Ob-

2. The Court will refer to the Debtor's parents individually as "Mr. Johnson" and "Mrs. Johnson" and collectively as the "Johnsons."

jecting Creditors filed a response to both motions in which they argued that prepetition events indeed were relevant to the Conversion Motion (Doc. 355).

The Court issued an oral ruling denying both the Debtor's and the Johnsons' motions for a protective order, concluding that the Objecting Creditors' response established why events transpiring before the Petition Date were relevant to the Conversion Motion. As the Court noted in its oral ruling, the Debtor had alleged that the Objecting Creditors fraudulently preyed on his parents to cause him to incur millions of dollars of debt. The Court concluded that the circumstances under which the loans were taken out and the prepetition activities of the Johnsons in that regard bore on the Debtor's allegations concerning the Objecting Creditors' purported predatory lending practices. The Court also found that the Debtor's allegations were relevant to the Objecting Creditors' contention, which the Court had acknowledged in the Attorney Protective Order, that the Debtor was not eligible for Chapter 7 relief because he had failed to negotiate with the Objecting Creditors in good faith. Seeing a link between the parties' competing narratives—the more spurious the prepetition claim of an Objecting Creditor, the less the Debtor could offer that creditor and still be found to have negotiated in good faith—the Court entered an order denying the Debtor's and the Johnsons' motions for a protective order (Doc. 357). The Objecting Creditors then proceeded with their depositions of

the Johnsons. A flurry of prehearing motions and objections ensued, which the Court disposed of in a series of oral rulings.

The Court held a two-day evidentiary hearing on the Conversion Motion (the "Hearing").[3] Prior to the Hearing, the Debtor and the Objecting Creditors entered into certain stipulations (the "Stipulations") (Doc. 365). During the Hearing, the Objecting Creditors further stipulated that the Debtor had satisfied the elements of § 1112(a)—that is, that the Debtor is a debtor in possession, that his case was not originally commenced as an involuntary case under Chapter 11, and that the case was not converted to Chapter 11 other than on his request.[4] Tr. I at 40–42.

The Objecting Creditors then presented evidence in support of their objections to the Conversion Motion. They called the Debtor, who testified over the course of two days both as on cross-examination and on direct. In addition to eliciting the Debtor's testimony, the parties presented documentary evidence. The Debtor's exhibits, numbered 1 through 20, all were admitted into evidence without objection. The Court will refer to each of the Debtor's exhibits by referencing the exhibit number and, if one is available, the page or other identifier (e.g., Ex. 4 at 17). The depositions of Mrs. Johnson (the "KJ Deposition") and Mr. Johnson (the "JJII Deposition") and the accompanying deposition exhibits were admitted into evidence as Exhibits 18 and 19, respectively. After the Hearing, the parties provided the

---

**3.** When citing the transcripts of the Hearing, the Court will refer to the transcript of the first day of the Hearing (Doc. 417) as "Tr. I" and the transcript of the second day (Doc. 418) as "Tr. II."

**4.** Section 1112(a) of the Bankruptcy Code states:

The debtor may convert a case under this chapter to a case under chapter 7 of this title unless—(1) the debtor is not a debtor in possession; (2) the case originally was commenced as an involuntary case under this chapter; or (3) the case was converted to a case under this chapter other than on the debtor's request.

11 U.S.C. § 1112(a).

Court with video of the depositions of the Johnsons (the "Parent Depositions").

The Objecting Creditors' Exhibits A through U, X through JJ, MM through OO, RR, SS and VV were admitted into evidence without objection. The Objecting Creditors' Exhibits K through T are the monthly operating reports filed by the Debtor through July 31, 2015 (the most recent report the Debtor filed before the Hearing).[5] In addition to the monthly op-erating reports,[6] the Objecting Creditors' exhibits include records of bank accounts and a securities account. In referencing pages from these records, the Court will cite the exhibit letter and Bates numbers (i.e., "Ex. X at 3274–75"). The following chart identifies the exhibit where the rec-ords for each account can be found, togeth-er with the institution where the account was maintained, the names in which the accounts were maintained and the year(s) covered.

| Ex. | Institution Where Account Maintained | Account Maintained in the Name of: | Years Covered |
|---|---|---|---|
| X | Capstar Bank (3 accounts) | The Debtor | 2012–2014 |
| Y | U.S. Bank | "Jack Johnson" | 2010–2013 |
| Z | U.S. Bank | Team Johnson, LLC | 2010–2013 |
| AA | The Huntington National Bank | The Debtor Mr. Johnson Mrs. Johnson | 2013–2014 |

5. The Chapter 11 Guidelines for Region 9, Operating Instructions and Reporting Re-quirements (Revised 01/14) ("UST Reporting Requirements"), *available at* http://www.justice.gov/ust/r09/docs/general/soh/ch11_instructions.pdf (last visited February 26, 2016), obligate Chapter 11 debtors, including individual debtors, to file monthly operating reports signed under penalty of perjury. See UST Reporting Requirements at 9, 34, 37. Each monthly operating report must be pre-pared on the accrual basis of accounting and must include, among other things, an operat-ing statement of income and expenses. *Id.* at 9, 38.

6. The Objecting Creditors did not present the monthly operating reports in chronological order, but instead designated them as follows: Ex. K (January 2015), Ex. L (March 2015), Ex. M (November 2014), Ex. N (October 2014), Ex. O (May 2015), Ex. P (April 2015), Ex. Q (June 2015), Ex. R (July 2015), Ex. S (December 2014), Ex. T (February 2015). In addition to considering these monthly operat-ing reports, the Court may take judicial notice of the monthly operating reports the Debtor filed after the Hearing.

| Ex. | Institution Where Account Maintained | Account Maintained in the Name of: | Years Covered |
|---|---|---|---|
| BB | Sammons Securities Company, LLC | The Debtor | 2011–2014 |
| CC | TCF National Bank | Mr. Johnson Mrs. Johnson | 2010–2013 |
| DD | TCF National Bank | Mr. Johnson Mrs. Johnson | 2010 |
| EE | TCF National Bank | The Debtor Mrs. Johnson | 2010–2014 |
| FF | TCF National Bank | The Debtor Mrs. Johnson | 2011–2012 |
| GG | TCF National Bank | Mr. Johnson Mrs. Johnson | 2010–2013 |
| HH | TCF National Bank | Mr. Johnson Mrs. Johnson | 2010–2013 |
| II | JPMorgan Chase Bank, N.A. | The Debtor Mr. Johnson Mrs. Johnson | 2013–2014 |
| JJ | JPMorgan Chase Bank, N.A. | Team Johnson Enterprises, LLC Tri Start Sports & Entertainment | 2013–2014 |

The Court will refer to the bank accounts referenced in Exhibits X through AA and CC through JJ as the "Bank Accounts" and will refer to the underlying bank statements for the Bank Accounts as the "Bank Statements."

After the Hearing, the Court entered a scheduling order (Doc. 387) under which the Objecting Creditors had 21 days from the date of the filing of the transcript of the Hearing to submit their proposed findings of fact and conclusions of law and to identify the portions of the Parent Depositions they believe the Court should consider in making its ruling. The Debtor then had 21 days from the date of the Objecting Creditors' submissions in which to file his proposed findings of fact and conclusions of law and his designation of the portion of the Parent Depositions on which he was relying.

In accordance with the scheduling order, the Objecting Creditors filed their designation of the Parent Depositions (Doc. 411) and also filed their proposed findings of fact and conclusions of law (the "Creditor Findings & Conclusions") (Doc. 412), attaching three schedules to that document. Two of those schedules are uncontroversial: Schedule 2 sets forth a timeline of the loans made to the Debtor by the Objecting Creditors and certain other creditors, *id.* ¶ 25, and Schedule 3 reflects salary of the Debtor that was directly deposited into the Bank Accounts, *id.* ¶ 27.B.

Schedule 1, however, drew a response from the Debtor. In Schedule 1, the Ob-

jecting Creditors purport to identify "expenditures" reflected in the Bank Statements, Creditor Findings & Conclusions ¶ 20, contending that the Bank Statements the Objecting Creditors summarize in Schedule 1 "demonstrate that the large majority of the loan proceeds underlying the Objecting Creditors' claims ... were obtained for and spent for personal, family and household goods and services." Creditor Findings & Conclusions ¶ 73. The Objecting Creditors include within Schedule 1 several sub-parts designated Parts A through C and E through Y (if they intended there to be a Part D, they did not file it). Part A is a four-column chart and Part B a pie chart purporting to summarize the other sub-parts of Schedule 1. In their proposed findings of fact (and in Parts A and B of Schedule 1), the Objecting Creditors contend that the expenditures and withdrawals from the Bank Accounts totaled $8,195,739.61. In calculating this number, they include "ATM Withdrawals" in the amount of $148,462.86, but failed to file the Part D that might have provided the support for the $148,462.86. In Parts C and E through Y, the Objecting Creditors provide five-column charts purporting to reproduce information from the Bank Statements, including the dollar amount and the description of payments/withdrawals, together with the designated exhibit and Bates number of the page of the Bank Statements from which the Objecting Creditors took the information. In addition, each of Part C and Parts E through

Y includes a "Category" by which the Objecting Creditors characterize the nature of the amount spent or withdrawn.[7]

In addition to filing his designation of the Parent Depositions (Docs. 430 & 431) and his proposed findings of fact and conclusions of law (the "Debtor Findings & Conclusions") (Doc. 432),[8] the Debtor filed a motion to strike Schedule 1 (Doc. 427) (the "Motion to Strike") pursuant to Rule 1006 of the Federal Rules of Evidence ("Rule 1006").

Rule 1006 states:

> The proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court. The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place. And the court may order the proponent to produce them in court.

Fed.R.Evid. 1006.

Despite the fact that the Objecting Creditors did not ask the Court to admit Schedule 1 into evidence, the Debtor takes the position that the Objecting Creditors were "submitting evidentiary materials" when they filed Schedule 1. Mot. to Strike at 6. Schedule 1 is not admissible as evidence, the Debtor contends, because "[s]ummaries under Rule 1006 *must* meet five basic criteria to be admissible." *Id.* Those criteria are set forth in three Sixth Circuit cases cited by the Debtor. *See*

---

7. The categories set forth in Part C and Parts E through Y are as follows: Art, Furniture, Appliances & Housewares (Part C); Automobiles (Part E); Bank Fees (Part F); Cash Withdrawals (Part G); Clothing & Accessories (Part H); Credit Card Payments (Part I); Education for [the Debtor's younger brother] (Part J); Entertainment & Travel (Park K); Food & Grocery (Part L); Health Care (Part M); Home Improvements & Repairs (Part N); Insurance (Part O); Jewels & Jewelry (Part P);

Loan Payments (Part Q); Miscellaneous Retail & Services (Part R); Miscellaneous Withdrawals (Part S); Personal Care (Part T); Pet Care (Part U); Physical Training (Part V); Restaurants (Part W); Shipping (Part X); Utilities & Phone Service (Part Y).

8. The parties completed their post-Hearing briefing on November 25, 2015.

*United States v. Smith,* 516 Fed.Appx. 592, 593 (6th Cir.2013); *United States v. Jamieson,* 427 F.3d 394, 408–10 (6th Cir. 2006); *United States v. Bray,* 139 F.3d 1104, 1110 (6th Cir.1998).

Pointing out that one of the five criteria for admitting a summary into evidence is that it be admitted based on the testimony of the person who prepared it, the Debtor notes that Schedule 1 was "not introduced through the testimony of a witness who prepared the summary." Mot. to Strike at 8. The Debtor concludes that Schedule 1 "should be stricken and not considered by the Court" because the Objecting Creditors "could not present this erroneous, misleading, and inadmissible 'evidence' at the [H]earing, nor should they be permitted to do so now. [Schedule 1 is] inherently flawed, biased, unreliable and untested." *Id.* For their part, the Objecting Creditors state in their objection to the Motion to Strike (Doc. 448) that they are not seeking to admit Schedule 1 into evidence, *see* Doc. 448 at 3, and that Schedule 1's "unreliability ... is de minim[i]s," Doc. 448 at 5.

As explained below, if the Objecting Creditors had exercised a modicum of care, they would have realized that Schedule 1 in fact is grossly inaccurate. But the Court did not learn this from the Debtor, because he identified only relatively minor inaccuracies in Schedule 1. *See* Mot. to Strike at 5–6. Instead, the Court uncovered the substantial deficiencies in Schedule 1 only after comparing it to the Bank Statements (and in certain instances, the Parent Depositions). But these deficiencies are not relevant to the Court's Rule 1006 analysis because it is not admitting Schedule 1 into evidence and is not relying on it to find that the Objecting Creditors have proved anything.

When interpreting a rule, the Court "must give effect to the plain meaning of the text." *United States v. Soto,* 794 F.3d 635, 652 (6th Cir.2015). Rule 1006 applies when a "proponent [seeks to] use a summary, chart, or calculation *to prove* the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." Fed. R.Evid. 1006 (emphasis added). Because the Court is not admitting Schedule 1 into evidence, the Objecting Creditors cannot use it to "prove" the content of the Bank Statements—or any fact for that matter. After all, in the adjudicative process, it is only evidence (and reason applied to evidence) that can prove a fact. The Sixth Circuit therefore has held that Rule 1006 only applies when "the evidence to be considered by the factfinder" is the summary itself. *Bray,* 139 F.3d at 1112; *see also id.* at 1110 ("[I]t is plain that a summary admitted under Rule 1006 is itself the evidence that the trier of fact should consider."). That is not the case here, because Schedule 1 is not being admitted into evidence.[9] Rather, Schedule 1 falls within the category of those summaries—in the words of the Sixth Circuit, "pedagogical-device summaries"—that are not governed by Rule 1006. *Id.* at 1112.

According to the Sixth Circuit, pedagogical-device summaries include "listings of data taken from ... documents in evidence, which are intended to summarize ... other evidence that has been admitted in the case, but which are not themselves admitted[.]" *Id.* The Sixth Circuit acknowledged that such summaries may, as does Schedule 1, "reflect to some extent, through captions or other organizational devices or descriptions, the inferences and conclusions drawn from the underlying evidence by the summary's proponent." *Id.* at 1111. The Sixth Circuit also recognized

9. Nor, for that matter, are Schedules 2 and 3.

that "[t]his type of [summary] is *more akin to argument than evidence* since [it] organize[s] the ... examination of testimony and documents already admitted in evidence." *Id.* (emphasis added) (internal quotation marks omitted).

At the conclusion of the Hearing, the Court directed the parties to submit proposed findings of fact and conclusions of law in lieu of making closing arguments. The Objecting Creditors chose to make their arguments partly in text and partly in chart format. The charts included in Schedule 1 in essence form part of the argument that the Objecting Creditors are making based on the Bank Statements. They could have set forth the information they provided in Schedule 1 entirely in the text of their proposed findings of fact. But that approach would have been unwieldy, and their decision to present the information in a chart format provides no reason for the Court to refuse to consider the Objecting Creditors' arguments. As it turns out, Schedule 1 is so replete with errors that it utterly fails to support the Objecting Creditors' contention that more than one-half of the funds they advanced were used for consumer purposes. But because Schedule 1 is not being admitted into evidence, Rule 1006 does not prohibit the Court from considering it. For all these reasons, the Court will enter a separate order denying the Motion to Strike. The Court turns next to the evidence.

## IV. Findings of Fact

■ The Debtor is a debtor in possession, and his case was neither commenced as an involuntary Chapter 11 case nor converted to Chapter 11 from another chapter of the Bankruptcy Code. Indeed, the Objecting Creditors have so stipulated, meaning that the Debtor has satisfied his burden of proof under § 1112(a) of the Bankruptcy Code. The Objecting Creditors, however, argue that the Court should decline to convert the Debtor's case because it would necessarily be dismissed if it were converted to Chapter 7. As the Objecting Creditors concede, Tr. I at 42, they have the burden of proving the facts supporting their objections to conversion. *See Condon v. Smith (In re Condon)*, 358 B.R. 317, 326 (6th Cir. BAP2007).[10]

■ The Objecting Creditors first contend that the Debtor's bankruptcy case would be subject to dismissal under § 707(b) of the Bankruptcy Code if it were converted to Chapter 7.[11] Creditor Findings & Conclusions ¶¶ 70–75. But § 707(b) applies only if a debtor has "primarily consumer debts," 11 U.S.C. § 707(b)(1), and a debtor has primarily consumer debts only if they exceed one-half of the total amount of his debt.[12] In

---

10. Like certain other statements made below, the statement that the Objecting Creditors have the burden of proof is a conclusion of law. To the extent statements made in this section of the opinion constitute conclusions of law, they are adopted as such. Likewise, to the extent any of the statements made in the legal analysis section of this opinion constitute findings of fact, they are adopted as such.

11. Under § 707(b) of the Bankruptcy Code, [a]fter notice and a hearing, the court, on its own motion or on a motion by the United States trustee, trustee (or bankruptcy administrator, if any), or any party in interest, may dismiss a case filed by an individu-

al debtor under this chapter *whose debts are primarily consumer debts*, or, with the debtor's consent, convert such a case to a case under chapter 11 or 13 of this title, if it finds that the granting of relief would be an abuse of the provisions of this chapter.
11 U.S.C. § 707(b)(1) (emphasis added).

12. *See In re Hlavin*, 394 B.R. 441, 447 (Bankr.S.D.Ohio 2008) ("Based on the context in which § 707(b)(1) was passed and the policy concerns it was intended to address, the Court adopts the majority view and concludes that a debtor has 'primarily consumer debts' if the aggregate amount of his or her

turn, any particular debt is a consumer debt only if it was "incurred by an individual *primarily* for a personal, family, or household purpose." 11 U.S.C. § 101(8) (emphasis added). The use of the word "primarily" in § 101(8) means that if a debt was incurred for more than one reason, it is the primary purpose for which it was incurred that determines whether the entire debt is a consumer or a non-consumer debt.[13] Thus, in order to establish that any particular debt is a consumer debt, the Objecting Creditors have the burden of proving that the debt was incurred by the Debtor primarily for a consumer purpose.

■■ In light of the use of the word "primarily" in both § 101(8) and § 707(b)(1) of the Bankruptcy Code, the Objecting Creditors' burden is clear: (1) establish the universe of debts that the Debtor incurred primarily for a personal, family, or household purpose; and (2) demonstrate that, when added together, those debts comprise more than one-half of his total indebtedness. For the reasons set forth below, the Court finds that the Objecting Creditors have failed to carry their burden of proving that the Debtor's consumer debt exceeds one-half of his total debt.[14]

## A. The Primary Nature of the Debtor's Debt

### 1. Background

Following in the footsteps of his father—who was on a national championship ice hockey team in college, KJ Dep. at 60, 186—the Debtor took to the sport early on, beginning to play when he was five years old. Tr. I at 44. The Debtor eventually devoted himself to ice hockey, and his parents assisted him in achieving his maximum potential in the sport. KJ Dep. at 59–60. Up until eighth grade, the Debtor developed his skills while attending schools in Michigan. But the Johnsons then enrolled him in a private school in Minnesota that cost approximately $30,000 per year, a tuition the Johnsons found themselves "really stretched to pay." KJ Dep. at 59, 69–70. The Johnsons' intent in enrolling their son in the new school was "to get academics and athletics on the same page to allow [him] the opportunity to get to a major university." Tr. I at 51.

The Johnsons also had another son who was 11 years younger than the Debtor. Desiring not to split the family up during the school year, they decided that Mr. Johnson would leave "a wonderful career job" behind in Michigan and take a job in Minnesota "so the family could be togeth-

---

consumer debt exceeds 50% of the total debt.").

**13.** *See Stewart v. U.S. Tr. (In re Stewart)*, 215 B.R. 456, 465 (10th Cir. BAP 1997) ("Section 101(8) requires that the court consider the purpose for which the debt was incurred, and where the debt was incurred for more than one purpose, deems that the primary purpose of the debt will determine its nature."), *aff'd*, 175 F.3d 796 (10th Cir.1999).

**14.** For purposes of this analysis, the Debtor's total indebtedness includes debt that he might dispute as to validity or amount. This approach is consistent with the Bankruptcy Code, which defines the term "debt" to mean

"liability on a claim," 11 U.S.C. § 101(12), and defines the term "claim" to encompass claims that are disputed, 11 U.S.C. § 101(5). *See In re Reavis*, No. 06–11721–R, 2007 WL 2219519, at *5 (Bankr.N.D.Okla. July 30, 2007) ("[C]ontingent, unliquidated and disputed debts are considered when determining whether a debtor's debts are primarily consumer debts."). The Court therefore need not describe debt that the Debtor might dispute with adjectives such as "alleged," "purported," or the like, and in an effort to enhance this opinion's readability the Court will not routinely do so. That said, in this opinion the Court is not adjudicating the validity or amount of any creditor's claim.

er" while the Debtor attended school there. KJ Dep. at 70. A few years later, the Johnson family moved back to Ann Arbor, Michigan so that the Debtor could "play hockey for the USA National Development Team program for his junior and senior year in high school." KJ Dep. at 61. All of these efforts resulted in the Debtor's being able to matriculate at the University of Michigan, where he played ice hockey for two years before beginning to play professionally for the Los Angeles Kings of the National Hockey League in 2007. Tr. I at 44–45, 51–53. After playing under two short-term contracts, the Debtor signed a contract with the Kings in January 2011 that was to provide him with compensation of $30.5 million over seven years (the "Player Contract"). Tr. I at 45–46; Stips. ¶ 1.[15]

Such a significant stream of income would present almost anyone with numerous wealth-building opportunities. And so it was for the Debtor, who testified that "after signing the [Player Contract], it was [his] understanding that it opened up the door to try and create more wealth and have wealth management opportunities." Tr. I at 56. In seeking to build his wealth, the Debtor declined to utilize the services of a professional financial planner or other expert. KJ Dep. at 48, 63, 263. Rather, trusting his parents without reservation, he allowed them to exercise total control over his financial affairs, Tr. I at 53, 112–14, 119, his understanding being that they would help him "save money, invest money, [and] make a profit." Tr. II at 47.

Toward that end, in April 2012, the Debtor signed a power of attorney granting extensive authority over his financial affairs to his mother, Tr. I at 113–17; Ex. SS, and perhaps to his father as well.

While two powers of attorney were admitted into evidence, the Debtor testified that he signed only one of them and that his signature was copied on the other, but he did not know which one was the original. Tr. I at 113–17. Mrs. Johnson testified that the Debtor signed the power of attorney granting her authority to act on his behalf, and that a second power of attorney was then prepared granting authority to both her and Mr. Johnson, but she was not clear about whether the Debtor had consented to his signature being placed on the second power of attorney. KJ Dep. at 274. According to the Debtor, the powers of attorney were consistent with his intent at the time to delegate authority to both his mother and father to handle his financial affairs. Tr. I at 117, 119. In any event, Mrs. Johnson (and perhaps Mr. Johnson, depending on whether the Debtor gave his father a power of attorney) received authority, among other things, to "execute all instruments and do all things in respect to all matters, businesses, affairs or properties of any description . . . to the same extent that [the Debtor could] do it present and active" and to "sign, endorse, execute and deliver . . . promissory notes . . . or other evidences of indebtedness. . . ." Ex. SS. Both powers of attorney also granted authority to "withdraw any and all funds that may be deposited now or hereafter in [the Debtor's] name in checking, savings . . . and any and all other accounts of any kind or nature" and to "take possession of any and all monies . . . belonging to [the Debtor and] to draw, collect and receive any and all monies on deposit to [his] credit in any bank or savings institution." *Id.*

■ The Johnsons also had access to the Bank Accounts into which the Debtor's

---

15. A copy of the Player Contract was admitted into evidence as Exhibit 6. The Debtor came to the Columbus Blue Jackets from the Los Angeles Kings in February 2012 via an assignment of the Player Contract. Tr. I at 45; Stips. ¶ 1.

income was deposited, Ex. EE, YY; JJII Dep. at 75–76, and it was Mrs. Johnson, not the Debtor, who closely monitored the Bank Accounts. KJ Dep. at 275–76; JJII Dep. at 73–74. Although the Johnsons may have viewed their access to the Debtor's income in part as a means to repay themselves for the sacrifices they had made for their son's career, their primary goal was the same as his. According to Mrs. Johnson, she and her husband intended to help their son to "borrow against the [Player Contract] and have a large sum of money that would be available for investments that would have potential earnings sooner rather than later." KJ Dep. at 95. Mr. Johnson described it this way: "We were always looking to make investments and it was always our goal . . . to make some investments and . . . set [the Debtor] up beyond hockey." JJII Dep. at 33.[16]

Although they both are college educated,[17] neither of the Johnsons have any training or experience in the fields of investing or financial planning. KJ Dep. at 48–63, 263. Mr. Johnson had been a school teacher and an employee of a company in the automotive industry, while Mrs. Johnson had worked in office automation for some time, after which she raised the Debtor and his brother and worked odd-jobs. JJII Dep. at 33; KJ Dep. at 52, 62–63. Proceeding without any background in finance, the Johnsons focused their investment efforts on real estate, life insurance, diamonds and gold, KJ Dep. at 155, 282; JJII Dep. at 55, 66–67, all the while facilitating their son's incurrence of debt to the Objecting Creditors.

 The Debtor also incurred debt to creditors other than the Objecting Creditors both for investment and consumer purposes. Ex. 17. As of the Petition Date, the Debtor had accumulated total indebtedness of $21,343,723.64.[18] One-half of that amount is $10,671,861.82. The Court accordingly can find that the Debtor's debt is primarily consumer in nature only if the Objecting Creditors carry their burden of proving that more than $10,671,861.82 of his debt was incurred

16. When analyzing whether debts such as those owed to the Objecting Creditors are consumer debts, courts have commonly applied the "profit motive" test. *See Swartz v. Strausbaugh (In re Strausbaugh)*, 376 B.R. 631, 637 (Bankr.S.D.Ohio 2007). "The profit motive test determines that debt is not consumer debt if the debt was incurred with an eye toward profit. . . . The profit motive analysis is used, and is clearly appropriate, to determine whether a debt falls outside the category of consumer debt." *IRS v. Westberry (In re Westberry)*, 215 F.3d 589, 593 (6th Cir. 2000) (internal quotation marks omitted). "A transaction is not a consumer debt when it is incurred with a profit motive." *Jennings v. Bodrick (In re Bodrick)*, 509 B.R. 843, 859 (Bankr.S.D.Ohio 2014); *see also Zolg v. Kelly (In re Kelly)*, 841 F.2d 908, 913 (9th Cir.1988) ("Debt incurred for business ventures or other profit-seeking activities is plainly not consumer debt for purposes of section 707(b).").

17. The Debtor testified during a deposition in January 2014 that his father had graduated from Michigan State University, Ex. NN at 34, and Mrs. Johnson testified that she graduated from the University of Michigan. KJ Dep. at 48.

18. The Court calculated this amount by adding together two subtotals. The first is the aggregate dollar amount of the proofs of claim filed in the Debtor's case ($21,156,-831.22). The second is the aggregate dollar amount of those claims for which no proof of claim was filed, but that the Debtor: (a) included on Schedules D, E and F of his amended schedules of assets and liabilities (the "Amended Schedule(s)") (Ex. 4); and (b) did not mark as "contingent," "unliquidated" or "disputed" ($186,892.42). Claims scheduled in this fashion must be included in the calculation because creditors whose claims were so scheduled need not file proofs of claim in order to have allowed claims. Fed. R. Bankr. P. 3003(b)(1).

primarily for a consumer purpose. For the reasons explained below, the Court finds that the Objecting Creditors have failed to carry their burden of proving that the Debtor's consumer debt exceeds that amount. In making this finding, the Court first considers the obligations owed to creditors other than the Objecting Creditors and then analyzes the debt owed to them.

### 2. Debt Owed to Creditors Other than the Objecting Creditors

An individual identified as Francis Garey ("Garey") filed Claim No. 19–1 in the amount of $2,947,000 for the "Purchase of stock of MDG Enterprises," Ex. 12, and a limited liability company known as FJ Group, LLC ("FJ") filed Claim No. 20–1 in the amount of $1,578,750 on account of the "Guaranty of Purchase of Condominium in Sunset Beach, CA." Ex. 13. Consistent with the Debtor's testimony that his parents were investing on his behalf, the Debtor represented on Schedule B of his Amended Schedules that the claims asserted by Garey and FJ were based on *"loans to purchase two investment properties* : (a) a condominium in Sunset Beach California owned by an entity [Garey] controls known as FJ ... and (b) a hotel in Hot Springs, Arkansas owned by an entity she controlled known as MDG Enterprises, Inc." Ex. 4 at 14 (emphasis added). The Debtor has characterized the debts owed to Garey and FJ as non-consumer debts. Ex. 17 at 2. A debt incurred with an investment motive is a non-consumer debt, and the information provided both in the Garey and FJ proofs of claim and in the Debtor's Amended Schedule B demon-

strates that any debts owed to Garey and FJ fit the bill. Despite having the burden of proof, the Objecting Creditors have not produced any evidence suggesting that the debts owed to Garey and FJ are anything other than nonconsumer obligations. The Court therefore finds that the claims asserted by Garey and FJ in the aggregate amount of $4,525,750 must be counted on the non-consumer debt side of the ledger.

The aggregate amount of debt owed to creditors other than Garey, FJ and the Objecting Creditors is $2,667,300.44, a number derived by starting with the total claim amount ($21,343,723.64) and subtracting the amount of claims asserted by the Objecting Creditors ($14,150,673.20) and by Garey and FJ ($4,525,750). The Debtor concedes that more than $1.6 million of this debt is consumer debt, Ex. 17 at 5, and the Court will assume for the sake of argument only that the entire amount of the debt owed to creditors other than Garey, FJ and the Objecting Creditors (i.e., $2,667,300.44) is consumer debt.[19]

### 3. Debt Owed to the Objecting Creditors

Subtracting $2,667,300.44 from $10,671,861.82 (one-half of the amount of the Debtor's total debt) leaves $8,004,561.38. Thus, if the entire $2,667,300.44 amount of the debt owed to creditors other than Garey, FJ and the Objecting Creditors is assumed to be consumer debt, then the Objecting Creditors would need to prove that $8,004,561.38 of the debt owed to them is primarily consumer debt in order to carry their burden. As explained below, however, the Object-

19. This assumption may not be warranted, because the Debtor has characterized his tax obligations in the category of consumer debt. Ex. 17 at 5. After noting that "[t]here is nothing inherent in [the profit motive] test, or direction from the Bankruptcy Code to sug-

gest, that the test defines the *only* category of non-consumer debt," the Sixth Circuit held in *Westberry* that an income-tax obligation does not constitute consumer debt. *Westberry,* 215 F.3d at 593.

ing Creditors have failed to prove by a preponderance of the evidence that the debt owed to any one of the Objecting Creditors is primarily consumer debt.

 The Debtor contends that the Court may rely on his Amended Schedules in determining whether a debt owed to an Objecting Creditor is consumer or non-consumer debt, checking only to confirm that he filed the Amended Schedules in good faith, as the Court did in assessing the nature of the debt owed to Garey and FJ. That is an appropriate approach when the debt is described on the schedules in such a way that its nature can be determined and there is no allegation of bad faith on the part of the debtor.[20] But unlike the debt owed to Garey and FJ, some of the debt owed to the Objecting Creditors is not described on the Amended Schedules in a manner that provides the Court with a basis to determine whether it was incurred primarily for a consumer or non-consumer purpose. And to the extent that the Amended Schedules describe the debt owed to an Objecting Creditor as non-consumer debt, the Objecting Creditors have questioned the Debtor's good faith in so characterizing it, contending that the Debtor identified his debt as primarily non-consumer debt so that he could later argue that § 707(b) would not apply if his case were converted to Chapter 7.

Under these circumstances, the only way the Court can assess whether the Debtor characterized a debt owed to an Objecting Creditor as non-consumer debt in good faith is by looking outside the Amended Schedules. Thus, in determining the primary purpose for which the Debtor incurred debt to the Objecting Creditors, the Court will consider four types of evidence: (1) the testimony of the Debtor and his parents regarding their purpose in incurring the debt to the Objecting Creditors generally; (2) the specific testimony regarding their intent in taking out loans with particular Objecting Creditors; (3) the provisions of the loan documents regarding the purpose of the loans; and (4) the actual use to which the Debtor and his parents put the funds borrowed from the Objecting Creditors.

### 4. The Testimony of the Debtor and the Johnsons Generally

Trusting his parents implicitly, the Debtor permitted them to handle his investments and other financial affairs while he focused on hockey. Tr. I at 53–54. He also allowed them to use his earnings from playing hockey to meet their needs—and those of his younger brother—for consumer goods and services. He did so because his father had earned no more than approximately $15,000 a year since 2007, and his mother had worked only odd jobs since 2003. JJII Dep. at 12–13; KJ Dep. at 62; Tr. I at 55. Recalling the efforts his parents had made over the years to help him achieve success, the Debtor was happy to assist them financially:

> I wanted to take that chance to pay back my mom and dad for all the sacrifices and opportunities they gave me to get me where I was. And I was perfectly fine with them, you know, being able to pay the bills with that, live comfortably until they got back on their feet. And that was my opportunity to pay them back. So, yes, they were—*it was intended that they would live off my—my income and my salary.*

Tr. I at 113 (emphasis added); *see also* Tr. I at 85, 154. Because loan proceeds are not income and salary, the Debtor's testimony establishes that his intent was that

20. *See U.S. Tr. v. Mohr,* 436 B.R. 504, 510 (S.D. Ohio 2010) (citing *Comprehensive Accounting Corp. v. Pearson (In re Pearson),* 773 F.2d 751, 756 (6th Cir.1985)).

his family pay for consumer goods and services using his income from playing hockey, not using funds borrowed from the Objecting Creditors.

As described in more detail below, the Debtor concedes having personally signed the loan documents with RFF, Blum and Capital Financial as well as a settlement agreement with Pro Player. He did not testify whether he signed the original loan documents with Pro Player or the promissory notes issued to Capital Holdings and EOT, each of which include a signature for "John Joseph Louis Johnson, III." Ex. 10 at 6; Ex. 15 at 9; KJ Dep. Ex. 3. Nor did he testify whether he signed the promissory note for the Cobalt loan, which includes a signature for "John Johnson" on behalf of Johnson MVP Sports, LLC ("Sports LLC") and as guarantor of Sport's LLC's obligations. Ex. 9 at 19.

If one of the Debtor's parents (rather than the Debtor) signed any of those documents on his behalf,[21] and if they intended to cause the Debtor to incur debt to the Objecting Creditors for consumer purposes contrary to his intent, then there would be a question whether, given the cross-purposes of the Debtor and the Johnsons, the debt so incurred was consumer or non-consumer debt. But here that question need not be answered, for the Court finds that the Objecting Creditors have failed to show by a preponderance of the evidence that the Johnsons' primary purpose was to use the borrowed funds to purchase consumer goods and services. Again, Mrs. Johnson testified that she and her husband intended to help their son to "borrow against the [Player Contract] and have a large sum of money

that would be available for investments that would have potential earnings sooner rather than later." KJ Dep. at 95; *see also* KJ Dep. at 67 ("[O]ur entire purpose from the start was to invest this money and make it grow."). Likewise, Mr. Johnson testified that "[they] were always looking to make investments and it was always [their] goal ... to make some investments and ... set [the Debtor] up beyond hockey." JJII Dep. at 33.

Indeed, the Objecting Creditors themselves would have the Court find that "[i]nitially, [the Johnsons'] stated purpose [in facilitating the Debtor's incurrence of debt] was to take advances on the Debtor's salary and make investments to provide for the whole family—to take care of their bills and living expenses." Creditor Findings & Conclusions ¶ 20. The Objecting Creditors also would have the Court find that the Johnsons "began to look to 'make some money and some investments,' to cover payments on the existing borrowings" and that they "worked through brokers to take additional advances ... from new lenders, both to make existing debt service payments and in an effort to consolidate the existing debt." *Id.*

True, as discussed in more detail below, the Johnsons appear to have diverted some of the borrowed funds from investment purposes to consumer uses. As also explained below, however, the evidence does not support the Objecting Creditors' contention that the Debtor and his parents used more than one-half of the loan proceeds for consumer purposes. The Court therefore cannot find that their primary intent was to use the borrowed funds for

---

21. Notwithstanding the power of attorney that the Debtor granted his mother (and possibly his father), Mrs. Johnson testified that she did not sign any loan documents with the Objecting Creditors on the Debtor's behalf, KJ Dep. at 135, and his father testified that he did not recall signing the Debtor's name on loan documents with the Objecting Creditors, JJII Dep. at 30.

the purchase of consumer goods and services.

### 5. Specific Testimony Relating to the Intent of the Debtor and the Johnsons/the Provisions of the Loan Documents Regarding the Purpose of the Loans

In addition to the testimony of the Debtor and his parents regarding their intent generally, other evidence supports the Court's finding that the Objecting Creditors have failed to carry their burden of proving that the Debtor's debts to them were incurred primarily for a consumer purpose. This additional evidence includes testimony of the Debtor and the Johnsons regarding their purpose in taking out particular loans as well as the provisions of the loan documents.

The Debtor specifically testified regarding his investment purpose with respect to the promissory note that he issued to Blum on or about March 10, 2011 (the "Blum Note"), which was the first time he borrowed funds from one of the Objecting Creditors. According to the Debtor, "at the time [of] the first loan ... with Rodney Blum, it was for investment purposes." Tr. I at 56; *see also* Tr. I at 81 ("I thought that it was being invested in investments and it would be paid—it would be paid back accordingly."). Although the Debtor concedes having signed the Blum Note, Tr. I at 61–62, 75–76, he testified that he did not read the note, but instead just signed the signature page when his mother "gave [him] this page to sign in the hotel lobby as [he] was leaving for pregame skate." Tr. I at 62. But if he had read the Blum Note, he would have found that its stated purpose was consistent with his understanding of the reason for the borrowing.

The Blum Note recites that "[t]he purpose of this loan is for Blum to assist and finance [the Debtor] in obtaining a life insurance policy ..., a disability insurance policy ..., and making financial investments exclusively with financial advisor Chad M. Breen, CFP of Breen Financial Services, Inc. of Dubuque, Iowa [ ("Breen") ]...." Ex. 11 (a copy of the Blum Note attached to Blum's proof of claim).

Further evidence that the loan from Blum was for investment purposes is the existence of the securities account maintained at the Sammons Securities Company, LLC in the name of the Debtor (the "Sammons Securities Account"). The account statements for the Sammons Securities Account identify Breen as the registered representative and "Long Term Growth" as the investment objective. Ex. BB at 2559. By the end of March 2011, a few weeks after the Debtor signed the Blum Note, the Sammons Securities Account had a value of $559,960.52. Ex. BB at 2503. Like the Debtor, Mr. Johnson testified that he believed that the proceeds of the Blum Note were to be used for investment purposes—in particular, to purchase life insurance policies and fund a securities account. JJII Dep. at 33–34, 36, 41. Mr. Johnson testified that Breen advised the Johnsons that their investments with him were "better than putting your money in the stock market" and that their return should be "ten percent or up." JJII Dep. at 38.[22] Based on all this evidence, the Court finds that the Blum Note gave rise to non-consumer debt of the Debtor. The Court further finds this evidence to be definitive with respect to the purpose of the Blum Note, meaning that the amount of nonconsumer debt on ac-

**22.** The Court finds that Mr. Johnson believed that Breen so advised him, but is making no finding as to whether Breen actually did so.

count of the Blum Note is the amount of the proof of claim filed by Blum, $1,171,941.60. Ex. 11.

Likewise, evidence supporting the non-consumer nature of the promissory note the Debtor issued to RFF (the "RFF Note") is definitive. The RFF Note, a copy of which is attached to RFF's proof of claim (Exhibit 8), was an amendment and restatement of promissory notes issued to RFF in August and October 2013. Ex. 8, RFF Note at 1. Dated January 21, 2014, the RFF Note states that "the funds being loaned in accordance with the terms of this Note are being used exclusively for commercial purposes and none of the funds being loaned in accordance with the terms of this Note are being used for personal, family, or household purposes." Ex. 8, RFF Note at 6. The RFF Note also provides that the proceeds of the RFF Note were to be used for two purposes: (1) to pay the Debtor's debt to EOT; and (2) to "obtain a Standby Letter of Credit and funds from a Joint Venture Project Agreement between Borrower [i.e., the Debtor, the Johnsons and Team Johnson Investments, LLC] and Tri–Star Investment Capital and/or Barclays Bank PLC Jersey, National Bank of Abu Dhabi, and SAMBA." Ex. 8, RFF Note at 1. The Debtor concedes having signed the RFF Note on his own behalf, and it appears that he signed it on behalf of Team Johnson Investments, LLC as well. Ex. 8, RFF Note at 8; Tr. II at 67, 71–72. His under-standing was that the loan was to be used for investment purposes, Tr. II at 56, an understanding shared by Mr. Johnson. JJII Dep. at 80–82. During the Hearing, RFF's own counsel appeared to confirm this understanding. Referring to the RFF Note, he asked the Debtor: "It was an investment loan. Correct?" Tr. II at 69. The Debtor responded that it was indeed an investment loan. *Id.* As reflected in the proof of claim filed by RFF, the Court finds that the additional amount of non-consumer debt on account of the RFF Note is $1,700,402.19.[23]

Although not as definitive as the evidence with respect to the loans received from Blum and RFF, evidence in addition to the general testimony of the Debtor and the Johnsons suggests that the loans received from Pro Player, Cobalt and EOT also were non-consumer loans. With respect to the Pro Player loan taken out in April 2011, Mrs. Johnson testified that it had an investment purpose, KJ Dep. at 303, and Mr. Johnson specifically testified that the purpose of the Pro Player loan was to invest in a life insurance policy. JJII Dep. at 39. This testimony is uncontroverted, and neither the April 2011 Pro Player loan documents nor any other documentary evidence contradicts it.[24] The loan on which Cobalt grounds its $1,299,627 claim was documented by the execution of a "Business Loan Agreement and Guaranty" dated December 22, 2011 on which Cobalt was the lender, Sports

23. In an adversary proceeding commenced by RFF against the Debtor after he filed the Conversion Motion, Adv. Pro. No. 15–2117, the Debtor filed a counterclaim (Adv. Doc. 7) in which he seeks a declaration that the RFF Note is usurious under a provision of the California State Constitution providing that " 'any loan or forbearance of any money, goods, or things in action, *if the money, goods, or things in action are for use primarily for personal, family, or household purposes''* shall not exceed 10% per annum." Adv. Doc. 7 ¶ 21 (emphasis added). By contrast, in support of the Conversion Motion, the Debtor has argued that the proceeds of the RFF Note were not used primarily for personal, family or household purposes. The Court finds this inconsistency on the Debtor's part to be inexplicable.

24. The Pro Player loan documents are attached as part of Exhibit 3 to the deposition of Mrs. Johnson.

LLC was the borrower, and the Debtor was the guarantor of Sports LLC's obligations. Ex. 9 (Cobalt's proof of claim). Although neither the Debtor nor the Johnsons testified specifically about this loan, the Business Loan Agreement and Guaranty expressly stated that the purpose of the loan was to provide Sports LLC with "capital to cover expenses incurred, or to be incurred, primarily for business and commercial purposes." *Id.* Similarly, the promissory note issued to EOT in September 2013, on account of which EOT asserts a claim in the amount of $632,672.30, stated that the Debtor "agrees that no advances under this Note will be used for personal, family or household purposes." Ex. 15 (EOT note at 4, copy attached to EOT's proof of claim).

In light of the fact that the Debtor contends that all of the debt owed to the Objecting Creditors is non-consumer debt, and given the Objecting Creditors' burden of proof, there is absolutely no evidentiary support for a finding that the debts owed to Pro Player, Cobalt and EOT were incurred primarily for consumer purposes. The same holds true for the Debtor's obligation to Capital Holdings, which arose out of a promissory note issued to The One Source Enterprises, LLC ("One Source"). Ex. 10. The One Source note does not include any provision delineating the purpose of the loan, and neither of the Johnsons seemed familiar with One Source. KJ Dep. at 310; JJII Dep. at 18. But again, given where the burden of proof lies, the Court cannot find that the debt owed to One Source (now Capital Holdings) was incurred primarily for consumer purposes.

That leaves Capital Financial. On or about April 15, 2014, the Debtor executed a promissory note in favor of Capital Financial in the original principal amount of $3.4 million and also signed the other Capital Financial loan documents (collectively, the "Capital Financial Loan Documents"). Ex. 14; Tr. I at 156–57. The Debtor signed the Capital Financial Loan Documents in Columbus, Ohio. Ex. 14 at 11 (showing an Ohio notary's signature on promissory note). He recalled the day he signed the Capital Financial Loan Documents in some detail:

> It was at a FedEx or some—excuse me, a UPS on High Street [in Columbus, Ohio]. My mom was in town. She printed off a document. The person there was a notary. My mom printed off the signature page. Will Allen pulled up in an SUV, got out. I signed it, handed it back to him. My understanding of that at the time was it was a restructuring of the original loan. That was my understanding of what I was signing at the time.

Tr. I at 155–56. When the Debtor signed the Capital Financial Loan Documents, "it was [his] understanding ... [that he was] restructuring [a prior] loan to benefit [him and his parents], to help make more of a profit for investments." Tr. 1 at 156. There is nothing in the Capital Financial Loans Documents that rebuts this testimony by the Debtor.

The loan being restructured through the execution of the Capital Financial Loan Documents actually was a series of loans made by an affiliate of Capital Financial, Capital Financial Partners, LLC ("Capital Partners"). According to Capital Financial's proof of claim, the Capital Financial Loan Documents "enabled the Debtor (a) to refinance the then outstanding amounts due from the Debtor to ... Capital Partners ... in connection with four separate loans made by ... Capital Partners ... to the Debtor on July 10, 2012, July 30, 2012 (two loans made on this date) and November 1, 2012, and (ii) to borrow an additional amount equal to $500,000." Ex. 14 at 3.

The documents evidencing the loans the Debtor previously received from Capital Partners are not in evidence. But in support of their argument that the loans gave rise to a consumer debt, the Objecting Creditors rely on a deposition of the Debtor taken on January 29, 2014 (before the Debtor signed the Capital Financial Loan Documents) in connection with litigation commenced by Capital Partners against the Debtor. *See* Ex. NN. Testifying about loan documents with Capital Partners that he was shown during the deposition, the Debtor acknowledged that the documents indicated that he had borrowed $410,000 from Capital Partners in July 2012 and had borrowed $1.4 million from Capital Partners in November 2012. Ex. NN at 21–24, 40, 42–43.

The Objecting Creditors ask the Court to find that the Debtor's debt to Capital Financial is primarily consumer debt because he testified during the January 2014 deposition that the loans made by its affiliate Capital Partners in 2012 were "used to pay 'family debts.' " Creditor Findings & Conclusions ¶ 43. Indeed, the Debtor stated during the deposition that the Capital Partners loans made in 2012—or at least those made in July 2012—were taken out because "[the Debtor and his parents] were in debt and looking to [right] some wrongs financially," and he also testified that the proceeds of the loans were intended to be used for "numerous things, medical things. Things accumulated prior to [his] professional career." Ex. NN at 16. But the import of that testimony is limited. The Debtor's deposition testimony is ambiguous and could be construed as relating only to the July 2012 loans, not the loan Capital Partners later made to the Debtor when, on November 1, 2012, he issued Capital Partners a new (and larger) note in the principal amount of $1.4 million. As the Debtor testified during his deposition, he signed the documents for the $1.4 mil-

lion loan while he was in Florida. Ex. NN at 19, 72–73, 78–79, 101–04.

During the Hearing, the Debtor described in some detail the circumstances surrounding his execution of the Capital Partners loan documents in November 2012 and why he believed that the loan was obtained for investment purposes. According to the Debtor, "at the time when we had taken out the loan [with Capital Partners while he was in Florida in November 2012], it was my understanding it was for investments." Tr. I at 126. "Simon Vo and a broker named [Maurice] Taylor were present. I flew down to Florida with my mother, and I signed—signed signature pages there. And at lunch they explained to me that it was for investment opportunities. And I believe Simon Vo even talked about investing in oil fields." Tr. I. at 126; *see also* Ex. NN at 20 ("Maurice Taylor was at the signing. Simon Vo met us for lunch prior to the signing.").

Even if the Debtor and the Johnsons intended to use some of the proceeds of the July and November 2012 Capital Partners loans to pay off pre-existing consumer debt, there is no evidence that their primary purpose was paying off such debt or that they used more than one-half of the proceeds to do so. Moreover, the Capital Financial Loan Documents, not the documents evidencing the 2012 Capital Partners Loans, are the documents on which Capital Financial's claim rests, and the Debtor testified that when he signed the Capital Financial Loan Documents, "it was [his] understanding ... [he was] restructuring [a prior] loan to benefit [the Debtor and his parents], to help make more of a profit for investments." Tr. 1 at 156. In short, the Debtor's deposition testimony on which the Objecting Creditors rely does indeed conflict with his Hearing testimony in some respects. But after giving due

consideration to all the evidence, the Court cannot find by a preponderance of the evidence that the debt reflected in the proof of claim filed by Capital Financial in the amount of $3,429,750 is a consumer obligation.

In sum, neither the testimony of the Debtor and his parents nor the loan documents that are in evidence support the Objecting Creditors' position that the Debtor's debts are primarily consumer in nature. The Objecting Creditors did not introduce any testimony from their own representatives or point to provisions of the loan documents evidencing a consumer purpose for the loans. Despite this, the Objecting Creditors ask the Court to find that the Debtor's and the Johnsons' primary purpose in taking out the loans was to facilitate consumer spending, contending that the intent was "to provide for the whole family—to take care of their bills and living expenses." Creditor Findings & Conclusions ¶ 20. But the possibility that the Debtor and the Johnsons intended to use earnings from the investments to pay their bills and living expenses does not transform obligations incurred for investment purposes into consumer debts. A debt incurred for the purpose of making a profit from an investment is a non-consumer debt even if the use to which the profits are intended to be put is a consumer purchase.[25] The Court therefore finds no merit in the Objecting Creditors' contention that "as a factual matter, it can be argued that investments to generate funds for retirement or family expenses as testified to here are therefore inherently obli-

gations incurred for consumer purposes." Creditor Findings & Conclusions at 17 n.9.

The Objecting Creditors also point out that the Johnsons failed to "compare the amount of interest on their borrowings with the rate of return on their alleged investments." Creditor Findings & Conclusions ¶ 20. While Mr. Johnson conceded their failure in this regard, JJII Dep. at 38, it does not necessarily establish that the Johnsons were acting as anything other than investors. The same goes for the proposed finding that the Johnsons "have shown no background or expertise in the area [of investing in diamonds], notwithstanding that diamond investments are pretty sophisticated...." Creditor Findings & Conclusions ¶ 28. The fact that the Johnsons attempted to invest on their own without experience or training and without conducting due diligence is indicative of a poor investment strategy, not consumer borrowing.

### 6. The Use of the Loan Proceeds

The amount of the loan proceeds (the "Loan Proceeds") identified on the Objecting Creditors' proofs of claim is $13,662,500 (i.e., the principal amount of the loans), broken down as follows: $2 million from Blum;[26] $3 million from Pro Player; $1 million from Cobalt; $2 million from Capital Holdings; $1,862,500 from RFF; $400,000 from EOT; and $3.4 million from Capital Financial. See Exs. 8–11, 14–16 (proofs of claim filed by the Objecting Creditors). The Objecting Creditors contend that the purpose of the Debtor and the Johnsons in borrowing

---

25. See Bodrick, 509 B.R. at 859 ("Investments are, as a basic premise, made with the end goal of achieving a return, or profit, on an initial investment. Although [the plaintiff] testified that the purpose of the investment was to eventually fund his daughter's education, his actions were clearly motivated by profit.").

26. While the Blum Note stated that it was for a principal amount of "up to" $2 million, a Promissory Note Modification Agreement and other documents attached to Blum's proof of claim identify the principal amount of the loan as $2 million. Ex. 11.

funds from the Objecting Creditors "is amply demonstrated here by the actual use [of the Loan Proceeds], which was to purchase primarily personal, family, or household consumer goods and services." Creditor Findings & Conclusions ¶ 73.

If the Objecting Creditors' contention that the Loan Proceeds were used primarily for consumer purposes was accurate, then the Court would need to consider whether the actual use of the Loan Proceeds by the Debtor and his parents is indicative of their purpose in incurring the debt. But the Court need not consider that issue here. For when one closely scrutinizes the evidence—including the Bank Statements—it becomes clear that Schedule 1 does not come close to supporting the Objecting Creditors' allegation that the Loan Proceeds were used predominately for consumer purposes.

The Debtor testified that he intended that his and his family's living expenses would be met using his income, and the Objecting Creditors have introduced no evidence that the Debtor or his parents failed to use his earnings for that purpose. Accordingly, any calculation of the amount of the Loan Proceeds that they used for consumer purposes must first factor in the amount of income the Debtor received and that therefore was available to them to pay for consumer goods and services. Based on the evidence of record, the Court can calculate the *minimum* amount of income the Debtor and the Johnsons would have had available to use for consumer purposes from March 10, 2011 —the date he first borrowed funds from an Objecting Creditor (Blum)—through the Petition Date (the "Borrowing Period"). Under the Player Contract, the Debtor was entitled to receive a signing bonus of $1 million in July 2011, Ex. 6 at 12, and the Debtor testified that he received the bonus. Tr. I at 77; Tr. II at 62. He would have received at least $420,000 from the signing bonus, because other evidence supports a finding that the Debtor generally received approximately 42% of his salary as net income.[27] It is possible, of course, that the deductions from the signing bonus were not as high as the deductions from his salary and that the Debtor therefore received more than $420,000 of the $1 million bonus.

In addition to the signing bonus, net salary in an amount of at least $749,560.18 was directly deposited into the Bank Accounts by the Los Angeles Kings and the Columbus Blue Jackets after the Borrowing Period began.[28] At first glance, net income in the amount of $749,560.18 appears to be quite low given that the Debtor's gross annual salary was $2.5 million for the 2011–12 season, $3.5 million for the next two seasons, and $5 million starting in the 2014–15 season. Ex. 6 at 13. The seemingly low amount of the net income deposited into the Bank Accounts is at least partially explained by several factors, including: (a) withholdings for income taxes and players dues, Tr. I at 173; (b) contributions to the Debtor's retirement plans, Ex. 4 at 5 (identifying interests in two 401(k) plans aggregating $303,907 in value); (c) his loss of income during the

---

27. This percentage is derived from the Debtor's testimony. As of the date of the Hearing, he had three years left on the Player Contract and was due to be paid a gross salary of $5 million per year, or $15 million in total. Tr. I at 173; Ex. 6 at 13. The Debtor's uncontroverted testimony established that his net income during the three-year period would be $6.3 million. Tr. I at 173. Given that the Debtor's gross income under the Player Contract for the three-year period was slated to be $15 million, his net income of $6.3 million would constitute 42% of his gross income.

28. *See* Ex. Y at 2645, 2649; Ex. AA at 1378, 1402, 1447, 1454, 1462, 1471, 1479, 1492, 1501; Ex. EE at 1944, 1946.

2012–13 NHL lockout, Tr. I at 170–71; Ex. NN at 13–14, 58–59; and (d) salary paid to certain of the Objecting Creditors through garnishments, *see infra* Part IV.C.2. It is possible that the Debtor actually received more than $749,560.18 in net salary during the Borrowing Period, because he testified that "escrow is taken out [of the players' paychecks] every year and we get a certain amount back throughout the course of the year," Tr. I at 80, but the Court does not have the information it would need to determine the amount of payments the Debtor received from the escrow account during the Borrowing Period.

Adding the minimum amount of the signing bonus the Debtor would have received ($420,000) to the minimum amount of net salary the Bank Accounts demonstrate were deposited into the Bank Accounts ($749,560.18), the result is $1,169,560.18. Thus, $1,169,560.18 is the *minimum* net amount of income that was available to the Debtor and his parents for them to use for consumer purposes during the Borrowing Period. The Objecting Creditors have introduced no evidence that the Debtor or his parents failed to use this amount of earnings for consumer purposes.

The calculation of the amount of Loan Proceeds used for consumer purposes next must take into account the expenditures made by the Debtor and his parents. On Schedule 1, the Objecting Creditors purport to identify $8,195,739.61 of expenditures from the Bank Accounts that allegedly were used by the Debtor or the Johnsons for consumer purposes. Assuming for the sake of argument that the entire $8,195,739.61 set forth on Schedule 1 was used to purchase consumer goods or services, and again assuming that $1,169,560.18 was the minimum amount of net income available to the Debtor and his parents during the Borrowing Period,

then the Court could calculate the amount of the Loan Proceeds that were used for consumer purposes as follows: $8,195,-739.61—$1,169,560.18 = $7,026,179.43. And that amount would exceed one-half of the Loan Proceeds of $13,662,500 (i.e., $6,831,250). Thus, under this analysis, if the Objecting Creditors had proved that the Debtor and the Johnsons expended all $8,195,739.61 on consumer goods and services and that $1,169,560.18 was the amount of net income available to the Debtor and his parents during the Borrowing Period, then the Court could find that they used more than one-half of the Loan Proceeds for consumer purposes.

In other words, the Objecting Creditors' best-case scenario for the amount of Loan Proceeds used by the Debtor and the Johnsons for consumer purposes is based on the following calculation: $8,195,739.61 (the purported consumer spending set forth on Schedule 1)—$1,169,560.18 (the *minimum* amount of the Debtor's net income available during the Borrowing Period) = $7,026,179.43. Every dollar that should not be included in the $8,195,739.61 amount due to a lack of evidence that the dollar was spent on consumer goods and services—and every dollar of the Debtor's income that should be included in the amount of the Debtor's earnings but has not been because the Objecting Creditors (who have the burden of proof) have failed to make the Court aware of it—moves the Objecting Creditors further away from proving their point. And they will not have proved their point at all if they are off by $194,929.43, which is $7,026,179.43 (the total amount of Loan Proceeds potentially used for consumer spending) minus $6,831,250 (one-half of the total Loan Proceeds).

The Objecting Creditors have failed to carry their burden of proof for two reasons. First, the Objecting Creditors have

not established the amount of net income that was available to the Debtor and his parents to use for consumer purposes during the Borrowing Period. Every dollar of additional income available to the Debtor during the Borrowing Period (e.g., from the return of escrowed salary or the receipt of more than 42% of his bonus, or because he had funds in the Bank Accounts from his income he earned before the Borrowing Period) would be one dollar less of Loan Proceeds that he or his parents would have needed to use for consumer purposes. For example, if he received $194,929.43 more from the signing bonus than the $420,000 the Court calculated above, then the Objecting Creditors would have failed to carry their burden for that reason alone. And when he was asked by counsel for one of the Objecting Creditors whether he "received a million dollar signing bonus" in July 2011, the Debtor answered in the affirmative. Tr. II at 62. The failure of the Objecting Creditors to present evidence establishing the *actual* amount of net salary and bonus available to the Debtor and his parents to use for the purchase of consumer goods and services during the Borrowing Period means that the Objecting Creditors have failed to carry their burden of proving that the Debtor and the Johnsons used more than one-half of the Loan Proceeds for consumer purposes.

Second, although the Debtor identified mistakes on Schedule 1 aggregating less than the $194,929.43 amount calculated above, see Mot. to Strike at 5–6, the Court finds that the Objecting Creditors actually overstate their case *by nearly $4 million.* The purported expenditures that are not supported by the evidence arise from multiple errors on the part of the Objecting Creditors.

### a. Amounts Predating the First Loan from an Objecting Creditor

Blum was the first Objecting Creditor to make a loan to the Debtor, and he did not advance funds until March 2011. Thus, no Loan Proceeds would have been available for the Debtor and his parents to use for a consumer purpose—or any purpose, for that matter—until March 2011. Despite this, the Objecting Creditors include a significant number of payments from 2010 in Schedule 1. Of course, those amounts were paid to third parties or withdrawn from the Bank Accounts well before any of the Objecting Creditors loaned the funds that they contend were used for consumer purposes. Due to the inclusion of amounts from 2010, the Objecting Creditors' case potentially is overstated by an additional $885,105.57.[29] App. I.[30]

In calculating the total amount of debt incurred by the Debtor and the Johnsons (Schedule 1 Part A), the Objecting Creditors take into account "returns" totaling $129,560.35. But Schedule 1 fails to show

---

29. The $885,105.57 amount includes all amounts paid or withdrawn in 2010 that are listed on Schedule 1. The Court discusses additional overstated amounts in certain of the other categories below. In order to avoid double-counting, amounts from 2010 have not also been included in these other categories.

30. Certain information supporting the Court's calculations are presented in unpublished appendices (each cited as "App. __") that, due to their length, are being filed together as a separate document. Appendix I extracts from

Schedule 1 the amounts and verbatim descriptions that the Objecting Creditors provided with respect to payments and withdrawals made in the year 2010. The Court determined the entries on Schedule 1 that reflect 2010 expenditures or withdrawals by comparing the Bates numbers on Schedule 1 to the Bates numbers for the Bank Statements covering the year 2010: Ex. Y at 2662–2709, Ex. Z at 2711–2773, Ex. CC at 2027–2053, Ex. DD at 2281–2293, Ex. EE at 1897–1931, Ex. GG at 2189–2212 and Ex. HH at 2112–2126.

what was returned and when those returns were made. Even in the highly unlikely event that all the returns the Debtor and the Johnsons made relate to 2010 purchases the Objecting Creditors' case still is overstated by $755,545.22 ($885,105.57 minus $129,560.35).[31]

Because a variance of as little as $194,929.43 on Schedule 1 would mean that the Objecting Creditors failed to support their contention that the Debtor and his family used more than one-half of the Loan Proceeds for consumer purposes, this $755,545.22 overstatement itself defeats the Objecting Creditors' argument that the Debtor and his parents used a majority of the Loan Proceeds for consumer spending. But to dispel any doubt about the Objecting Creditors' failure to carry their burden of proving that the Debtor and his parents spent over 50 percent of the Loan Proceeds for the purchase of consumer goods and services, the Court explains in detail below how the Objecting Creditors have inflated Schedule 1 in several other significant ways.

### b. Inaccurate Transcription and Duplication of Amounts from the Bank Statements

Exhibiting a maddening lack of attention to detail, the Objecting Creditors incorrectly transcribed several amounts from the Bank Statements. In their most egregious transcription error, on Part Q of Schedule 1 the Objecting Creditors cite Exhibit X at 3291 as support for a $450,000 payment to "National Mortgage Residences," but the cited page from the applicable Bank Statement identifies a payment of only $50,000, and no other document in Exhibit X references a $450,000 payment or any payment near that amount. As a result of this error alone, Schedule 1 is

overstated by $400,000. In addition, an $80,000 payment included on Part R instead should have been $60,000, a $20,000 mistake. Ex. II at 1807. These two mistakes alone account for a $420,000 overstatement on Schedule 1—again, more than enough by itself to undercut the Objecting Creditors' position.

Although of less significance, the Debtor points out that Part K identifies: (i) a payment of $1,074.95 to "DNCSS Nationwide" when in fact the payment listed on the referenced page (Ex. AA at 1406) was $131.70 (a discrepancy of $943.25); and (ii) payments of $43 and $906.95 to the "Staples Center" when instead the payments to the Staples Center listed on the referenced page (Ex. AA at 1396) were merely $43 and $64.50 (a discrepancy of $842.45). Mot. to Strike at 5. The discrepancies noted by the Debtor result in an overstatement of $1,785.70. As the Debtor also points out, Part P includes the same $34,900 amount on two line items. One is a check in the amount of $34,900 issued by Mrs. Johnson to Lewis Jewelers, Ex. II at 1697, while the other is a copy of the same check marked "NSF." Ex. II at 1718; Mot. to Strike at 5. The Objecting Creditors concede that this was a $34,900 mistake, noting that the Bank Statement admitted into evidence as Exhibit II at 1705 appears to show that the $34,900 check ultimately was honored. *See* Doc. 448 (Objecting Creditor's response to the Motion to Strike) at 5. Adding $34,900 to the $1,785.70 overstatement discussed above, the Debtor identified mistakes on Schedule 1 in the total amount of $36,685.70. Combining that amount with the $420,000 in transcription errors identified by the Court, the Objecting Creditors' errors in this category aggregate $456,685.70.

---

**31.** Because the Court is crediting all of the returns to 2010, in order to avoid double-counting the returns, no credit will be given

to the Objecting Creditors for returns in the other categories discussed below.

#### c. Unwarranted Assumption that Withdrawals Resulted in Expenditures

In calculating the $8,195,739.61 amount of purported consumer spending by the Debtor and his parents, the Objecting Creditors include on Part A of Schedule 1 a line item for "ATM Withdrawals" of $148,462.86 [32] and on Part G an amount for "Cash Withdrawals" that, not counting withdrawals made in 2010, total $1,261,019.98. Together, those two items aggregate $1,409,482.84 of withdrawals. The Objecting Creditors state that "there is no explanation by the Debtor or his parents on how this cash was spent." Creditor Findings & Conclusions ¶ 27.C. There are at least two problems with this statement.

First, if the Objecting Creditors had compared Part G to the evidence in this case—including the transcripts of the Parent Depositions, which certain of the Objecting Creditors' attorneys took—then they would have known that their statement that "there is no explanation by the Debtor or his parents on how [this withdrawn cash] was spent" is in large part simply untrue:

- A June 13, 2011 withdrawal of $274,452.48 that the Objecting Creditors include on Part G (based on Exhibit EE at 1953) was used on that same date to purchase—through a cashier's check drawn on TCF National Bank—the Debtor's 2011 Ferrari. *See* JJII Dep. at 58–59; Ex. 14 to JJII Dep. Although the $274,452.48 was used for consumer purposes, the Objecting Creditors

also include the payment for the Ferrari on Part E (in the "Automobiles" category), resulting in double-counting on the Objecting Creditors' part.

- Citing Exhibit BB at 2485 (from the statement for the Sammons Securities Account), the Objecting Creditors include a $15,000 "Withdrawal by Check," but that check was used to pay a "Management Fee." There is no evidence that the payment of a management fee in connection with an investment account constituted consumer spending.

- Citing Exhibit FF at 2016, the Objecting Creditors include a $98,452 withdrawal on Part G. Mrs. Johnson testified that the withdrawn cash was used to invest in diamonds and gold, KJ Dep. at 174, and the Objecting Creditors offered no evidence contradicting her testimony.

- The Objecting Creditors include purported withdrawals of $5,700 and $10,000 on Part G that were not withdrawals at all, but instead were *payments made to the Debtor.* The amounts the Objecting Creditors included were the amounts of two checks issued to the Debtor by Michelle Traylor for a security deposit with respect to property that the Debtor owned as of the Petition Date (but has since sold) on Malaga Way in Manhattan Beach, California (the "Malaga Way Property"). Ex. II at 1714, 1735.

Second, to the extent that there truly is no explanation for how the withdrawn cash

---

32. As discussed above, in calculating the $8,195,739.61 amount of purported consumer spending by the Debtor and his parents, the Objecting Creditors include "ATM Withdrawals" in the amount of $148,462.86, but they failed to file the Part D that might have provided support for that amount. Accordingly,

because the Objecting Creditors have the burden of proof, even if the withdrawals could somehow be construed as constituting expenditures, the amount of consumer spending alleged by the Objecting Creditors still would be inflated by ATM Withdrawals in the amount of $148,462.86.

was used, the Court cannot assume that the cash was spent on consumer goods or services—or that it was spent at all for that matter. The same can be said for certain "Miscellaneous Withdrawals" included on Part S, including three withdrawals ($50,000, $60,000 and $134,202.48) totaling $244,202.48. The sum of that amount and the $1,409,482.84 of withdrawals calculated above is $1,653,685.32. After taking into account the evidence demonstrating that withdrawn cash in the amount of $105,680 was expended for consumer purposes,[33] this leaves the use of $1,548,005.32 of withdrawals ($1,653,-685.32—$105,680) unexplained. Under one of the Objecting Creditors' own theories of this case (that assets are being hidden), it is possible that some of this withdrawn cash was not spent at all and that the Debtor's bankruptcy estate may have claims against persons or entities holding secreted cash or other assets. It is also possible, of course, that the withdrawn cash was used for the purchase of consumer goods and services. But the Objecting Creditors bear the burden of proof and have no basis to ask the Court to assume that the withdrawn cash was expended, let alone that it was used for consumer purchases. In short, withdrawals are just that—withdrawals—not expenditures. Because the Objecting Creditors have the burden of proof, they overstate Schedule 1 by every dollar they include on Schedule 1 that they have not shown by a preponderance of the evidence to be an amount expended on consumer goods or services. Schedule 1 therefore is overstated by the additional amount of $1,548,005.32.

### d. Unwarranted Assumption that Certain Payments Were Made for Consumer Goods or Services

The Objecting Creditors also ask the Court to assume—again, despite the lack of any evidence that would support the assumption—that certain expenditures were made for the purchase of consumer goods or services. They identify credit card payments (other than those made in 2010) of $407,658.87 on Part I of Schedule 1, but did not put the credit card statements into evidence. The Court therefore cannot assess whether the payments were made for the purchase of consumer goods or services and cannot assume that they were, meaning that Schedule 1 is inflated by an additional $407,658.87. Similarly, on Part X the Objecting Creditors identify post–2010 payments to Federal Express, UPS and other companies that provide delivery and related services in the aggregate amount of $55,837.88, classifying the payments in the category of "Shipping." But there is no reason for the Court to assume that the payments were made for consumer purposes rather than in furtherance of the Johnsons' investment activities. This is especially true in light of the large dollar amount of some of the payments (e.g., payments to Federal Express in, among other amounts, $1,000.09, $1,719.77

---

**33.** Withdrawn cash in the amount of $13,000 was used to purchase cashier's checks issued to Roger Schaefer, the Debtor's landlord in Columbus prior to the Petition Date. Ex. II at 1699, 1724; KJ Dep. at 181–82. A withdrawal of $1,680 was used to purchase a cashier's check issued to Arbor Valley Lawn & Tree Service. Ex. II at 1755. Citing Exhibit II at 1806, the Objecting Creditors also include a withdrawal of $91,000 on Part G. Of this amount, $60,000 was used to repay Mr.

Johnson's personal loan from a Tim Spiro, JJII Dep. at 63 & Ex. II at 1807; $5,000 was used to pay Eric Haas and another $5,000 to pay Jacquelyn Lelu for the Debtor's legal fees, KJ Dep. at 230–31 & Ex. II at 1808, 1810; and $20,000 was used to make a mortgage payment to U.S. Bank for the Malaga Way Property. Ex. II at 1809. The Debtor has characterized the debt owed to U.S. Bank as consumer debt. *See* Ex. 17 at 4.

and $3,120.23). In addition, because Federal Express and UPS both provide services other than delivery services, the Court cannot assume that all of the expenditures in this category were spent on shipping as opposed to some other goods or services, such as the printing service that the Debtor testified his mother used at a UPS store to print the signature page for the Capital Financial Loan Documents.

If the Objecting Creditors wanted to establish by a preponderance of the evidence that the expenditures they included in the Shipping category were made for consumer purposes, then they should have asked the Debtor or the Johnsons about them and should have conducted any other necessary discovery. Again, however, they failed to ask the Debtor or the Johnsons about this category of expenditures, and there is no reason for the Court to assume that the payments were made for consumer purposes.

The same goes for most of the insurance expenses identified on Part O. Mrs. Johnson testified that she insured diamonds, gold and other items she purportedly purchased for investment purposes through State Farm, KJ Dep. at 159, and insurance coverage purchased from State Farm accounts for most of the insurance costs included on Part O. Yet the Objecting Creditors did not attempt to show how much of the State Farm insurance costs reflected on Part O were incurred in order to insure items purchased for investment purposes and how much were incurred to insure the personal items of the Johnsons and the Debtor. Accordingly, after taking into account payments made to State Farm in 2010, Schedule 1 is overstated by an additional $51,819.43.

The Objecting Creditors suggest that Mrs. Johnson purchased the diamonds, gold and jewelry for personal use, not for investment purposes. But, as explained below, they have failed to prove by a preponderance of the evidence that most of the payments made for those items—as well as certain other payments—were made for consumer purposes rather than as part of the questionable investment strategy of the Johnsons.

### i. Diamonds and Gold/Finished Jewelry

On Part P of Schedule 1, the Objecting Creditors identify post–2010 payments of $648,175.28 in the category of "Jewels and Jewelry." Mrs. Johnson testified during her deposition that she invested in loose diamonds, gold and pieces of finished jewelry. KJ Dep. 149, 188–91, 200–05, 210–12. Her decision to invest in diamonds and gold, she said, was inspired by her parents, who "were products of the [D]epression" and taught her "to invest in something that's immediately liquidatable." KJ Dep. at 118–19. According to Mrs. Johnson, she purchased the diamonds, gold and jewelry at wholesale prices in order to sell them at a profit. KJ Dep. at 281–82.

The Debtor and the Johnsons also spent funds on jewelry purchased for personal use. Mrs. Johnson's testimony and the Bank Statements support a finding that $53,088.71 of the $648,175.28 amount was spent to repair personal jewelry or purchase jewelry for personal use.[34] See KJ Dep. at 219 & KJ Dep. Ex. 12 at 2256 (purchase of jewelry in the amount of $210.88 for personal use); KJ Dep. at 227 & KJ Dep. Ex. 11 at 1797 ($27,000 for engagement and wedding rings for the Debtor's fiancée); KJ Dep. at 233–34 &

---

**34.** *See also* KJ Dep. at 185–86 & KJ Dep. Ex. 8 at 2027 ($1,000 work on Mr. Johnson's national championship ring in 2010). Because the $1,000 was expended in 2010, it was already deducted above and is not included here.

KJ Dep. Ex. 13 at 1456 (jewelry purchase of $1,181.13 as a gift); KJ Dep. at 235 & KJ Dep. Ex. 13 at 1465 ($3,896.70 for a gift purchased by or on behalf of the Debtor); KJ Dep. at 237–38 & KJ Dep. Ex. 13 at 1503 ($7,500 that may have been for engagement and wedding rings for the Debtor's fiancée); Ex. II at 1844 ($13,300 check for an "engagement ring").[35]

Although Mrs. Johnson conceded that she occasionally wore some of the finished jewelry that she had purchased as an investment, KJ Dep. at 151, this does not establish by a preponderance of the evidence that this jewelry was purchased for personal, rather than investment, purposes. The Objecting Creditors might have attempted to uncover evidence contradicting Mrs. Johnson's testimony that the vast majority of her purchases at jewelry stores were for investment purposes. For instance, they could have issued subpoenas to the companies where the items were purchased. The Objecting Creditors, however, failed to do so. Thus, while it is certainly possible that more than $53,088.71 was spent on jewelry for personal use after 2010, the Objecting Creditors offered no evidence to show that this was the case. As a result of the unsupported assumption that the items Mrs. Johnson bought at jewelry stores were purchased for consumer purposes, Schedule 1 is overstated by an additional $595,086.57 ($648,175.28 minus $53,088.71).

#### ii. Mrs. Johnson's Other Business Venture

Despite the danger of making assumptions, the Court can probably safely assume that certain expenditures on Schedule 1 were made for the purchase of consumer goods or services. For example, the $6.75 payment to McDonald's included on Part W of Schedule 1 (supported by Exhibit CC at 2093) almost certainly was for personal consumption, not a business expense or an investment in McDonald's Corporation. The same cannot be said for multiple other payments included on Schedule 1. For example, 73 payments in amounts ranging between $200 and $1,067.40 to a "Boresha Coffee" stand out. See Part L. During her deposition, Mrs. Johnson testified that she was involved in a business venture with a friend who was working on a new coffee concept. KJ Dep. at 62, 184. Whether or not this was "Boresha Coffee," the Court does not know, because the Objecting Creditors did not ask Mrs. Johnson. In any event, due to the unsupported assumption that payments to Boresha Coffee were made for consumer purposes, Schedule 1 is overstated by post-2010 payments to Boresha Coffee in the amount of $36,211.71.

#### iii. Business Investments by Mr. Johnson

Like his wife, Mr. Johnson also invested in small companies. The Debtor testified that he knew before the Petition Date that his father had invested in a company identified on his Schedule B as Barwis Methods Training Centers LLC, which also has been identified as Barwis Methods Training Center of Southeast Michigan, LLC ("Barwis"). Tr. II at 10; Ex. 4 at 7.[36]

---

**35.** In his proposed findings, the Debtor states that "certain de minimis jewelry appears to have been purchased by Mrs. Johnson for personal or gift use without Debtor's knowledge." Debtor Findings & Conclusions at 9 n.10. In this regard, he mentions the $1,000 spent for work on Mr. Johnson's national championship ring and also notes the

$5,288.71 expended on various gifts of jewelry. In a glaring omission, he neglects to mention the larger amounts spent on wedding and engagement rings for his fiancée—expenditures that presumably were not made without his knowledge.

**36.** Mr. Johnson also invested in a tech startup company knows as Wayn, Inc. JJII Dep. at

Attempting to call into question the characterization of Barwis as an investment, the Objecting Creditors state that Mrs. Johnson "testified during her deposition . . . that Barwis was the gym her younger son worked out at for years and while discussing it at some length [she] never mention[ed] that it was owned by the Debtor." Creditor Findings & Conclusions at 19 n.12. In order to ascertain the payments that had been made to Barwis, the Court searched Schedule 1 for "Barwis." Initially, the Court found only a few payments in relatively small amounts that were consistent with the gym membership dues alluded to by the Objecting Creditors. But then the Court noted that Part V included a $49,500 line item for "Check # 2564—Berwis Methods Training." That is, Barwis was misspelled in Schedule 1. The Court's review of the underlying Bank Statement and the referenced check confirmed that the Debtor's father, Mr. Johnson, issued a check in the amount of $49,500 to "Barwis Methods Training," not Berwis Methods Training. The check was drawn on an account maintained at TCF Bank. *See* Ex. HH at 2168, 2177.

When an attorney for one of the Objecting Creditors asked Mrs. Johnson during her deposition whether this check was for her younger son's training, she responded that she "didn't sign this check" and that she therefore did not "know exactly what this was for." KJ Dep. at 207. Although the Objecting Creditors conducted Mr.

Johnson's deposition after his wife had already been deposed, JJII Dep. at 70, they never asked Mr. Johnson, who had signed the $49,500 check, about his reason for issuing it to Barwis.

While the precise nature of the $49,500 payment to Barwis is uncertain, such a large amount does not appear to be consistent with the payment of gym membership dues, but instead seems more indicative of some form of investment in Barwis. Moreover, on June 10, 2015 (before the Hearing), the Debtor filed a motion seeking approval of a compromise with Barwis (Doc. 271) under which it would purchase the Debtor's membership interests in Barwis for "their adjusted book value, $74,125." Doc. 271 at 2. No party in interest objected to that motion, and the Court entered an order approving it (Doc. 306). Given the lack of any evidence that the $49,500 payment to Barwis was made for consumer purposes, the Court finds that Schedule 1 is overstated by that additional amount.

#### e. Synopsis of Schedule 1's Shortcomings

Based on the foregoing analysis, the Court finds that, not counting other potentially unwarranted assumptions the Objecting Creditors have made that are not enumerated above, they have overstated Schedule 1 by nearly $4 million, calculated as follows:

63–64. It does not appear, however, that any payments to Wayn, Inc. are included on

Schedule 1. The Debtor identified the company as "Way–In, Inc.," Ex. 4 at 7.

| Category | | Amount Overstated |
|---|---|---|
| a. | Expenditures Predating Loans (2010) | $755,545.22 |
| b. | Inaccurate Transcription | $456,685.70 |
| c. | Withdrawals | $1,548,005.32 |
| d. | Credit Card Payments | $407,658.87 |
| d. | Shipping | $55,837.88 |
| d. | Insurance | $51,819.43 |
| d.i. | Diamonds, Gold, Jewelry | $595,086.57 |
| d.ii. | Boresha Coffee | $36,211.71 |
| d.iii. | Barwis Training Methods | $49,500.00 |
| **Total** | | **$3,956,350.70** |

Again, a mistake of as little as $194,929.43 on Schedule 1 would mean that the Objecting Creditors have failed to carry their burden of proving that the Debtor and his parents used more than one-half of the Loan Proceeds for consumer purchases. Because Schedule 1 is overstated by at least $3,956,350.70, the Objecting Creditors have failed to prove that the Debtor and the Johnsons spent more than one-half of the Loan Proceeds for the purchase of consumer good or services.

In making this ruling, the Court notes that the Objecting Creditors were required to file their list of exhibits and exchange their exhibits with the Debtor no later than a week before the Hearing, Doc. 356 at 3, and that a full two months passed between the date of the Hearing and the date on which the Objecting Creditors filed Schedule 1. By the time they submitted Schedule 1, therefore, the Objecting Creditors would have been in possession of the Bank Accounts on which Schedule 1 is based for more than two months at a minimum. Schedule 1 apparently represented the best effort they could muster in an attempt to prove that the Debtor's debts were primarily consumer debts. As detailed above, the Objecting Creditors fell far short.

### f. An Additional Gross Overstatement by the Objecting Creditors

In addition to substantially inflating Schedule 1, the Objecting Creditors wrongly contend that the Debtor has not accounted for more than $4.2 million of the Loan Proceeds. *See* Creditor Findings & Conclusions ¶ 27.B ("[T]he Bank Statements do not explain the use of $4,200,000 or more in Loan Proceeds."). The Objecting Creditors calculate this amount by starting with the Loan Proceeds, which they contend "total approximately $14,000,000," and subtracting from that number the $8,195,739.61 amount set forth on Schedule 1 plus an amount for the Debtor's income. *Id.* An accusation that more than $4.2 million of the Loan Proceeds are missing should be based on more precision than a statement that those proceeds total "approximately $14,000,000," especially when that amount is the starting point for the Objecting Creditors' calculation. As discussed above, the actual amount of the Loan Proceeds was $13,662,500, meaning that the Objecting Creditors' calculation is off from the start by $337,500.

Even more troubling is the fact that the Objecting Creditors should have known that several million dollars of the Loan Proceeds were paid to third parties unaffiliated with the Debtor or his parents. According to the documents attached to certain of the Objecting Creditors' own proofs of claim, more than $3.4 million was paid to those Objecting Creditors and to brokers and other third parties. Schedule 2 to the loan agreement with Capital Financial states that, out of the $3.4 million of Loan Proceeds provided by Capital Financial, only $500,000 was advanced to the Debtor, with the remaining $2.9 million going elsewhere. *See* Ex. 14 at 25. The amount of $2.5 million was paid to Capital Financial's affiliate, Capital Partners, in repayment of the funds advanced by Capital Partners, and additional amounts were paid to parties other than the Debtor for an origination fee, death and disability insurance, and legal fees and expenses. *Id.* And $212,500 of funds were set aside for payment to Capital Financial. *Id.* at 15–16, 25. In total, Schedule 2 to the Capital Financial loan agreement explains where $2.9 million of the Loan Proceeds went. *Id.* On top of that, the closing statement for the $3 million loan made by Pro Player states that the net amount advanced to the Debtor was $2,477,694.34, with more than $230,000 going to brokers and nearly $275,000 to the purchase of a "Death, Disgrace, Disability Policy." KJ Dep. Ex. 3 (Pro Player closing statement); *see also* KJ Dep. at 303–04. In sum, $522,305.66 of the Loan Proceeds advanced by Pro Player were provided to parties other than the Debtor. When that number is combined with the $2.9 million from the Capital Financial loan that the Debtor did not receive, it becomes evident where at least $3,422,305.66 of the Loan Proceeds went. It is also clear that the Objecting Creditors would have known this and should have known that, contrary to their pro-posed finding in this regard, the unaccounted-for Loan Proceeds are at most $874,894.55, calculated as follows: $13,662,500 (Loan Proceeds) minus $3,422,305.66 (the minimum amount of Loan Proceeds not advanced to the Debtor) minus $1,169,560.18 (the minimum amount of earnings available to the Debtor and his parents during the Borrowing Period) minus $8,195,739.61 (the aggregate amount on Schedule 1). Of course, the Court is not finding that $874,894.55 of the Loan Proceeds are unaccounted for, because that number itself could be inflated. Among other things, Loan Proceeds other than the $3,422,305.66 identified by the Court might not have been advanced to the Debtor, and the earnings available to him and his parents during the Borrowing Period might have exceeded $1,169,560.18. But the difference between the amount that the Objecting Creditors contend is unaccounted for and the maximum amount that in fact could be unaccounted for further demonstrates their carelessness in preparing Schedule 1 and in formulating the arguments they have based upon it.

### 7. Summary of the Court's Findings Concerning the Primary Nature of the Debtor's Debt

For all these reasons, the Court concludes that the Objecting Creditors have failed to carry their burden of proving that the Debtor incurred more than one-half of his debt for a personal, family, or household purpose. To summarize, this finding is supported by:

(a) the uncontroverted representations made by the Debtor in his Schedule B, which, consistent with the proofs of claim filed by Garey and FJ, show that the debts owed to Garey and FJ are non-consumer obligations;

(b) the express terms of the loan documents with Blum, RFF and Cobalt evi-

dencing the investment, profit-making purpose of the loans;

(c) the Debtor's uncontroverted testimony regarding his investment purpose generally, as well as his more detailed testimony regarding the circumstances under which he signed the loan documents with Blum, RFF and Capital Financial;

(d) the Johnsons' uncontroverted testimony that their primary purpose in facilitating the loans with the Objecting Creditors was to use the Loan Proceeds in order to invest on behalf of the Debtor;

(e) the documentary evidence establishing the existence of the Sammons Securities Account;

(f) the documentary evidence demonstrating that Mrs. Johnson purchased items at jewelry stores and her uncontroverted testimony that the vast majority of the purchases were made for investment purposes;

(g) the uncontroverted evidence that the Johnsons intended to invest in life insurance policies, that Mr. Johnson invested in small companies such as Barwis and Wayn Inc. and that Mrs. Johnson participated in a coffee-related venture; and

(h) the failure of the Objecting Creditors to demonstrate that more than one-half of their loans proceeds were actually used for consumer purposes.

To be clear, the Johnsons almost certainly, and the Debtor quite possibly, diverted a portion of the Loan Proceeds from their intended use for investment and instead used them to purchase consumer goods and services. In fact, the Debtor himself has stated that his parents purchased consumer goods "with the proceeds from one or more of these loans." Reply ¶ 27. And when she was asked during her deposition whether she understood "that

the monies that [she was using to purchase consumer goods and services] was [her son's] salary and not the loans," she answered "[t]hat was the intent, yes," KJ Dep. at 267, suggesting that this intent was not always observed. In addition, the Johnsons certainly were incompetent investors. But when debts are " incurred with a profit motive," the debts are non-consumer debts "even though that purpose failed." *In re. Bell,* 65 B.R. 575, 577 (Bankr.E.D.Mich.1986). Neither the incompetence and carelessness exhibited by the Debtor and the Johnsons, nor the diversion of an undetermined portion of the Loan Proceeds for consumer use, makes it more likely than not that the Debtor's primary purpose in borrowing funds from the Objecting Creditors—and his parents' primary purpose in facilitating his borrowing the money—was to engage in consumer spending.

Based on the evidence presented, the Court finds that the Objecting Creditors have failed to carry their burden of proving that the Debtor's debts are primarily consumer debts. The alternative would be to assume that the Debtor and his parents, rather than being incompetent investors and spendthrifts, instead were schemers who deliberately took out what they viewed as millions of dollars of the equivalent of payday loans with the primary intent of spending the borrowed funds on consumer goods and services and ultimately defaulting when the money inevitably ran out, thereby jeopardizing the sound financial future they said they were seeking to build. Although this alternative is not outside the realm of possibility, it is unsupported by the evidentiary record made at the Hearing. Section 707(b) of the Bankruptcy Code therefore would not apply if the Debtor's case were converted to Chapter 7.

## B. The Debtor's Bad Faith

The Objecting Creditors next contend that the Debtor was acting in bad faith when he commenced his Chapter 11 case and that he has conducted himself in bad faith since then. His bad faith, they argue, would require the dismissal of the Debtor's case if it were converted to Chapter 7, meaning that the Court should deny the Conversion Motion. Creditor Findings & Conclusions ¶¶ 76–80.

In support of their contention that the Debtor commenced his case in bad faith, the Objecting Creditors allege that he intended all along to shield his income from creditors by eventually converting the case to Chapter 7. As evidence of his purported intent, they rely on the Debtor's failure to identify his debts as primarily consumer debts on his bankruptcy petition, positing that he intended to convert his case to Chapter 7 and then take the position that § 707(b) could not possibly apply because his debts are not primarily consumer debts—or, failing that, because § 707(b) does not apply in the context of converted cases.[37] *See* Creditor Findings & Conclusions ¶ 43 ("Like several aspects of the Debtor's filings noted herein, that statement on the Petition appears to be part of a premeditated effort to avoid the 'means' test under section 707(b) of the Bankruptcy Code."). For the reasons already stated, however, the Court has found that the Objecting Creditors failed to meet their burden of proving that the Debtor's debts are primarily consumer debts. The Court accordingly cannot use the Debtor's failure to state on his bankruptcy petition that he has primarily consumer debts as a basis to find that he filed the petition in bad faith.

That said, there is abundant other evidence of the Debtor's bad faith both during this case and before the Petition Date. Because the import of the Debtor's prepetition conduct becomes more apparent when seen in light of his bad faith during the case, the Court will discuss his postpetition bad faith first and then turn to his prepetition conduct.

## C. The Debtor's Bad Faith During the Case

Under § 1107(a) of the Bankruptcy Code, the Debtor became a "debtor in possession" on the Petition Date and in that capacity owed certain fiduciary duties to his creditors, including creditors holding several million dollars of claims that he concedes are legitimate. Tr. I at 194–96. Because no Chapter 11 trustee has been appointed in the case, the Debtor continues to owe those same fiduciary duties to his creditors. The Debtor is not relieved of his obligations to creditors simply because his parents appear to be partly to

---

**37.** The Debtor has taken the position that § 707(b) would be inapplicable if his case were converted to Chapter 7 because § 707(b) does not apply in cases converted from other chapters of the Bankruptcy Code. In support of this argument, the Debtor points out that § 707(b) provides that the Court "may dismiss a case filed by an individual debtor under [Chapter 7]," 11 U.S.C. § 707(b)(1), and contends that it therefore applies only to cases originally filed under Chapter 7. Debtor Findings & Conclusions ¶ 57. As the Debtor acknowledges, a split of authority exists on the issue of whether § 707(b) applies to converted cases. Debtor Findings & Conclusions

¶ 58. *Compare Advanced Control Solutions, Inc. v. Justice,* 639 F.3d 838, 840 (8th Cir. 2011) ("[Section] 707(b)(1) applies with equal force to bankruptcy proceedings that commenced under Chapter 7 as with those converted from Chapter 13.") *with In re Thoemke,* No. 9:12–bk–17027–FMD, 2014 WL 443890, at *2 (Bankr.M.D.Fla. Feb. 4, 2014) ("[T]he Court holds that § 707(b)(1) applies only if a bankruptcy case is initially filed under Chapter 7."). The Court need not decide this issue given that the Objecting Creditors failed to carry their burden of proving that the Debtor's debt are primarily consumer debts, making § 707(b) inapplicable in any event.

blame for the circumstances that led to his bankruptcy. And while these circumstances understandably engender some measure of sympathy for the Debtor's financial plight, they do not excuse him from fulfilling his fiduciary duties as a debtor in possession. In fact, the Debtor has acknowledged his fiduciary duties to creditors of his bankruptcy estate. Tr. I at 140, 148. For the reasons explained in detail below, the Court finds that the Debtor has failed to abide by his fiduciary duties and that he has conducted his Chapter 11 case in bad faith. In fact, the evidence in this regard is clear and convincing.

On the Petition Date, the Debtor filed an application (the "Retention Application") (Doc. 4) to employ Hahn Loeser & Parks LLP ("HLP") as his bankruptcy counsel. In the Retention Application, which the Debtor personally signed, he stated that "[a]s a result of . . . predatory lending and investment schemes, [he] now purportedly owes in excess of $12 million and has been named as a defendant in numerous lawsuits seeking to collect on these predatory loans and investments." Retention Application at 5.[38] He was refer-

ring, of course, to the claims of the Objecting Creditors. He continued: "The cost to defend such litigation and make payments pursuant to certain garnishment orders and onerous settlement agreements obtained by the purported creditors and agreed to by his advisors created a liquidity crisis for [the Debtor] necessitating his petition for relief under Chapter 11 of the Bankruptcy Code." *Id.*[39]

■■■ Addressing a liquidity crisis is a legitimate use of Chapter 11, because its "purpose . . . is to provide a debtor with legal protection in order to give [him] the opportunity to reorganize, and thereby to provide creditors with going-concern value [or, in an individual case, a portion of the debtor's future income,] rather than the possibility of a more meager satisfaction through liquidation."[40] Consistent with this purpose, during a status conference held in this case in December 2014 (the "Status Conference"), HLP attorney Marc Kessler ("Kessler") represented to the Court that the Debtor "takes full responsibility for where he's at," that he "is here understanding what his responsibilities are," and that "[their] plan is to file a

38. As the Court stated during the Hearing, Tr. I at 390, it may take judicial notice of the contents of documents filed in this case, including the fact that certain representations were made in those documents.

39. As discussed in section IV.D below, the Debtor personally signed a settlement agreement with Pro Player (the "Pro Player Settlement Agreement"), thereby resolving an action that it had commenced against him in the Court of Common Pleas of Franklin County, Ohio (the "State Court"), an action in which the State Court had entered an order garnishing a portion of the salary he was to receive from the Columbus Blue Jackets. The suggestion in the Retention Application that the Debtor's problems arose in part from "settlement agreements . . . agreed to by his advisors [his parents]" was misleading to the extent that it suggested that the Debtor had not signed the Pro Player Settlement Agreement.

Mrs. Johnson testified that she and her husband had "no involvement with" the negotiations over the Pro Player Settlement Agreement. KJ Dep. at 306. By contrast, in an adversary proceeding commenced against him by Pro Player, Adv. Pro. No. 15–2186, the Debtor has filed a second amended counterclaim (Doc. 32) in which he states that he "never personally participated in any settlement negotiations with Pro Player," and that "[i]n April of 2013, Mrs. Johnson presented Debtor with the signature page of the [Pro Player] Settlement Agreement and advised him to execute the same. Debtor was not presented with the entirety of the [Pro Player] Settlement Agreement or made aware of all its material terms." Adv. Doc. 32 ¶¶ 54, 56.

40. *Canadian Pac. Forest Prods. Ltd. v. J.D. Irving, Ltd. (In re Gibson Grp., Inc.)*, 66 F.3d 1436, 1442 (6th Cir.1995).

plan." Doc. 398 (the "Status Conference Transcript") at 12–13. The Debtor echoed this statement during the Hearing when he testified that "[he] thought by filing Chapter 11 it would force all the creditors to get around the table to negotiate, because [he] was unsuccessful prior to Chapter 11." Tr. I at 93.

The negotiations would be aided, HLP attorney Daniel DeMarco ("DeMarco") represented to the Court during the Status Conference, by "bringing to bear the services of a financial expert, particularly a forensic accountant, to help us trace where these funds [from the Objecting Creditors] arrived, where they went, what payments were actually made and credits granted." Status Conference Tr. at 16. According to DeMarco, this was "a necessary part of putting together a plan so that [they could] share with the creditors what [they] believe actually happened here in terms of advances and payments." *Id.* at 16. The Debtor was present during the Status Conference and would have heard his counsel's statement that the retention of a forensic accountant was "a necessary part of putting together a plan." A month or so after the Status Conference, the Debtor filed a motion seeking to extend the exclusive periods for filing and soliciting acceptances of a Chapter 11 plan, stating that he was "mindful of his obligation[ ] to pursue a Plan diligently." Doc. 113 at 6. The Debtor, however, did not meet his obligation. Indeed, as explained below, he has failed to fulfill his fiduciary duties—both before and after filing the Conversion Motion—in manifold ways.

### 1. Failure to Retain Forensic Accountant Before Filing the Conversion Motion

Given his own counsel's representation during the Status Conference that the retention of a forensic accountant was a nec-essary step forward in formulating a plan of reorganization and presenting it to creditors, the Debtor should have filed an application to retain a forensic accountant well before he filed the Conversion Motion. And yet, at the time he filed the Conversion Motion, the Debtor had not requested authority to employ a forensic accountant. In fact, it was not until April 30, 2015—nearly two months after he filed the Conversion Motion—that the Debtor filed a motion to employ a forensic accountant (Doc. 230), Nesser Consulting Group Ltd. ("Nesser"). Not only that, but the Debtor has conceded that it was not until April 17, 2015—nearly six weeks after he filed the Conversion Motion on March 5, 2015—that he even began consulting with Nesser. *See* Doc. 263 at 4 ("On April 17, 2015, Debtor began consulting with Nesser."); Doc. 347 (Transcript of June 25, 2015 hearing) at 28 (Debtor's counsel representing to the Court that April 17, 2015 was "when we first began the consulting with Mr. Nesser and he first began to render services.").

In their proposed findings of fact, the Objecting Creditors point out the Debtor's failure to retain a forensic accountant before he filed the Conversion Motion. Creditor Findings & Conclusions ¶ 58. Notwithstanding the fact that the Objecting Creditors filed their proposed findings three weeks before the Debtor filed his own, he did not attempt to explain or justify his failure to retain the forensic accountant before filing the Conversion Motion. Instead, he ambiguously stated that "[the] Debtor, with the assistance of his professionals, including his counsel and a forensic accountant, investigated his financial history and affairs." Debtor Findings & Conclusions ¶ 33. He neglected, however, to mention that any assistance Nesser provided would have come long after he filed the Conversion Motion.

During the hearing on Nesser's retention, at which counsel for CapStar Bank ("CapStar") questioned why the forensic accountant had not been retained before the Conversion Motion was filed, the Debtor's counsel attempted to place the blame at the feet of CapStar for not turning over Bank Statements for the Bank Accounts maintained at CapStar. *See* Doc. 347 at 20 ("[I]t's difficult for Mr. Nesser to complete a forensic report if there are accounts where we don't have access to the information and the reason in this instance we don't have access to the information is CapStar. . . ."). But that argument was a red herring, because it failed to explain why Nesser could not have begun analyzing the Bank Statements the Debtor had received. Nor did it explain why the Debtor decided to wait until June 11, 2015—more than three months after he filed the Conversion Motion—to issue a subpoena to CapStar for the production of the Bank Accounts of which it was the custodian. *See* Doc. 273 (subpoena issued to CapStar dated June 11, 2015).

There is simply no justification for the Debtor's failure to retain a forensic accountant before he filed the Conversion Motion. Furthermore, the Debtor's failure to employ a forensic accountant before he filed the Conversion Motion strongly suggests that, at some point after the Status Conference, he stopped being serious—if he ever was—about formulating and proposing a Chapter 11 plan.

## 2. Failure to Object to the Claims of the Objecting Creditors Before Filing the Conversion Motion

The Debtor has an obligation to object to proofs of claim if doing so would serve a purpose.[41] The Court finds that objecting to the claims of the Objecting Creditors before the Conversion Motion was filed would have served multiple purposes and also finds that the Debtor violated his fiduciary duty to other creditors when he failed to do so.

In analyzing the Debtor's obligation to object to the claims of the Objecting Creditors, it is important to keep two things in mind. First, the Debtor has stated time and again his belief that the claims of the Objecting Creditors are subject to disallowance in their entirety. According to the Debtor, the primary grounds for disallowance are, depending on the particular Objecting Creditor, "breach of fiduciary duty, fraud and usury." Tr. I at 87. In addition, the Debtor has alleged that prepetition transfers made to certain of the Objecting Creditors through garnishment of his salary constituted avoidable transfers. *See* Reply at 14 ("Through garnishments [Blum] seized an additional $493;054.20 during the 2013–14 season, which sums are avoidable."); Reply at 16–17 ("Pro Player garnish[ed] $120,000 a month, totaling at least $1,025,000 during the 2013–14 season, which sums are avoidable.").[42] If those allegations are true,

---

41. *See* 11 U.S.C. § 1107(a)(1) (providing that the debtor in possession has certain of the duties of a Chapter 11 trustee, including those set forth in § 1106(a)(1)); § 1106(a)(1) (providing that a Chapter 11 trustee has certain duties that a Chapter 7 trustee would have, including the duties set forth in § 704(a)(5)); § 704(a)(5) (providing that a Chapter 7 trustee shall, "if a purpose would be served, examine proofs of claims and object to the allowance of any claim that is improper").

42. The Debtor argues that conversion "is in the best interest of all the creditors" because, among other things, it "stops garnishments benefiting only a few of the objecting claimants" and "allows a Chapter 7 trustee to pursue avoidance claims (*e.g.*, potential recovery of significant prepetition garnishments)." Reply at 66. This argument ignores two obvious facts: (1) the filing of the Chapter 11 petition itself automatically stayed the garnishments, while conversion would do noth-

then they would provide another basis for the Debtor to object to the claims of Blum and Pro Player, because the Bankruptcy Code provides that the Court "shall disallow any claim of any entity ... that is a transferee of a transfer avoidable under [certain sections of the Bankruptcy Code], unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable...." 11 U.S.C. § 502(d). The second thing to keep in mind as the Court analyzes the Debtor's fiduciary duty to object to the claims of the Objecting Creditors is that the Debtor has repeatedly suggested that their claims are blocking his path to a successful reorganization.[43] Assuming for the sake of argument that the Debtor's beliefs regarding the illegitimacy of the Objecting Creditors' claims and the effect of their purported recalcitrance are genuine,[44] then at least three purposes would have been served by seeking to disallow their claims. The leverage he would have gained in the plan negotia-

tions with the Objecting Creditors is the most obvious benefit the Debtor would have achieved had he objected to their claims before filing the Conversion Motion. If the Debtor truly believed that the claims of the Objecting Creditors were subject to disallowance, then it made no sense for the Debtor to fail to negotiate with them from the position of optimal strength—which he would have placed himself in by objecting to their claims. Moreover, if the Debtor had engaged in good-faith negotiations with the Objecting Creditors and the negotiations had failed, then objecting to and obtaining the disallowance of their claims would have served a second purpose—paving a way toward the possible confirmation of a Chapter 11 plan without the Objecting Creditors' consent.[45] Quite simply, disallowance of their claims would have prevented the Objecting Creditors from having standing to vote to reject a Chapter 11 plan, and also would have kept them from having standing to object to the plan's confirmation. A third

---

ing to augment the protection already being afforded the Debtor by the automatic stay; and (2) as a Chapter 11 debtor in possession, the Debtor could seek to avoid the prepetition garnishments to the same extent as a Chapter 7 trustee could.

**43.** *See* Reply at 29–30 ("Debtor formulated a reasonable methodology for a consensual Chapter 11 plan and, particularly, proposed terms for treatment under such a plan for [the Objecting Creditors and CapStar] between February 27, 2015 and March 4, 2015. None of these claimants were willing to consider modifications to their claims or accept or propose concessions with respect to their treatment."); Tr. I at 101–02 ("I believe that a plan could not be reached. And I couldn't pay in full. I just—I just couldn't do it. If I gave everything I had, I couldn't pay in full. And if a settlement can't be reached, I didn't see an alternative route."); Debtor Findings & Conclusions ¶ 79 ("Because the absolute priority rule applies to individuals in Chapter 11 ... and because the Objecting Claimants cannot be persuaded to accept something less

than payment in full (or close to payment in full), Debtor is unable to confirm a Chapter 11 plan.").

**44.** As discussed in Section IV.C.3 below, the Debtor's contention that the only way he could obtain confirmation of a Chapter 11 plan of reorganization is to either pay 100% of the Objecting Creditors' claims or secure 100% consent on their part is simply false.

**45.** *See, e.g., Bavelis v. Doukas (In re Bavelis),* 490 B.R. 258 (Bankr.S.D.Ohio 2013), *aff'd,* 2013 WL 6672988 (6th Cir. BAP Dec. 19, 2013), *aff'd,* 773 F.3d 148 (6th Cir.2014). In *Bavelis,* the individual Chapter 11 Debtor objected to and obtained the disallowance of a $14 million proof of claim asserted by a purported creditor who had been opposing the debtor's efforts to reorganize, but who no longer had standing to do so after the claim was disallowed. Then, after negotiating with certain other creditors, the debtor obtained confirmation of a consensual Chapter 11 plan.

purpose that would have been served by objecting to the claims of the Objecting Creditors would be to increase the distributions to creditors holding approximately $7 million of claims that the Debtor concedes are legitimate. Tr. I at 195–99; Tr. II at 33.

For all these reasons, seeking to disallow the claims of the Objecting Creditors would have facilitated the Debtor's proposal of a Chapter 11 plan providing for a meaningful distribution to the creditors whose claims he recognizes as legitimate. The Debtor testified that he wanted to repay those creditors' claims: "I ... wanted to pay the legitimate [creditors] as much as I saw fair." Tr. I at 197. And he apparently believed that fairness supported a dividend of 80% to those creditors. Tr. II at 34. But the Debtor did not act in accordance with his professed goal of achieving confirmation of a Chapter 11 plan, nor did he conduct himself like someone who was genuinely concerned about the interests of his legitimate creditors.

The Debtor's lack of concern for the interests of the creditors he deems to be legitimate is evidenced by his failure to object to the claims of the Objecting Creditors. RFF filed its proof of claim on December 1, 2014, or approximately three months before the Debtor filed the Conversion Motion, and all of the other Objecting Creditors filed their proofs of claim anywhere from three to four weeks before the Debtor filed the Conversion Motion. Notwithstanding the purposes that would have been served—and the strategic advantages that would have been gained—by objecting to their claims, the Debtor had not filed any claim objections at the time he filed the Conversion Motion. Instead, after the Debtor filed the Conversion Mo-

tion, certain of the Objecting Creditors initiated adversary proceedings against him seeking to deny his discharge or have his debts to them declared nondischargeable.[46] It was only then—in compulsory counterclaims the Debtor asserted in the adversary proceedings—that he sought to disallow the claims of the Objecting Creditors. Tr. I at 151. That is, the Debtor filed claim objections after he filed the Conversion Motion and then did so only defensively in response to attempts to limit or deny his discharge, not in an exercise of his fiduciary duty to object to claims and thereby facilitate the formulation of a Chapter 11 plan and a distribution to creditors.

In fact, the Debtor still has not filed objections to the claims of the Objecting Creditors that have not commenced adversary proceedings against him. This omission includes failing to object to the claim filed by Blum, who the Debtor represented in the Reply had received prepetition avoidable transfers in the amount of $493,054.20, creating a potential basis for disallowance of Blum's claim under § 502(d). In addition to failing to object to the Blum claim, the Debtor still has not objected to the proofs of claim filed by Capital Holdings or Cobalt.

The Debtor contends that he failed to seek disallowance of the claims of the Objecting Creditors before he filed the Conversion Motion because he did not wish to impose the cost of litigating the validity or the amount of their claims on his bankruptcy estate. Converting the case, the Debtor testified, would make more funds available for distribution to his legitimate unsecured creditors. Tr. I at 152. But that is not a good-faith argument under

---

46. *See* Adv. Pro. Nos. 15–2107 (Capital Financial), 15–2108(EOT), 15–2117(RFF) and 152186 (Pro Player).

the circumstances of this case for at least two reasons. First, the Debtor has been more than willing to impose the costs of litigating the Conversion Motion on his creditors. After all, to date HLP attorneys have spent 1,692.90 hours and accrued $657,826.50 in legal fees in connection with the Conversion Motion. *See* App. II (85 hours and $26,699 in legal fees through the date of the filing of the Conversion Motion); App. III (1,607.90 hours and $631,127.50 in legal fees in connection with the Conversion Motion after its filing). HLP filed a motion in which the firm made clear that the Debtor intends to use his postpetition income—an asset of his bankruptcy estate that could be used to satisfy the Debtor's legitimate creditors—to pay those fees to the extent they are allowed. *See* Doc. 470 at 3–4. Second, if the Debtor truly believes that the Objecting Creditors' claims are subject to disallowance, then he cannot in good faith argue that litigating with the Objecting Creditors over the disallowance of their claims would do anything other than potentially benefit other unsecured creditors. Again, disallowance of the claims would eliminate the Objecting Creditors' standing in the context of plan confirmation and also would serve to increase the distributions to the Debtor's other creditors.

By contrast, Chapter 7 would only lead to a worse result for those creditors. As in Chapter 11, the allowance of the Objecting Creditors' claims in Chapter 7 would substantially dilute the recovery of other creditors on their claims. In order to avoid this dilution, a Chapter 7 trustee would have to litigate with the Objecting Creditors over the disallowance of their claims just as the Debtor would have been required to do in Chapter 11. And this litigation in the converted case would increase administrative expenses to the same extent as claims litigation by the Debtor in the context of Chapter 11. The only difference is that in Chapter 7 none of the Debtor's postpetition income earned after conversion would be an asset of the bankruptcy estate available to the trustee to fund the litigation or to pay unsecured creditors—and, in the Debtor's view, none of the income earned after he filed the Chapter 11 case would be available to the Chapter 7 estate.[47]

In short, creditor recoveries would be just as diluted by the Objecting Creditors' claims in Chapter 7 as they would be in

---

47. *See* Reply at 73 ("[P]ost-petition, pre-conversion wages from personal services are excepted from the Chapter 7 estate.") (citing *Wu v. Markosian (In re Markosian)*, 506 B.R. 273, 255 (9th Cir. BAP 2014) and *In re Evans*, 464 B.R. 429, 440–41 (Bankr.D.Col.2011)). Although the Debtor fails to point this out, several other courts have held that income earned by a Chapter 11 debtor after the filing of a Chapter 11 case but prior to its conversion to Chapter 7 constitutes property of the Chapter 7 estate. *See Rogers v. Freeman (In re Freeman)*, 527 B.R. 780, 789–97 (Bankr. N.D.Ga.2015) (discussing cases on both side of the issue before holding that income earned by a Chapter 11 debtor after the filing of a Chapter 11 case but before a conversion to Chapter 7 does constitute property of the Chapter 7 estate); *In re Meier*, 528 B.R. 162, 164 (Bankr.N.D.Ill.2015) (holding that property of the estate in case converted from Chapter 11 to Chapter 7 includes preconversion earnings; *In re Hoyle*, 2013 WL 3294273, at *6 (Bankr.D.Idaho June 28, 2013) (same); *see also Cantu v. Schmidt (In re Cantu)*, 784 F.3d 253, 257 (5th Cir.2015) ("A 2005 amendment to the Bankruptcy Code expanded th[e] definition [of property of the estate] for individual chapter 11 debtors to encompass 'all property of the kind specified in section 541 that the debtor acquires after the commencement of the case but before the case is . . . converted to a case under Chapter 7.' 11 U.S.C. § 1115(a)(1). Causes of action . . . that are acquired after commencement but before conversion are therefore property belonging to the estate."), *cert. denied*, —— U.S. ——, 136 S.Ct. 417, 193 L.Ed.2d 317 (2015).

Chapter 11, but the Chapter 7 trustee would have less resources than the Debtor would have available to fund claims litigation against the Objecting Creditors. It accordingly is difficult to see what other unsecured creditors would lose by the Debtor's litigating the allowance of the Objecting Creditors' claims in Chapter 11. In fact, the other creditors would only stand to benefit from the Debtor's litigating with the Objecting Creditors. The Debtor himself seems to appreciate this, for when he was asked whether he knew that "a conversion will likely leave nothing or little for your unsecured creditors," the Debtor responded that he "understand[s] that's a possibility." Tr. I at 95. That possibility is much less likely in a Chapter 11 case where the Debtor's income is unquestionably available to both fund the litigation against the Objecting Creditors and pay allowed claims.

Furthermore, the adversary proceedings the Objecting Creditors commenced against the Debtor seeking to deny his discharge or have his debt to them declared nondischargeable will survive conversion. He therefore will be litigating with the Objecting Creditors one way or another—whether in Chapter 11 or Chapter 7—and will be using his postpetition income to do so. If this case were converted and the Debtor prevailed in the adversary proceedings seeking to deny or limit his discharge, he would protect his discharge from the Objecting Creditors' challenges, and at the same time shield his postconversion income (and in the Debtor's view, all of his postpetition income) from

unsecured creditors. This would benefit only the Debtor, not his unsecured creditors. In the meantime, the claims for affirmative relief that the Debtor asserts in the adversary proceedings against the Objecting Creditors—claims that might serve to augment the bankruptcy estate—would belong to the Chapter 7 bankruptcy estate and could be pursued only by the Chapter 7 trustee.[48] Again, however, the Chapter 7 trustee would have no access to a portion of the Debtor's postpetition income—and in the Debtor's view, would have access to none of it—in order to fully litigate those affirmative claims for relief.

Based on the foregoing, the Court finds that the Debtor does not wish to spend his postpetition income objecting to the claims of the Objecting Creditors if doing so would only benefit the creditors whose claims he deems to be legitimate, not himself. Rather, as long as he is going to litigate with the Objecting Creditors anyway, he would prefer to do it in a Chapter 7 case where, if he were to prevail, the benefit would inure to him in the form of a Chapter 7 discharge and the retention of millions of dollars of future income.

### 3. Failure to Negotiate with the Objecting Creditors in Good Faith

The commencement of a Chapter 11 case should serve as "an invitation to a negotiation,"[49] the goal being a reorganization under which creditors are repaid using the debtor's going-concern value—or, in the case of an individual Chapter 11 debtor, his future income—rather than assets that typically have significantly less

---

**48.** *See In re Nicole Gas Prod., Ltd.,* 502 B.R. 508, 513 (Bankr.S.D.Ohio 2013) ("[P]repetition causes of action of a Chapter 7 debtor are property of the debtor's estate.... [A] Chapter 7 trustee has the exclusive right to assert those claims.") (citing *Parker v. Goodman (In re Parker),* 499 F.3d 616, 624 (6th Cir.2007) and *Stevenson v. J.C. Bradford & Co.*

*(In re Cannon),* 277 F.3d 838, 853 (6th Cir. 2002)).

**49.** *In re Arnold,* 471 B.R. 578, 592 (Bankr. C.D.Cal.2012) (quoting Elizabeth Warren & Jay Westbrook, *The Law of Debtors and Creditors* 677 (6th ed. 2009)).

value in liquidation. Here, the Debtor's future income is the income he will realize from the Player Contract during the case and stands to realize from the Player Contract going forward, plus earnings from future contracts or other sources. According to the Debtor, "he is scheduled to earn approximately $6.3 million over the next three years under the remainder of his Player Contract, after taking into account taxes, escrow, and player dues." Debtor Findings & Conclusions ¶ 41. During his first year in bankruptcy (the 2014–15 hockey season), the Debtor in fact had net take home pay of $2,262,731.92. Doc. 404 at 2. Not counting legal fees, his expenses for that first year in bankruptcy were $425,707.78, leaving $1,837,024 of net income from salary after expenses. *Id.* Thus, even if the Debtor were to continue to spend at his currently excessive level—which, as discussed below, he cannot do—he will have accumulated at least $7.34 million of cash during the first four years after the Petition Date, minus whatever the bankruptcy estate must pay in legal fees. Second, the Debtor will be around 31 or 32 years old when the Player Contract expires. Given his age, he has far longer than the three years remaining on the Player Contract in which he can earn money, whether as a professional hockey player or otherwise.[50]

The income the Debtor has earned during the case and stands to earn going forward substantially exceeds the value of his non-exempt assets. Other than unspent postpetition earnings—which the Debtor contends would not be property of his bankruptcy estate if his case were converted—the non-exempt assets of the bankruptcy estate that do not appear to be encumbered have a value of around $400,000 to $500,000. *See* Ex. 4 at 18 ($300,000 net proceeds from sale of 8 Stratford Court, Manhattan Beach, CA);[51] Doc. 271 (motion seeking approval of a compromise under which Barwis would pay $74,125 to the Debtor's estate). As discussed in more detail below, the Debtor has taken the position that the sale of real property the Debtor owns in Ann Arbor, Michigan (the "Ann Arbor Property") would net $15,000 for unsecured creditors. In addition, as discussed below, the Debtor owns a Ferrari and three BMWs valued collectively at approximately $280,000; creditors assert liens on those vehicles, but the Debtor has suggested that the validity of those liens are subject to challenge. Other than that, the Debtor included personal property assets valued at less than $30,000 on his Schedule B, Ex. 4 at 4–6, and he included all but approximately $9,000 of those assets on his Schedule C (Property Claimed as Exempt). Ex. 4 at 19. The Debtor also holds interests in two 401(k) plans aggregating $303,907 in value as the Petition Date, but claims the entirety of those interests as exempt. Ex. 4 at 5, 19.

Taken together, the value of the Debtor's non-exempt assets—even including those potentially subject to liens—is approximately $800,000. That amount is much less than the approximately $7.34 million of cash (minus legal fees) that the Debtor will have accumulated during the

---

50. As to his potential earnings after his hockey career ends, the Court notes that the Debtor testified that he is still "trying to complete [his] degree ... at the University of Michigan." Tr. I at 44. In January 2014, the Debtor testified during a deposition that "[c]redit-wise [he is] a senior at the University of Michigan." Ex. NN at 8.

51. In a joint motion filed by the Debtor and Fidelity National Title Company, the sale proceeds to be distributed to the Debtor were estimated to be in the amount of $410,190.47. Doc. 158 at 2.

first four years following the filing of his Chapter 11 case even if his spending were to continue at its current level. And the Debtor will continue to have earning potential after that time.

Because the cash the Debtor has accumulated during this case already exceeds the value of his non-exempt assets, and because he is likely to accumulate significant amounts of cash going forward, the Debtor should have engaged in good-faith negotiations with the Objecting Creditors—if not for their sake, then at least for the benefit of the creditors holding millions of dollars of claims that the Debtor recognizes as legitimate. Although the Debtor conceded that he has a duty to negotiate with his creditors in good faith, Tr. I. at 150, for the reasons explained below, the Court finds that he has failed to do so.

The details of the Debtor's offer to the Objecting Creditors would have been probative of the issue of whether he engaged in good-faith negotiations with them. But the Court does not know what the Debtor offered the Objecting Creditors, for when they attempted to elicit his testimony on that point, his counsel objected, jealously guarding that information through reliance on the settlement privilege recognized by the Sixth Circuit and Rule 408 of the Federal Rules of Evidence. Tr. I at 68–71.[52] According to the Debtor, he made the same offer to each of the Objecting Creditors, Tr. I at 86, and in its pre-Hearing brief RFF alleged that the Debtor offered it a 2% recovery. Doc. 184 at 9. The Court previously found that this allegation "improperly revealed details of the offer the Debtor allegedly made during settlement negotiations," *In re Johnson*, 535 B.R. 223,

226 n. 3 (Bankr.S.D.Ohio 2015), and the Court therefore declines to consider it in deciding whether to grant the Conversion Motion. The Court does so even though the Debtor testified that he "believe[d] some [of the Objecting Creditors] would take around 98 percent," Tr. I at 102, and even though the Debtor reiterated his belief in his proposed findings of fact and conclusions of law, stating that the "Objecting Claimants would not take less than payment in full, or close to payment in full," but that he "believes that some of the Objecting Claimants would have accepted a 98% settlement," Debtor Findings & Conclusions ¶ 42 n.18 & ¶ 43.

In other words, the Debtor was more than willing to testify about the Objecting Creditors' purported settlement proposals but was unwilling to testify as to his own, invoking the settlement privilege. The settlement privilege cannot be used both as a shield and as a sword, so when the Debtor testified in such detail about the Objecting Creditors' offers, he arguably waived the privilege. The Objecting Creditors, however, did not assert that he had waived the privilege by so testifying during the Hearing, and the Court draws no adverse inference against the Debtor based on the dividend RFF alleges he offered.

Despite not knowing the dividend the Debtor offered to the Objecting Creditors, the Court finds that he failed to negotiate with them in good faith. As the Court previously noted, in denying the Objecting Creditors' request to depose the Attorneys, the Court admonished the Debtor that if the Objecting Creditors "adduce

52. *See Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.,* 332 F.3d 976, 981 (6th Cir.2003) ("The public policy favoring secret negotiations, combined with the inherent questionability of the truthfulness of any statements made therein, leads us to conclude that a settlement privilege should exist, and that the district court did not abuse its discretion in refusing to allow discovery."); *see also* Fed.R.Evid. 408 (Compromise Offers and Negotiations).

evidence during the hearing on the Conversion Motion supporting the allegations they have made in their objections [as to the Debtor's alleged failure to negotiate in good faith], the Court finds it difficult to conceive how the Debtor could rebut that evidence without delving into matters shielded by the attorney-client privilege, the work-product doctrine and the settlement privilege." *Attorney Protective Order*, 535 B.R. at 228. As explained below, the Objecting Creditors have introduced ample evidence of the Debtor's bad faith in conducting his Chapter 11 case, including his bad faith in negotiating with the Objecting Creditors.

Parties intending to negotiate in good faith will allow reasonable time for the formulation of reasonable counteroffers. The Debtor, however, allowed almost no time for the Objecting Creditors to make counteroffers before he filed the Conversion Motion. Their ability to do so was constrained because the Debtor made his first offer to most of the Objecting Creditors just a few days before filing the Conversion Motion, and he presented his offer to the Objecting Creditor holding the largest claim *the day before he filed the Conversion Motion.* Tr. I at 94, 98; Tr. II at 5. Moreover, the Debtor filed the Conversion Motion before he had even received a response from certain of the Objecting Creditors. Tr. I at 96. Although the Debtor testified that more than one of the Objecting Creditors rejected his offer before he filed the Conversion Motion, the only one the Debtor could specifically recall having rejected the offer at that time was EOT, Tr. I at 97, 137–39, the holder of the smallest claim among the Objecting

Creditors ($632,672.30). The Court finds that the Debtor's offer to the Objecting Creditors was a perfunctory gesture and not a serious attempt to negotiate a plan of reorganization.

During the Hearing, the Debtor attempted to justify filing the Conversion Motion without waiting for a response from certain of the Objecting Creditors by suggesting that he could not possibly confirm a Chapter 11 plan if any one of the Objecting Creditors failed to settle with him. Tr. I at 96–97, 101–02; Tr. II at 60. Along those same lines, he contends in his proposed findings of fact and conclusions of law that "[b]ecause the absolute priority rule applies to individuals in Chapter 11 ... and because the Objecting Claimants cannot be persuaded to accept something less than payment in full (or close to payment in full), Debtor is unable to confirm a Chapter 11 plan." Debtor Findings & Conclusions ¶ 79. But the Debtor's purported justification relies on a false premise, because he does not necessarily need to obtain the agreement of all of the Objecting Creditors in order to obtain confirmation of a Chapter 11 plan.

This is true for two reasons. First, if the Debtor's view of the invalidity of the Objecting Creditors' claims is correct, then their claims are subject to disallowance, and if their claims are disallowed, then they will have no standing to object to confirmation of a Chapter 11 plan. Second, although the absolute priority rule referenced by the Debtor applies in individual Chapter 11 cases in the Sixth Circuit,[53] the rule would come into play only if

---

**53.** *See Ice House Am., LLC v. Cardin,* 751 F.3d 734 (6th Cir.2014). Under the absolute priority rule as it is applied in individual Chapter 11 cases, a plan of reorganization cannot be confirmed over the vote of a rejecting class of unsecured claims if the debtor does not either

provide each unsecured creditor holding a claim in the rejecting class with "property of a value, as of the effective date of the plan, equal to the allowed amount of such claim," 11 U.S.C. § 1129(b)(2)(B)(i) or, failing that, provide that all of his non-exempt assets that

the Debtor failed to have the claims of the Objecting Creditors disallowed and a class of unsecured claims of which the Objecting Creditors' claims were a part "ha[d] not accepted" the plan. 11 U.S.C. § 1129(b)(1). That is, "[i]t is important to note that the application of the so-called absolute priority rule applies only in cases when a class of unsecured claims or equity interests is impaired and does not accept the plan."[54]

It is also important to note that the Bankruptcy Code does not require a unanimous vote from the members of a class of claims in order for the class to accept a Chapter 11 plan. Rather, a "class of claims has accepted a plan if such plan has been accepted by creditors ... *that hold at least two-thirds in amount and more than one-half in number* of the allowed claims of such class held by creditors ... that have accepted or rejected such plan." 11 U.S.C. § 1126(c) (emphasis added). Two-thirds in amount and more than one-half in number is far less than the 100% acceptance that the Debtor posits is required in order for him to obtain confirmation of a consensual Chapter 11 plan.[55]

Another false premise on which the Debtor relies relates to the amount he could feasibly pay under a Chapter 11 plan. The Debtor suggests that a determination of the amount available to him to fund a plan should be based on the assumption that if he "remains healthy and employed, he is scheduled to earn approximately $6.3 million over the next three years under the remainder of his Player Contract, after taking into account taxes,

---

he owned as of the commencement of the case will be disposed of for the benefit of unsecured creditors, 11 U.S.C. § 1129(b)(2)(B)(ii). *See In re Martin,* 497 B.R. 349, 359 (Bankr.M.D.Fla.2013) ("Under Martin's proposed Plan, holders of unsecured claims will not be paid in full; this class has not accepted the Plan treatment; and the Plan provides that Martin will retain non-exempt investment properties. Since the absolute priority rule still applies in individual Chapter 11 cases ... the Court will, by separate order, deny confirmation of the Plan.").

54. *Pennbank v. Winters (In re Winters),* 99 B.R. 658, 662 (Bankr.W.D.Pa.1989).

55. The Objecting Creditors suggest another way for the Debtor to obtain confirmation of a Chapter 11 plan even if a class of impaired unsecured claims were to fail to accept the plan, making the "absolute priority rule" of 11 U.S.C. § 1129(b)(2) applicable: liquidate his non-exempt prepetition assets so as to comply with § 1129(b)(2)(B)(ii) and pay his creditors his projected disposable income for five years under § 1129(a)(15). Creditor Findings & Objections at 30 n.24. The Debtor contends that this approach is "impossible" because in order to effectuate it the Debtor would need to pay his projected disposable income under § 1129(a)(15), but also would

need to satisfy § 1129(a)(8) by obtaining an acceptance of the plan by all of his classes of unsecured claims. Debtor Findings & Conclusions at 24 n.23. The Debtor's position again is incorrect, for it ignores the fact that by liquidating his non-exempt prepetition assets in order to meet the requirements of § 1129(b)(2)(B)(ii), the Debtor would satisfy the absolute priority rule, thus making his compliance with § 1129(a)(8) unnecessary. The Objecting Creditors have not suggested— either in their briefing or at the Hearing—that the Debtor's only path to confirmation (absent a settlement with them) is satisfying both § 1129(b)(2)(B)(ii) and § 1129(a)(15). And the Court takes no position whether it would be reasonable for the Objecting Creditors to insist on that approach given the serious issues that have been raised about the validity of their claims—issues that counsel for one of the Objecting Creditors frankly acknowledged at the Hearing. As counsel for RFF, who also made an opening statement during the Hearing on behalf of all of the Objecting Creditors, put it: "Certainly none of ... the [O]bjecting [C]reditors ... are standing before the Court asking that [they] be found today not to have sinned." Tr. I at 34. He added that the Objecting Creditors "recognize that there are arguments that could be made that certain of these claims have issues with interest rates, security interests, et cetera." *Id.*

escrow, and player dues." Debtor Findings & Conclusions ¶ 41.

The Debtor's reliance on the $6.3 million figure ignores at least three facts. First, as discussed above, even if the Debtor were to continue to spend at his current high level, he is on course to accumulate approximately $7.34 million of cash during the first four years after the Petition Date, minus whatever the estate pays in legal fees. Second, as discussed below, the Debtor's fiduciary duties to the estate prohibit him from continuing to spend at his current level, meaning that he will be able to conserve even more cash for the benefit of his bankruptcy estate. Third, it is not uncommon for Chapter 11 plans to last at least five years. Given that the Debtor will be either 31 or 32 years old when the term of the Player Contract expires, he has far longer than the three years remaining on the Player Contract in which he can earn money, either as a professional hockey player or otherwise. And while the Debtor contends that "the scope and duration of [his] career and income are far from certain," and that "this is not the type of case where [the Debtor] enjoys, and will continue to enjoy, a stable and predictable living," Debtor Findings & Conclusions ¶ 78, these arguments fail to persuade. For while all that may well be true, it is beside the point. After all, it would be the rare individual Chapter 11 debtor, if any, who could propose a plan of reorganization if what were required was a predictable future and certainty about his prospective stream of income.

In addition to leaving little or no time for meaningful counteroffers and negotiating based on false premises, the Debtor presented his offer to the Objecting Creditors on a take-it-or-leave-it basis. In fact, he conceded that when he had the opportunity to make another offer before the Court-ordered mediation, he made the very same offer to the Objecting Creditors that he had made before filing the Conversion Motion. Tr. II at 7. And while the Debtor could have used the threat of conversion as leverage in his negotiations with the Objecting Creditors, he failed to do so. When asked whether he would agree that neither he nor his attorneys had informed the Objecting Creditors that he would immediately file the Conversion Motion if they failed to accept his proposal, the Debtor agreed that the Objecting Creditors had not been so informed. Tr. II at 8–9. But despite failing to mention the possibility of conversion to the Objecting Creditors, both the Debtor and his attorneys certainly were considering the prospect of converting the case. In making this finding, the Court recognizes that the Debtor testified that he did not consider conversion before he made his initial offer to the Objecting Creditors. See Tr. II at 6 ("I don't know what my attorneys were considering at that time. I know that wasn't a consideration for me at that point."). Notwithstanding this testimony, for the reasons explained below, the Court finds that the Debtor and his attorneys had decided—before they even made an offer to any of the Objecting Creditors—to file the Conversion Motion if any one of the Objecting Creditors rejected the Debtor's take-it-or-leave-it offer.

As discussed in more detail below, the Debtor's attorneys began researching conversion-related issues on February 18, 2015—before the Debtor even made his first offer to an Objecting Creditor on February 27, 2015. When the Objecting Creditors pointed this out during the Hearing, the Debtor denied having considered conversion before he made an offer to the Objecting Creditors. It is perhaps for this reason that the Debtor states vaguely in his proposed findings of fact that "beginning in February 2015 Debtor proposed a plan settlement to Objecting Claimants."

Debtor Findings & Conclusions ¶ 42. But in a previous submission to the Court and in his Hearing testimony, the Debtor was not so vague. Again, the Debtor filed the Conversion Motion on March 5, 2015, and he conceded that the earliest he made an offer to any of the Objecting Creditors was a few days before filing the Conversion Motion. Tr. I at 94. In a portion of his testimony that the Debtor fails to cite in his proposed findings of fact, the Debtor admitted that he first made a settlement offer to the Objecting Creditor holding the largest claim *the day before* he filed the Conversion Motion—March 4, 2015. Tr. I at 98. In the Reply he filed before the Hearing, the Debtor stated that he "proposed terms for treatment under … a plan for [the Objecting Creditors and CapStar] between February 27, 2015 and March 4, 2015," Reply at 29–30, a timeline borne out by his attorneys' fee statements.

Reviewing the fee statements submitted by the Debtor's counsel in light of the Debtor's position that he could not possibly reorganize if even one Objecting Creditor rejected his offer, it becomes evident that he had already decided to immediately file the Conversion Motion if any one of them failed to accept his proposal. According to HLP's first fee application (the "First Fee Application") (Ex. U), on February 18, 2015, an HLP attorney conducted "[r]esearch regarding applicability of the means test to individual debtor cases converted from Chapter 11 to 7." Ex. U, Part C5 at 40. From that date until the date on which the Debtor made his first offer to any of the Objecting Creditors (February 27, 2015), HLP attorneys spent 13.2 hours researching the means-test issue. Then, on February 27, 2015 alone, HLP professionals spent an additional 11.3 hours of time related to conversion. This time included 4.7 hours conducting "[r]esearch regarding whether pre-conversion wages are considered property of a Chap-

ter 11 debtor's estate," Ex. U, Part C2 at 18; 2.3 hours summarizing the applicability of the means test in converted cases, *id.*; 1.2 hours researching "Southern District procedures and case filings regarding conversion/dismissal," *id,* Part C5 at 43; and 1.4 hours researching issues related to and drafting the Conversion Motion, *id.*

Again, although he testified that multiple Objecting Creditors had rejected his offer before he filed the Conversion Motion, the only one of the Objecting Creditors that the Debtor could specifically recall was EOT. Tr. I at 97, 137–39. On March 2, 2015, DeMarco and Kessler spent half an hour "negotiat[ing] with [counsel for EOT] … concerning plan proposal to EOT." Ex. U, Part C5 at 48. By contrast, from February 28, 2015 (the date after the first offer to any of the Objecting Creditors) through the March 2, 2015 date of the conference with EOT's counsel, the Debtor's attorneys had spent an additional 15.2 hours on conversion-related issues. By the end of the day on which they negotiated with EOT, the Debtor's attorneys had spent 40.9 hours of time related to the Conversion Motion.

Over the course of the three days after the conversation with EOT attorney's (March 3, 2015 through March 5, 2015 when the Conversion Motion was filed), HLP professionals spent an additional 44.1 hours related to the Conversion Motion. In all, the Debtor's attorneys expended 85 hours of time on conversion from February 18, 2015 through the day they filed the Conversion Motion. App. II. In that same time frame, by contrast, the Debtor's attorneys billed only 44.2 hours set forth in time entries that even mention the word "plan" or the like; that was after spending only 18.4 hours between the Petition Date and February 18, 2015 on such matters (for a total of 62.6 hours up to the date of the filing of the Conversion Motion). App.

IV. Moreover, much of that time is described generically as relating to "plan issues," "plan strategy" and "plan considerations." Given how intertwined conversion and plan issues became, it is more likely than not that the HLP attorneys spent at least some of the time on "plan issues" and "plan strategy" also addressing the prospect of conversion. In any event, it is impossible to determine which of those generalized entries actually relate to the formulation of a Chapter 11 plan.

HLP included most of this conversion-related time in the "Plan of Reorganization" time category. Including the time spent analyzing conversion within the Plan of Reorganization category might have been justified if the Debtor had used the prospect of filing the Conversion Motion as leverage in his plan negotiations with the Objecting Creditors. But, again, when he was asked whether he would agree that neither he nor his attorneys had advised the Objecting Creditors that he would immediately file the Conversion Motion upon their rejection of his proposal, the Debtor agreed that they had not done so. Tr. II at 9.

As noted above, during the Hearing, counsel for one of the Objecting Creditors made the Debtor aware of HLP's entries reflecting the time the firm spent in February 2015 analyzing conversion issues before the Debtor had even extended his offer to the Objecting Creditors. In response, the Debtor testified that he had not considered conversion prior to making those offers. Tr. II at 6 ("I don't know what my attorneys were considering at that time. I know that wasn't a consideration for me at that point."). The Object-

ing Creditors also noted HLP's conversion-related time entries in their proposed findings of fact. Creditor Findings & Conclusions ¶ 61 n.22. There is, of course, an obvious discrepancy between the time entries and the Debtor's testimony that he was not considering conversion before he made an offer to the Objecting Creditors. Yet the Debtor did not even attempt to explain the discrepancy in his own proposed findings of fact and conclusions of law. Instead, he represented that he made offers "beginning in February 2015" without identifying the precise date of the first offer (February 27, 2015), and simply repeated that he "did not consider the conversion of his case when he proposed the plan settlement to Objecting Claimants, and only considered conversion when negotiations with them proved fruitless." Debtor Findings & Conclusions ¶ 43.

The Court considers it unlikely that HLP attorneys would have spent time analyzing issues relating to conversion starting on February 18, 2015 without informing the Debtor that they were doing so. Nor is it conceivable that DeMarco and Kessler would have failed to mention the concept of conversion when, before the first offer was made to any of the Objecting Creditors, they had an hour-long conference with the Debtor on February 24 to discuss "plan strategy." Ex. U, Part C5 at 42. True, the Debtor's attorneys spent some time (albeit relatively little) preparing a "plan Term Sheet." But that demonstrates only the obvious—that the Debtor had to present something to the Objecting Creditors. It does not show that the Debtor was serious about seeking confirmation of a Chapter 11 plan.[56]

---

56. After the filing of the Conversion Motion, HLP time entries mentioning the word "plan" or "mediation" aggregate 148.60 hours, giving rise to $68,613 of fees. *See* App. V. Several of those entries also mention conversion, and most of the services were performed in connection with preparations for the Court-ordered mediation, which in large part involved the Conversion Motion.

The Court finds that the Debtor was considering conversion before he made the first offer to any of the Objecting Creditors and that he failed to inform them of his intent to immediately file the Conversion Motion if any one of them failed to accept his proposal. The Debtor made his offers on the eve of filing the Conversion Motion and filed the Conversion Motion despite not having allowed time for any meaningful negotiations to occur. And then, when he had the opportunity to make another offer before the Court-ordered mediation, the Debtor made the very same offer that he had previously presented to the Objecting Creditors. Quite simply, the approach taken by the Debtor in this case looks nothing like a good-faith attempt to reach an agreement with the Objecting Creditors on the terms of a plan of reorganization. For all of the reasons set forth above, the Court finds that the Debtor negotiated with the Objecting Creditors in bad faith.

### 4. Failure to Promptly Sell Depreciating Assets

The Debtor has failed to sell depreciating assets for the benefit of his bankruptcy estate while at the same time imposing the costs of retaining those assets on the estate. As of the date of the Hearing, the Debtor owned a 2011 Ferrari that he estimated to be worth $193,000 on the Petition Date. Ex. 4 at 5. During the Hearing, the Debtor explained that the Ferrari was his "dream car," but that he does not drive it and intends to sell it. Tr. II at 41. The Debtor also pointed out in his proposed findings of fact and conclusions of law that the Objecting Creditors had "adduced no evidence of Debtor intending to retain any vehicles," Debtor Findings & Conclusions at 38 n.32, which would include not only the 2011 Ferrari, but also his three BMWs. The Debtor conceded that he has continued to permit the Johnsons to drive

one of his BMWs during his bankruptcy case. Tr. I at 48. On his Schedule B, he represented that this BMW, as well as another of his BMWs of the same year and model (2007 BMW X5), has a value of $21,025. Ex. 4 at 5. The Debtor owns yet another BMW, a 2012 BMW X6, that he values at $45,000. *Id.* The Debtor and CapStar, which contends that it has a lien on the 2012 BMW, entered into an agreed order under which the Debtor is making payments to CapStar. *See* Doc. 253.

Given the Debtor's professed intentions, the Court finds that he had a fiduciary duty to maximize the value of his bankruptcy estate by selling the Ferrari and any of the BMWs that he intends to dispose of (he does not, of course, need three BMWs). This obligation included not only selling the vehicles, but also doing so promptly after the Petition Date so that his bankruptcy estate could realize as much value as possible from them before they depreciated in value any further. The Debtor admitted that he has a fiduciary duty to maximize the value of his bankruptcy estate, Tr. I at 140, and he also conceded that he has an obligation to—as counsel for one of the Objecting Creditors put it—"avoid all unreasonable expenses." Tr. I at 148. Yet the Debtor failed to observe his fiduciary duty in this regard, for he had not sought authority to sell the Ferrari or the BMWs as of the date of the Hearing—which took place nearly a year after the Petition Date—and in fact still has not requested authority to sell the vehicles. All the while, the Debtor has used funds belonging to his bankruptcy estate to pay insurance costs and other expenses associated with the retention of the Ferrari and the BMWs. For the period from April 17, 2015 through October 17, 2015, the six-month premium for the four vehicles was $8,764, with the 2011 Ferrari accounting for $5,277 of that total. *See*

Ex. P at 10–12 (monthly operating report for the period ending April 30, 2015). In addition, as of January 31, 2016, the Debtor has spent $14,921.01 (an average of $932.56 per month) on fuel and maintenance and repair of his vehicles. Doc. 494 at 2.

During the Hearing, the Debtor explained that he had not yet attempted to sell the Ferrari because he wanted to "prioritize" his efforts by selling the Malaga Way Property in Manhattan Beach, California first. Tr. II at 42–43. But there is nothing that should have prevented the Debtor, with the assistance of his professionals, from attempting to sell a vehicle at the same time his professionals were marketing his real property in California. The Debtor's explanation for his delay in attempting to sell the Ferrari is not convincing. The Court finds that by failing to promptly sell the Ferrari and other depreciating assets (including at least one of his BMWs), the Debtor has not fulfilled his fiduciary duty to creditors to maximize the value of his bankruptcy estate and conserve its resources. This is all the more true given the insurance costs and other expenses the estate has borne due to his retention of the Ferrari and the BMWs.

### 5. Failure to Disclose Transfers to or on Behalf of the Debtor's Parents and to Fully Investigate Assets of the Parents

### a. Failure to Disclose Transfers

Once he filed his bankruptcy case, the Debtor was obligated to report certain information to the Court and parties in interest. The Debtor contends that he has made "all required filings." Debtor Findings & Conclusions ¶ 82. As explained below, given the Debtor's failure to fully comply with his reporting obligations, this is simply not true.

Under § 521(a)(1) of the Bankruptcy Code and Rule 1007(b)(1) and (c) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rule(s)"), the Debtor was required to file, within 14 days after the Petition Date, a schedule of assets and liabilities and a statement of his financial affairs. On the Petition Date, the Debtor filed a motion (Doc. 6) requesting an extension through November 20, 2014 in which to file the required documents, and the Court thereafter entered an agreed order between the UST and the Debtor (Doc. 24) granting him an extension through November 7, 2014. On that date, the Debtor filed his original schedules of assets and liabilities (the "Original Schedules") (Exhibit 2) and his original statement of financial affairs (the "Original SOFA") (Exhibit 3).

The evidence presented during the Hearing suggests that the Debtor's bankruptcy estate almost certainly has fraudulent transfer claims against the Johnsons on account of cash they received from the Debtor's earnings or borrowings before the Petition Date without the Debtor receiving a reasonably equivalent value in exchange. The Debtor should have had sufficient information to identify such claims on the Original Schedules. After all, in the Retention Application filed on the Petition Date, he stated that "[the Johnsons] and [the Objecting Creditors] took advantage of [the Debtor] and, for that matter, [the Johnsons'] financial inexperience and naiveté *to use [ the Debtor's] money without telling him*." Retention Application at 5 (emphasis added). Moreover, the Debtor's attorneys spent several hours meeting with or otherwise communicating with the Johnsons starting on the Petition Date and continuing through November 6, 2014.[57] Despite this, when the

---

**57.** DeMarco and Kessler had a meeting with the Johnsons that lasted 2.4 hours on the

Debtor filed the Original Schedules on November 7, 2014, he stated on Schedule B that his "Potential Claims Against Various Third Parties" was "undetermined." Ex. 2 at 7. It was not until May 20, 2015—more than two months after the Debtor had decided to pass administration of his bankruptcy estate to a Chapter 7 trustee—that he finally amended his Schedule B to state that he had claims against his parents for "avoidable transfers" and "negligence [that] contributed to significant losses and Debtor's finances spiraling out of control." Ex. 4 at 17. This delay is important for two reasons. First, because the Debtor has taken the position that none of his postpetition earnings would be property of his bankruptcy estate available to a Chapter 7 trustee if his case is converted, the delay suggests that the Debtor was never serious about using his income to pursue claims belong to his bankruptcy estate. Second, if the Debtor had disclosed the claims against his parents before he filed the Conversion Motion, in light of the Debtor's obvious reluctance to pursue those claims, a party in interest would have had grounds to file a motion under § 1104(a) of the Bankruptcy Code for the appointment of a Chapter 11 trustee earlier in the case. *See, e.g., In re Grasso*, 490 B.R. 500, 517–518 (Bankr.E.D.Pa.2013) ("[T]his Court [has] recognized that the [d]ebtor's estate possessed colorable claims against [his] wife relating to these alleged transfers that warranted an independent and impartial investigation. The existence of the estate's potential claims against the [d]ebtor's wife evidenced a conflict of interest and that such conflict con-

stituted cause for appointment of a Chapter 11 Trustee.").

Furthermore, Question 10 of the Original SOFA required the Debtor to identify all property: (1) that was not listed in answers to prior questions (there was no property so listed); and (2) that the Debtor transferred within two years before the Petition Date, other than property transferred in the ordinary course of business or financial affairs of the Debtor. Ex. 3 at 4. In particular, Question 10 required the Debtor to identify: (1) the name and address of the transferee and the transferee's relationship to the Debtor; (2) the date of the transfer; and (3) the property transferred together with its value. In response to that question, the Debtor's answer was "Investigating." Ex. 3 at 4. When the Debtor filed his amended statement of financial affairs (the "Amended SOFA"), he did not amend his answer to Question 10, but again stated that he was "Investigating" transfers of property that he had made within two years before the Petition Date. Ex. 5 at 4. Filing the Reply on April 2, 2015, the Debtor represented that "[h]e ha[d] not transferred assets to insiders or third parties unless for fair consideration." Reply at 32. After he made that representation, one of his attorneys spent 2.70 hours on May 8, 2015 conducting "[r]esearch regarding disclosure of transfers, gifts, or purchases made on behalf of parents on statement of financial affairs." Ex. U, Part C 4 at 51. Of course, the gifts referenced in the time entry would not have been made for, as the Debtor put it in the Reply, "fair con-

Petition Date, both of them recording the time as "Attend meeting with J. Johnson, II and T. Johnson regarding facts relating to assets and liabilities of J. Johnson, III." Ex. U, Part C 1 at 4, 5. Then, on October 9, 2014, Kessler billed one hour of time for an "[i]nterview of J. Johnson, II and T. Johnson regarding liabilities and creditors' purported loans," and, on

October 21, 2014, he billed another 2.4 hours for the "[i]nterview of J. Johnson, II and T. Johnson regarding loans and creditors." Ex. U, Part C1 at 8 & Part C3 at 95. He also billed 1.4 hours of time on November 6, 2014 for a "[m]eeting with J. Johnson, Sr. regarding related entities and ownership of property/assets." Ex. U, Part C3 at 56.

sideration." With respect to gifts, Question 7 on the Amended SOFA required the Debtor to identify: (1) the name and address of the recipient of the gift and the recipient's relationship to the Debtor, (2) the date of the gift and (3) the nature of the gift and its value. In response to that question, the Debtor omitted the required detail, stating only "Various Parties/Various Dates" and "Donations—approx. value $5,000." Ex. 5 at 4. Again, when the Debtor filed the Amended SOFA, he stated that transfers made prior to the Petition Date remained under investigation. As of the date of this opinion, the Debtor still has not disclosed any gifts or other transfers made to his parents or to third parties on their behalf, nor has he further amended the Amended SOFA to state that no such gifts or transfers were made.

In their proposed findings of fact, the Objecting Creditors pointed to the Debtor's statement in the Original SOFA and the Amended SOFA that he was still investigating asset transfers to insiders within one year before the Petition Date. Creditor Findings & Conclusions at 24 n.18. In so doing, they cited Question 3.c of the Original SOFA and the Amended SOFA, which elicited disclosure of transfers to insiders who are *creditors*. Given that the Johnsons are unlikely to be creditors of the Debtor, the reference to Question 3.c appears to have been a mistake.[58] That said, the fact of nondisclosure had been adequately noted, and the Debtor should have addressed it. Yet when he filed his own proposed findings after the Objecting Creditors filed theirs, the Debtor declined to address his failure to identify transfers to his parents or other third parties. In lieu of doing so, he merely

pointed out that he had identified on the Amended Schedules causes of action that he believes he has against his parents. Debtor Findings & Conclusions ¶ 35. But the inclusion of that information on the Amended Schedules did not satisfy the Debtor's obligation to identify actual transfers with the detail required by the Amended SOFA. Nor is the Debtor's failure excused by his testimony that he had "been unable to determine 'to the penny' where all of his assets went before June 2014," Debtor Findings & Conclusions ¶ 34 (citing Tr. I at 91), or his testimony that his "investigation was ongoing even as of the Hearing," *id.* (citing Tr. I at 100). Even if this were the case, the Debtor should have disclosed what he knew about asset transfers made to the Johnsons and other third parties and then amended the disclosure if additional information became available. Again, he still has not done so. The Court finds that the Debtor has failed to comply with his obligations under § 521(a)(1) of the Bankruptcy Code and Bankruptcy Rule 1007 to disclose the details of his transfers to his parents and other third parties.

The Debtor's failure to fully comply with his disclosure obligations is particularly glaring given the magnitude of the prepetition spending on luxury homes and automobiles, approximately $400,000 of improvements to the Ann Arbor Property (described in more detail below), and jewelry purchases exceeding $600,000.

### b. Failure to Fully Investigate Assets of the Johnsons

The Debtor contends that pursuing his parents would be pointless because they

---

**58.** Responding to Question 3.c on his Amended SOFA, the Debtor attached a sheet in which he described some of the factual bases for the claims he may have against his par-

ents. Ex. 5 at 12. The Debtor, however, did not disclose transfers he made to his parents with the detail required by the Amended SOFA.

purportedly lack any significant assets.[59] Tr. at II at 46; *see also* Debtor Findings & Conclusions ¶ 36 ("Debtor's investigation also confirmed that the Johnsons have limited to no assets and, further, that they are not concealing assets.") (citing Tr. I at 177, Tr. II at 45–46). But the Debtor, who has never undertaken any formal discovery to confirm his belief regarding his parents' financial condition, apparently is content to simply take their word for it—primarily based on a half-day meeting the Debtor's attorney had with the Johnsons in February 2015.[60] The Debtor agreed that "up until the creditors took [the Johnsons'] deposition, basically [he] relied upon what [his] professionals could learn from just simply talking with [his] parents." Tr. I at 105. Similarly, when counsel for one of the Objecting Creditors inquired about the basis for the Debtor's statement in the Amended SOFA that "the Johnsons have limited to no assets and have advised that they are considering filing for bankruptcy," Tr. I at 177, the Debtor stated that "well, from meeting with [his] professionals after they spoke to [his] parents, [he] believe[d] that [his] parents just flat out made that statement." Tr. I at 178. He also testified that they "look[ed] through bank accounts and tr[ied] to look through any assets that they might have, [and considering] they have no employment . . . it seems like something that's a possibility [i.e., that the Johnsons have no assets]."

Tr. I at 179. But, again, he never undertook formal discovery to confirm his belief that his parents lack any significant assets. The Debtor contends that this was appropriate even though his parents withheld financial information from him both before and after the Petition Date. Tr. I at 104–07. He explained that he took this approach because he was "trying to use honey instead of vinegar" for fear his parents would "clam up" if they were subjected to a more formal process of inquiry. Tr. I at 105. While that may explain why the Debtor used a nonadversarial approach as an initial matter, it does not explain why he found a wholesale abandonment of the opportunity to conduct formal discovery to be advisable once his efforts to obtain information from them informally had come to an end.

Furthermore, there is nothing in the record from which the Court can ascertain the actual questions the Debtor's counsel posed to the Johnsons during their meetings and telephone conferences. The Court has, however, carefully reviewed the Parent Depositions—depositions initiated by the Objecting Creditors and whose scope the Debtor tried unsuccessfully to limit to events occurring after the Petition Date. During those depositions, neither counsel for the Debtor nor counsel for the Objecting Creditors asked the Johnsons the full range of questions that may have elicited whether they have any cash or

---

59. Mr. Johnson testified that he owns a Ferrari, but that the "motor is fried" as the result of some "surge or something" caused by a charger placed on the vehicle. JJII Dep. at 60. Mrs. Johnson testified that the Ferrari is titled in the name of both of the Johnsons. KJ Dep. at 153. On the Amended SOFA, the Debtor stated in his answer to Question 14 that he holds or controls a 2012 Mini Cooper on behalf of his parents. Ex. 5 at 5.

60. *See* Debtor Findings & Conclusions ¶ 35 ("Debtor's investigation of the Johnsons included a four-plus hour meeting between the

Johnsons and Debtor's counsel on February 12, 2015, in Minneapolis, Minnesota and various other communications."). During their depositions, the Johnsons testified that they met with DeMarco and Kessler on February 12, 2015 for more than four hours. KJ Dep. at 251–52; JJII Dep. at 86–88. On that day, DeMarco billed 4.4 hours for "[i]nterview[ing] witnesses regarding J. Johnson, III," and Kessler billed 4.4 hours for a "[m]eeting with witnesses regarding certain financial transactions with creditors." Ex. U, Part C2 at 15.

other assets that they have not disclosed, or whether they have access to such assets. For example, no one asked the Johnsons whether they possessed or had access to cash or cash equivalents and, if so, in what amount and where such cash/cash equivalents might be located. This is potentially important because Mrs. Johnson testified that she sold diamonds, gold and other jewelry that she had bought for investment purposes. Testimony that Mrs. Johnson gave about specific items supports a finding that she spent at least $350,573.20 purchasing those items. *See* KJ Dep. at 174, 188–91, 200, 202–05, 210–12, 219–22, 226–28.[61] In addition, she was not asked about other large amounts she spent at jewelry stores that total $292,559.87.[62] Most, if not all, of this amount likely falls into the same category as the items purchased for $350,573.20, bringing the total diamonds, gold and jewelry potentially purchased for investment purposes to $643,133.07.[63]

Mrs. Johnson testified that she purchased the items she bought for investment purposes at wholesale prices and that this "created a situation that almost no matter how we sold them we would make a profit[.]" KJ Dep. at 282. She also testified that she did not have receipts of the sale transactions because the entities to whom she sold the jewelry "don't give receipts." KJ Dep. at 153. And she answered "no" when asked whether she could "produce any paperwork evidencing the fact that [she] sold this jewelry." *Id.* Mrs. Johnson says that she no longer has any of the items that she purchased for investment purposes, KJ Dep. at 149, but did not testify regarding the proceeds of the sale of the items. Notwithstanding the fact that the Johnsons have not adequately accounted for assets aggregating more than $643,000 in value, the Debtor contends that the Court and parties in interest should just accept their word that they have no significant assets based on informal communications—primarily the half-day meeting in February 2015—that his attorney had with the Johnsons. The Court strongly disagrees.

### 6. Postpetition Support of the Debtor's Parents and Brother Using Resources of the Bankruptcy Estate

In the Chapter 11 case of an individual debtor, "earnings from services performed by the debtor after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7" are not the debtor's property, but instead are property of his bankruptcy estate. 11 U.S.C. § 1115(a)(2).

---

**61.** Mrs. Johnson testified that the only reason she would purchase items at Frederick Jewelers was for investment purposes. KJ Dep. at 220–21. Thus, the $350,573.20 includes all items that Mrs. Johnson purchased at Frederick Jewelers, even if she did not specifically testify about the reason for her purchase at that store on a particular date.

**62.** *See* Ex. Z at 2780, 2795, 2820, 2841, 2856–58, 2860, 2917, 2920, 2926, 2928, 2957, 2969, 2979; Ex. AA at 1404; Ex. CC at 2060, 2069; Ex. EE at 1898,1913,1923,1933,1943,1945, 1949, 1953; Ex. GG at 2189, 2221; Ex. HH at 2123, 2131; Ex. II at 1697.

**63.** The Court has not included in this amount the $53,088.71 that the evidence shows was spent to purchase or repair jewelry for personal use or gifts. The $643,133.07, however, does include items purchased before the Borrowing Period began in 2010. After all, someone who purchased an item in 2010 could still retain the item—or the proceeds of the sale of the item—just as readily as she could if the item were purchased in 2011 or later.

Moreover, as previously noted, the primary purpose of an individual Chapter 11 case is to provide the debtor with a breathing spell so that he can reorganize his debts and provide a recovery to his creditors out of his future earnings rather than a lesser recovery through liquidation of his assets. Thus, once he filed his bankruptcy case, the Debtor had a fiduciary duty to his creditors to preserve his earnings by controlling his expenses. Using his income to support persons other than the Debtor or his dependents would violate that fiduciary duty and would constitute bad faith on his part. *See In re Garrett,* No. 14–04063–5–DMW, 2015 WL 1546149, at *7 (Bankr.E.D.N.C. Mar. 31, 2015) ("Although the court is sympathetic to the Debtor's desires to help those who are unwilling or unable to support themselves, the Debtor's bankruptcy filing exhibits bad faith. Debtors cannot choose to give unreasonable amounts of money to friends and loved ones instead of paying debts on which they are legally obligated.").

Neither the Debtor's parents nor his brother are his dependents. *See* Ex. 4 at 43 (the Debtor stating on his Schedule J that he has no dependents). Despite this, the Debtor continued to use cash belonging to the bankruptcy estate to support his parents and brother after the Petition Date in a variety of ways. First, after the Petition Date, the Debtor paid rent for the residence where his parents and younger brother stay while his brother attends the same private school in Minnesota that the Debtor attended; the Debtor also paid part of his brother's private-school tuition. Tr. I at 50, 112, 141–42. As of the period ending January 31, 2016, the expenditures made by the Debtor after the Petition Date for the living expenses and tuition of his brother totaled $15,350.93. Doc. 494 at 2.

Second, the Debtor conceded during the Hearing that he has continued to permit the Johnsons to drive one of his two 2007 BMW X5s after the Petition Date. Mrs. Johnson testified that the Johnsons are not paying the premiums required to insure the BMW. KJ Dep. at 113–14. Because the BMW is property of his estate, the Debtor is obligated to insure the vehicle until he seeks and obtains Court authority to sell it, and he has insured the BMW at a cost to the estate of at least $892 every six months. *See* Ex. P at 10–12 (monthly operating report for the period ending April 30, 2015 stating that the six-month premium for one of the Debtor's 2007 BMWs is $892 and the six-month premium for the second 2007 BMW is $942). Thus, by allowing his parents to use the BMW rather than selling it, the Debtor is accommodating his family in a way that has caused the estate to incur additional costs of at least $1,784 ($892 × 2), bringing to $17,134.93 the total cash he has expended for transportation, rent and tuition of his nondependent family members.

On top of that, when the Johnsons and their younger son are not residing in Minnesota during the school year, they live at the Ann Arbor Property. According to the Debtor's Schedule A, the Ann Arbor Property has a value of $550,000. Ex. 4 at 3. As of the date of the Hearing, the Debtor had not attempted to sell the Ann Arbor Property despite having been in bankruptcy for nearly a year. His retention of the Ann Arbor Property has imposed costs on the bankruptcy estate. As of the period ending January 31, 2016, the Debtor had paid property insurance premiums for the Ann Arbor Property of $4,271.30. *See* Doc. 494 at 2. He also has paid $1,039.46 for maintenance, repair and upkeep of the Ann Arbor Property. *Id.* In addition, the Debtor continued to pay the utility bills for the Ann Arbor Property.

Tr. I at 142.[64]

As he did with the 2011 Ferrari, the Debtor explained that he had not yet sold the Ann Arbor Property because he wanted to "prioritize" his efforts and first sell the Malaga Way Property. Tr. II at 42. But, again, nothing prevented the Debtor from marketing the Ann Arbor Property and the Malaga Way Property simultaneously. Further, the Debtor filed a motion to sell the Malaga Way Property back in May 2015, nearly four months before the Hearing at which the Debtor testified that he had not attempted to sell the Ann Arbor Property because he was "tackling [the sale of assets] one at a time." Tr. II at 42. The Court finds the explanation the Debtor provided during the Hearing as to why he had not yet sold the Ann Arbor Property to be unconvincing. In light of the costs associated with the retention of the Ann Arbor Property, the Debtor's failure to attempt to sell it early in the case constitutes another violation of his fiduciary duty to preserve funds belonging to the bankruptcy estate.

After the Hearing, on October 16, 2015, TCF National Bank ("TCF") filed a motion for relief from stay with respect to the Ann Arbor Property (the "TCF Motion") (Doc. 393).[65] In his objection to the TCF Motion, the Debtor stated that he had not yet attempted to sell the Ann Arbor Property because "the residential real estate market slows considerably during the fourth quarter, gaining momentum during the first quarter and reaching peak volume during the second quarter." Doc. 414 at 6 n.5. He also represented that "[k]eeping the [Ann Arbor] Property off the market during the slower fourth quarter [of 2015] will help prevent the [Ann Arbor] Property from accumulating too many days on the market, which can have the effect of depressing would-be offers for residential real estate." Id. But that purported justification in no way explains his failure to attempt to sell the Ann Arbor Property during the first, second or third quarters of 2015.

Objecting to the TCF Motion, the Debtor pointed out that relief from the automatic stay under § 362(d)(2) may be granted "only if [the] Debtor lacks equity in the [Ann Arbor] Property and the [Ann Arbor] Property is not necessary for an effective reorganization." Id. at 6. According to the Debtor, he has equity in the Ann Arbor Property and, "because the Conversion Motion remains pending, the [Ann Arbor] Property ... likewise remains necessary for an effective reorganization." Id. He then noted that, "[c]onsistent with [the] Debtor's obligation to maximize returns to creditors, [he] sought the services of a real estate broker in order to evaluate the [Ann Arbor] Property for marketing and sale...." Id. That is, the Debtor acknowledged the proposition that he has an obligation to maximize the recovery

---

64. As of the period ending December 31, 2015, the Debtor had spent $14,954.48 on "Electricity, heat, natural gas." See Doc. 469 at 2. The monthly operating report, however, does not state how much of this was for the Ann Arbor Property.

65. TCF asserted in the TCF Motion that the "Debtor has failed to pay post-petition real estate taxes and other assessments due and owing on the [Ann Arbor Property] in the aggregate amount of $11,218.31, which amounts have been advanced by [TCF]." TCF

Mot. at 3. The Debtor thereafter paid real estate taxes of $11,218.31 on November 23, 2015. See Doc. 449 at 2, 10 (wire payment of $11,218.31 noted in monthly operating report for the period ending November 30, 2015). During the Hearing, the Debtor testified that the taxes on the Ann Arbor Property were not "up to date." Tr. I at 47–48. All of this raises the question of why the Debtor had reported on the monthly operating reports he filed before the Hearing that he had paid "all postpetition taxes...." See, e.g., Ex. R at 1.

realized by unsecured creditors. A necessary corollary of that proposition is that the Debtor, as he also has recognized, has a duty to avoid all unreasonable expenses and "protect the estate and preserve it." Tr. I at 148.

Along those lines, he represented to the Court in his objection to the TCF Motion that garnering the value of the equity in the Ann Arbor Property through a sale was necessary for an effective reorganization. Then, on January 15, 2016, the Debtor filed a motion to sell the Ann Arbor Property (the "Sale Motion") (Doc. 463) and a related motion to retain a broker (the "Broker Motion") (Doc. 465). In the Sale Motion, the Debtor stated that he had not yet entered into a contract for the sale of the Ann Arbor Property, but that he anticipated listing it for sale at $575,000, more than the $550,000 value identified on the Amended Schedules.[66] He also stated that he "estimates that the sale of the [Ann Arbor] Property within 2% of its listing price will result in approximately $15,000.00 for unsecured creditors holding allowed Claims." Sale Mot. at 4. Combined with the Debtor's statement in his objection to the TCF Motion that the Ann Arbor Property is necessary to an effective reorganization, the Debtor's representation in the Sale Motion makes clear that he is taking the position that the receipt of $15,000 of proceeds from the sale of the Ann Arbor Property is necessary to an effective reorganization.

That said, it is far from clear that the sale of the Ann Arbor Property will net $15,000 for unsecured creditors. In the Sale Motion, the Debtor represents that a sale within 2% of the $575,000 listing price (i.e., a sale price of at least $563,500) will net approximately $15,000 for unsecured creditors after the Debtor pays the only holders of claims secured by the Ann Arbor Property identified in the Sale Motion: the State of Michigan in the amount of $780.41 and TCF in the amount of $514,339.31. Sale Mot. at 4. But the Debtor's counsel has submitted a proposed agreed order resolving the TCF Motion under which TCF would receive no less than $518,698.61: (1) principal in the amount of $450,440.81; (2) prepetition interest in the amount of $14,651.35; (3) real estate taxes that were paid by TCF in December 2014, August 2015 and December 2015 in the aggregate amount of $12,424.90; and (4) accrued postpetition interest as of January 20, 2016 in the amount of $41,181.55.[67]

The difference between the $518,698.61 minimum to be paid to TCF under the proposed agreed order and the $514,339.31 amount estimated in the Sale Motion is $4,359.30. That difference alone reduces the Debtor's $15,000 of estimated net proceeds to unsecured creditors to $10,640.70. In addition, under the agreed order, TCF would receive interest accruing at the rate of more than $86 per day from January 21, 2016 to the date the Ann Arbor Property is sold. Because the agreed order gives the Debtor 120 days from the date the Broker Motion is approved to sell the Ann Arbor Property, the per diem could be $10,320 or more ($86x120), which would all but eliminate any benefit for unsecured

66. Later in the Sale Motion, the Debtor identified the "proposed purchase price" as $595,000, not the $575,000 mentioned earlier in the Sale Motion. Doc. 463 at 8.

67. TCF would be entitled to postpetition interest only if its claim turns out to be oversecured (i.e., only if the Ann Arbor Property sells for more than the amount of its claim). See 11 U.S.C. § 506(b). Despite this, the proposed agreed order contains no clawback provision under which TCF would repay the $41,181.55 or other postpetition interest in the event its claim turns out not to be oversecured.

creditors even if the Ann Arbor Property sells for $575,000. In order to achieve this end, counsel for the Debtor has incurred fees, *see* App. VI, that would be paid, if at all, out of assets of the bankruptcy estate.[68] These fees have been incurred in order to potentially garner net proceeds of $15,000 for unsecured creditors (and perhaps nothing) from a sale of the Ann Arbor Property. The Court finds that the Debtor's efforts constitute a transparent attempt to retain the Ann Arbor Property as long as possible for the benefit of one or more of his nondependent family members.

All of the foregoing demonstrates that the Debtor has used and continues to attempt to use cash resources of the bankruptcy estate to support his parents and brother that instead could have been used to satisfy the claims of creditors. In an attempt to justify the financial support he rendered his family after the Petition Date, the Debtor testified that his intent was to help his younger brother, not his parents. Tr. I at 48, 50, 148–49. According to the Debtor, "[m]y interest was in my brother and part of protecting the estate was to keep focus[ed] on my own life and making sure that my brother had a place to live...." Tr. I at 148–49. Even if that is true, it is beside the point. The Debtor's brother is not his dependent, and his sense of responsibility for his brother—while certainly understandable— does not trump his fiduciary duty to creditors. Nor does the Court credit the Debtor's argument that "[i]n order for me to have the utmost focus and keep performing at my highest level, making sure that my brother was taken care of in that aspect, I believe was crucial." Tr. I at 149. While his willingness to support his brother may have been laudable, the Debtor had no responsibility to ensure that his brother

lived in a half-million dollar home or that he continued to attend an expensive private high school. On the contrary, the support the Debtor provided to his parents and brother after the Petition Date constituted a clear violation of his fiduciary duties to creditors.

### 7. Failure of the Debtor to Control His Own Expenses

As discussed above, before the Debtor filed the Conversion Motion, his attorneys had researched whether income a Chapter 11 debtor earns prior to conversion to Chapter 7 is property of his bankruptcy estate after conversion, and the Debtor has taken the position that none of the salary he earned after the Petition Date will be property of his bankruptcy estate if his case is converted. Again, there is a split of authority on this issue. But assuming for the sake of argument that the Debtor's position is correct, his filing of the Conversion Motion in no way absolved him of his fiduciary duty as debtor in possession to control his expenses and thereby conserve cash belonging to the estate.

The Debtor, in fact, does not argue otherwise. Instead, he makes other arguments, including one based on his Schedule I (Income) and Schedule J (Expenses). During the Status Conference, counsel for the Debtor referenced his original Schedules I and J, referring to Schedule J as the Debtor's budget. Status Conference Tr. at 26. On his original Schedule J, the Debtor stated that, after taking his projected monthly expenses into consideration, he would have $129,139 of disposable income per month, or more than $1.5 million on an annual basis. Ex. 2 at 33–34. It was apparent upon reviewing his original Schedule I that the Debtor's disposable

---

**68.** The Court recognizes that certain of these fees, including those incurred obtaining a val-uation of the Ann Arbor Property, were necessary in any event.

income likely would be higher than this amount, because the Debtor deducted from his income $62,500 per month on account of salary placed into escrow under the NHL collective bargaining agreement, Ex. 2 at 31, which the Debtor testified players "get a certain amount [of] back throughout the course of the year." Tr. I at 80. Compared to the amount of his income, the amount of claims that the Debtor scheduled as undisputed, noncontingent and liquidated was relatively small. On his original Schedule D through Schedule F that he filed prior to the Status Conference, the Debtor identified only $233,782.55 of claims as undisputed, non-. contingent and liquidated. Ex. 2 at 8–25. And without backing off the statements the Debtor had made in the Retention Application to the effect that the Objecting Creditors' claims are invalid, during the Status Conference, counsel for the Debtor indicated a willingness on the Debtor's part to work toward a negotiated Chapter 11 plan. Status Conference Tr. at 7–12. Comparing the amount of the Debtor's anticipated annual income to the amount of undisputed claims set forth on the Original Schedules, and taking into consideration the Debtor's professed willingness to negotiate with the Objecting Creditors, it seemed unnecessary to impose a budget on the Debtor in order to protect the interests of unsecured creditors. Instead, in light of the Objecting Creditors' suggestion that they planned to meet and confer with the Debtor and his bankruptcy counsel regarding his budget after the Status Conference, the Court indicated its preference for an agreed budget negotiated between the Debtor and the Objecting Creditors. Status Conference Tr. at 41. No such budget was reached, and the Objecting Creditors did not bring any issues

concerning the Debtor's spending to the Court's attention until after he filed the Conversion Motion.

The Debtor relies on Schedule J and the lack of an objection to it by the Objecting Creditors as justification for his high level of spending during this case. But the mere fact that the Debtor's Schedule J did not draw an objection from creditors does mean that the Debtor's spending levels during this case have been consistent with his fiduciary duty to conserve the estate's resources. Furthermore, neither the Court's decision not to impose a budget, nor the fact that the UST failed to bring any budgetary issues to the Court's attention, insulates the Debtor from a finding that he violated his fiduciary duties by overspending. The Debtor's argument to the contrary—that "no creditors or interested parties objected [to Schedule J,]" Debtor Findings & Conclusions ¶ 29—is as compelling as an argument made by a motorist ticketed for speeding who responds to the police officer: "But I have been exceeding the speed limit here all year long and no one has stopped me until now."

Like the speeding motorist, the Debtor should have known better. During the Hearing, he testified that he had determined that he had approximately $7 million of legitimate claims. *See* Tr. I at 195 ("We've done investigations . . . to make the proper analysis and conclusion on who was legitimate and illegitimate."); Tr. I at 197 (stating with respect to approximately $7 million of claims filed by creditors other than the Objecting Creditors that "there was no disputing that they were legitimate claims"); Tr. I at 199 (when asked whether the "$7 million pool" was "[c]ompletely legitimate," the Debtor testifying "Yes, to the best of my understanding").[69] The

---

69. Not counting the claims asserted against him by the Objecting Creditors, the Debtor

has $7,193,050.44 of claims that were either: (1) asserted in proofs of claim filed in the

Debtor also testified that he offered to pay the holders of those claims 80 cents on the dollar, or $5.6 million, and that he did so around the same time he made his offer to the final Objecting Creditor on March 4, 2015. Tr. II at 33–35. In other words, the Debtor testified that, by early March 2015, he was proposing to make a $5.6 million cash outlay over the term of a Chapter 11 plan for the creditors he deemed legitimate. Notwithstanding the Debtor's considerable income, an agreement to pay $5.6 million to the holders of those claims would be a significant undertaking. And that would be only part of the Debtor's cash outlay. He also would need to use cash to address the claims of the Objecting Creditors—either by funding the litigation required to obtain their disallowance or by using some of his earnings to reach a settlement with the Objecting Creditors. All of this warranted a reduction in spending by the Debtor from the levels that he had set forth on Schedule J.

In short, given the amount of debt the Debtor had decided was legitimate by early March 2015, it should have been clear to him at that point that it was unreasonable to continue to maintain his current level of spending if he was serious about funding a Chapter 11 plan. The Debtor suggested during the Hearing that he was still willing to fund a Chapter 11 plan at that point, testifying that his offer to the Objecting Creditors remained open even as of the date of the Hearing. Tr. II at 7 ("To this day I would like to settle this and not be here."). And yet, as explained below, the Debtor's excessive spending continued unabated after he filed the Conversion Motion. In fact, certain of his expenditures actually *increased* after he filed the Conversion Motion. The Court makes this

finding notwithstanding the Debtor's representation that he "has made several lifestyle adjustments and efforts to reduce his expenses, and is continuing to do so as he remains in Chapter 11 but seeks to convert to Chapter 7." Reply at 56.

The Debtor asks the Court to find that he engaged in "belt-tightening" after the Petition Date. Debtor Findings & Conclusions ¶¶ 30, 32; *see also id.* ¶¶ 72, 91. In addition, the Debtor asks the Court to find that he "experienced a dramatic shift in day-to-day expenditures. Among other things, he stopped paying for entertainment for himself and with friends." Debtor Findings & Conclusions ¶ 31. But as of the period ending July 31, 2015—which is the period covered by the most recent monthly operating report admitted into evidence during the Hearing—the Debtor had been in bankruptcy for approximately 10 months, and, according to his monthly operating report for that period, the Debtor had spent $4,560.62 on entertainment alone. Ex. R at 2. And as of the period ending July 31, 2015, he had spent $26,682.35 (nearly $2,700 per month) on food and housekeeping and $8,954.24 (nearly $900 per month) on clothing and dry cleaning. Those amounts are clearly excessive for a single individual (the Debtor was not married until July 2, 2015).

In spite of those excessive expenditures, the Debtor testified that he reduced his expenses postpetition, explaining that "when I went to the grocery store prior to this, I wasn't, you know, using my Giant Eagle card to try and get gas points and looking for deals on toilet paper and detergent." Tr. I at 109. But if he was saving money postpetition by shopping for those items at Giant Eagle, he made up for it in expenditures on other items. In addition to his food purchases at Giant Eagle and

Debtor's case to which the Debtor has not objected; or (2) included on the Amended

Schedules without being marked as "contingent," "unliquidated" or "disputed."

other grocery stores, the Debtor made considerable expenditures at restaurants and other establishments both before and after he filed the Conversion Motion. For example, the Debtor spent $257.71 at Eddie Merlot's on January 22, 2015 (Ex. K), and $599.83 on May 1, 2015 (Ex. O); $164.03 at the Elevator Brewing Co. on November 7, 2014 (Ex. M); $132.16 at Mortons of Chicago on November 14, 2014 (Ex. M); $334.75 at the Kansas City Steak Company on November 28, 2014 (Ex. M); $207.07 at the Hyde Park Grill on December 17, 2014 (Ex. S) and $244.55 on April 26, 2015 (Ex. P); $499.50 at the Murder Mystery Company on February 28, 2015 (Ex. L) and another $499.50 on June 4, 2015 (Ex. Q); and $215.36 at the J. Liu Restaurant on June 6, 2015 (Ex. Q). These are only some of the examples of the large amounts the Debtor spent at restaurants and other establishments after the Petition Date.

Even when the Debtor is not spending large amounts on individual meals, he maintains a substantial monthly budget for dining out. For example, the Debtor's operating report in May 2015 shows the Debtor spent over $2,000 at restaurants in a month-long period, Ex. O, all the while spending approximately $1,400 at grocery stores in the same time period. *Id.*; *see also* Ex. L (spending approximately $1,700 at restaurants and $900 at grocery stores in March 2015); Ex. P (spending approximately $1,500 at restaurants and $875 at grocery stores in April 2015). Not all of the Debtor's restaurant outings come with large tabs, but the Debtor's operating reports suggest the Debtor goes out to eat most days—indeed, often more than once a day—while also spending hundreds of dollars on groceries each month. *See, e.g.,* Ex. P & App. VII. The Debtor also continues to spend significant amounts at clothing stores and other retailers. For example, his December 2014 operating report shows that the Debtor spent $489.53 at Michael Kors, $317.12 at Saks Fifth Avenue, $200 at Victoria's Secret, $295.63 at Macy's, $469.65 at Lululemon, and $237.58 at Boho 72—over $2,000 in all. Ex. S.[70] Such shopping habits do not appear to be out of the ordinary for the Debtor. His May 2015 operating report reflects over $2,300 spent at retail stores, including $371.61 at Banana Republic, $285.54 at JCPenny, and multiple trips to Nordstrom for $117.18, $334.46, and $234.36. Ex. O.[71]

---

**70.** The Court recognizes that some of this high consumer spending could be due to the holiday season and corresponding gift-buying. But the Debtor reported only $39.90 of "Gifts" on his December 2014 operating report. Ex. S. If these purchases were indeed intended as gifts, the Court questions why the Debtor did not label them as such. If, on the other hand, these purchases were for his personal use and enjoyment, spending $2,000 of his bankruptcy estate's funds on new clothing and accessories at a time when he should have been conserving his income to fund a plan would constitute a violation of his fiduciary duties to creditors.

**71.** The Debtor regularly includes an expense of "Other—John Johnson" on his monthly operating reports. As of January 31, 2016, the amount he listed for that expense category since the Petition Date totals $30,160. Doc. 494 at 2. Because the Debtor and Mr. Johnson share the name "John Johnson," and because it did not appear appropriate to characterize payments the Debtor was making to himself as expenses, it appeared that he was making payments to his father. But the Court then noted that the total amount reported each month in the Other—John Johnson category equaled the amount of the Debtor's ATM withdrawals (the only exception being November 2015, when the Debtor withdrew $2,100 from ATMs, but included only $1,600 in the "Other—John Johnson" category, potentially explicable by the omission of a $500 ATM withdrawal). If $30,160 is the amount of payments the Debtor has made to his father during this case, then those payments would constitute additional inappropriate expenditures. And if the amount of $30,160 plus $500

Not only that, but, as noted above, the amounts the Debtor spent on certain items actually increased after he filed the Conversion Motion. For example, during the first five months of the case, the Debtor spent an average of $1,949.30 per month on food and housekeeping, but expended an average of $3,387.17 per month on food and housekeeping from March 2015 through the end of the period (July 31, 2015) covered by the most recent operating report admitted into evidence during the Hearing and $3,069.23 per month from March 2015 through January 2016. From the Petition Date through February 2015, he spent an average of $831.86 per month on clothing and dry cleaning, an amount that increased to an average of $958.98 per month from March through July 2015. The Debtor's housing costs also increased. On the Petition Date, the Debtor was paying rent of $2,000 per month. Ex. N at 2. But then, on May 28, 2015, he filed a notice of change of address to his current residence (Doc. 259), where he is paying approximately $2,700 per month. That is, after the Petition Date—and, it appears, after he filed the Conversion Motion—the Debtor moved into a residence where he is paying approximately $700 more per month for rent than he was paying on the Petition Date, a 35% increase. And the amount the Debtor spent on "telephone, cell phone, internet and cable" more than doubled after he filed the Conversion Motion. During the period prior to filing the

Conversion Motion he spent an average of approximately $300 on those items, an amount that increased to an average of more than $700 per month after he filed the Conversion Motion.

On average, the Debtor spent $20,056.37 per month from the Petition Date through February 2015, $27,350.10 per month from March through July 2015 and $22,796.07 per month from March 2015 through January 2016.[72] That is, the Debtor's monthly spending increased anywhere from nearly $3,000 to $7,000 after he filed the Conversion Motion. What the evidence shows is this: Despite his awareness of the millions of dollars of debt he deemed legitimate and despite his professed willingness to continue to work toward a negotiated Chapter 11 plan with the Objecting Creditors even after he filed the Conversion Motion, the Debtor continued his free-spending ways, unconstrained by the notion that he had the fiduciary duty to conserve the property of his bankruptcy estate. And, in doing so, the Debtor continued a pattern that began before he filed the Conversion Motion.

In an effort to justify his level of postpetition spending, the Debtor testified that in the 10 months from the Petition Date through July 31, 2015, he spent approximately $107,000 less in the aggregate than the amount listed on Schedule J. Tr. II at 44. Although the actual number may be

is, as appears to be the case, the amount of the Debtor's ATM withdrawals as of January 31, 2016, then the Debtor has not adequately disclosed how he has used that amount of cash.

72. In calculating this amount, the Court did not include accrued legal fees. The Court also did not include his wedding expenses (which increased as the July 2, 2015 wedding date approached) or items that appear in the post-Conversion Motion operating reports—

such as dental expenses, taxes, fees and training expenses—that do not necessarily reflect increased consumer spending by the Debtor. The Court also did not include "[c]hecks issued pre-petition/cleared post-petition," because that item does not involve postpetition spending. In short, despite giving the Debtor every benefit of the doubt, the Court finds that he increased his consumer spending by a considerable amount after he filed the Conversion Motion.

less than $107,000, it is around $100,000.[73] Based on this number, the Debtor contends that he has engaged in "belt-tightening" after the Petition Date. Tr. II at 42–44. But a comparison of Schedule J to the Debtor's monthly operating reports submitted into evidence for the approximately 10–month period after the Petition Date (up through July 31, 2015), makes it clear that the $100,000 or so of alleged under-budget spending does not actually reflect true belt-tightening. Rather, this variance between actual and estimated expenditures arises from the Debtor's overestimation of expenses.

On Schedule J, the Debtor estimated that he would pay $800 per month ($8,000 over a 10–month period) for life insurance and $1,600 per month ($16,000 over a 10–month period) for disability insurance, but as of July 31, 2015 he had paid nothing for such insurance. Ex. R at 2. The Debtor provided for $3,500 per month ($35,000 over a 10–month period) on Schedule J for car payments, but as of July 31, 2015 had paid only $4,691.02 total, which appears to be the amount paid to CapStar under the agreed order between the Debtor and CapStar. *Id.* He included real estate taxes of $2,069 per month ($20,690 over a 10–month period), but as of July 31, 2015, he had paid nothing for real estate taxes. *Id.* Likewise, he identified maintenance, repair and upkeep expenses of $2,410 per month ($24,100 over a 10–month period), but as of July 31, 2015, he had paid a total of only $1,107.20 on maintenance, repair and upkeep of his properties. *Id.* He allowed $6,461 per month for mortgage payments ($64,610 over the 10–month period), but paid only $46,754.58 on any mortgage during that period of time (for the Malaga Way Property). *Id.* Homeowner's association and condominium fees of $505 per month ($5,050 over a 10–month period) also appeared on Schedule J, but as of July 31, 2015 the Debtor had paid nothing for such fees. *Id.*

The line items discussed above account for much of the difference between the total amount of expenses identified on Schedule J and the amount the Debtor had actually spent as of the date of the Hearing. Thus, the Debtor was engaging in "belt-tightening" only if that term is defined to include listing expenses on Schedule J—many of them excessive to begin with—and then failing to make payments on account of those purported expenses. But this is belt-tightening in name only. This is all the more true here given that the Debtor spent considerably more in certain expense categories than the amounts he estimated on Schedule J. For example, the Debtor listed $2,000 per month for rent for his primary residence, but was paying approximately $2,700 per month as of the date of the Hearing. *See* Tr. II at 39, Ex. R. In addition, the Debtor allowed for $2,200 per month for food and housekeeping supplies (an amount that itself is excessive), but instead had spent nearly $2,700 per month on food and housekeeping as of the date of the Hearing.[74] And, again, the Debtor's spending on consumer goods and services increased significantly after he filed the Conversion Motion.

---

73. During those 10 months, the Debtor spent approximately $373,780.98 (the total of $732,511.92 on Exhibit R minus accrued legal fees of $358,730.94). Schedule J identified monthly expenses of $47,132, or $471,320 over a 10–month period. $471,320 minus $373,780.98 is $97,539.02.

74. The Debtor also has spent $7,735.50 (approximately $770 per month) for storage units in the 10 months leading up to the Hearing. Neither the Amended Schedules, the Debtor's monthly operating reports, nor any other document he has filed, explains why the Debtor is incurring such an excessive amount per month on storage.

Any expenditure discussed above in and of itself would not necessarily have led to a finding that the Debtor has failed to control his expenses. Taken together, however, the expenditures that the Debtor has made on behalf of himself and his nondependent family members after the Petition Date compel the Court to find that the Debtor violated his fiduciary duties to his creditors by failing to conserve cash belonging to the bankruptcy estate.

## D. The Debtor's Prepetition Conduct

Seen in the light of his conduct after the Petition Date, the Debtor's irresponsibility before bankruptcy becomes all the more apparent. As he did after the Petition Date, the Debtor failed to control his prebankruptcy expenditures. Indeed, as the Objecting Creditors point out, the Debtor's excessive postpetition spending was a continuation of his prepetition spendthrift habits. Creditor Findings & Conclusion ¶¶ 47–48. The Debtor conceded that his prepetition expenditures included: (1) rent for a "top floor apartment" in the Arena District for which he paid $4,000 per month, Tr. II at 39; (2) approximately $8,000 per year on suits, an amount that did not include expenditures for other clothing, Tr. II at 42; (3) amounts paid for a new car every two years, including the 2011 Ferrari and three BMWs, Tr. II at 42; (4) expenses for "[q]uite a bit" of travel to visit friends, Tr. II at 39, 41–42; and (5) expenditures made when he paid

the bill for dining and entertainment with friends, which he testified happened "all the time." Tr. II at 38.

The Debtor also owned two luxury homes in Manhattan Beach, California, Tr. I at 162–64, the Malaga Way Property and another property known as Stratford (the "Stratford Property"),[75] as well as the Ann Arbor Property. In addition to making mortgage payments, the Debtor would have paid amounts for insurance and property taxes for all three properties. While the Debtor's failure to closely monitor the Bank Statements might have meant that he did not know the precise costs of retaining these properties, he would have known that the costs were not insignificant.

The Debtor also would have been aware of at least some of his parents' excessive spending. For example, the Debtor concedes that the Johnsons spent more than $400,000 renovating the Ann Arbor Property. Tr. I at 49. Although the Debtor testified that he did not know the cost of the renovations before the Petition Date, he would have known that the renovations were occurring. After all, during the off-season, the Debtor and his parents lived together at the Ann Arbor Property up until June 2014. Tr. I at 46. The renovations included finishing the basement of the Ann Arbor Property and constructing a new brick patio. Tr. I at 49. The Debtor could not have failed to notice such extensive renovations, nor could he have

---

**75.** The Debtor testified that the Stratford Property and the Malaga Way Property were purchased for investment purposes. Tr. I at 162. The Debtor and his parents lived together at the Malaga Way Property while he was playing for the Los Angeles Kings, Tr. I at 162, but the Debtor also testified that the Malaga Way Property was "intended to be a rental property as well." Tr. I at 163. And he testified that his understanding was that the Stratford Property was purchased either as a retirement home for his parents or "pos-

sibly [to] be sold down the line, hopefully for a lot more than what they bought it for to make a profit." Tr. at 163. Of course, hope alone does not make the Stratford Property an investment, for everyone who purchases a home hopes that it will appreciate in value. Because it need not do so in order to assess whether the Debtor exhibited bad faith or to determine the primary nature of his debt, the Court does not reach the issue of whether the Malaga Way Property or the Stratford Property were purchased for investment purposes.

failed to appreciate that the renovations were not inexpensive.

Such a high level of prepetition expenditures might have been excusable if the Debtor had been unaware at the time he and his parents engaged in the spending that he was having trouble servicing his debt. Contending that he did not know about his financial problems until late in the game, the Debtor asks the Court to find that "[i]t was not until the end of the 2013–14 hockey season, when the [Blue Jackets] informed [him] that they were contacted by an alleged creditor, that [he] initially believed that perhaps 'not all [his] ducks were in a row.'" Debtor Findings & Conclusions ¶ 19 (quoting Tr. I at 153). More precisely, the Debtor testified that the Blue Jackets organization was "contacted by creditors" sometime around April 2014, that he was "called up" and that this was the "first time anyone ever said anything to [him]" about his financial problems. Tr. I at 153. He also asks the Court to find that his understanding was that "everything was great" and that "[t]his understanding held true until at least April 2014." Debtor Findings & Conclusions ¶ 18 (quoting Tr. I at 56 and citing Tr. I at 157). But the Debtor's testimony in this regard strains credulity well past the breaking point. Indeed, there is abundant evidence that the Debtor knew long before April 2014 that all was not well with his finances.

According to Mrs. Johnson, the Debtor started asking questions about how his parents were spending his money when he "was being served with lawsuits." KJ Dep. at 132. Mrs. Johnson testified that the Debtor "told us about the lawsuit, and of course he asked questions." *Id.* His mother told him that she and his father were "trying to fix it." *Id.* But even if he believed his mother when she said they were trying to solve his financial problems,

his belief would in no way change the fact that he was aware of the problems.

One of the lawsuits of which the Debtor would have been aware is the case commenced by Capital Partners, the affiliate of Capital Financial discussed above in connection with the Capital Financial Loan Documents. As previously noted, on January 29, 2014, counsel for Capital Partners took a deposition of the Debtor, and during that deposition the Debtor acknowledged that his salary was not being used to pay back Capital Partners, because he did not "have the money to do it in an orderly fashion." Ex. NN at 36. The Debtor also acknowledged that his salary was being garnished by Pro Player. Ex. NN at 35–36. Thus, the Debtor certainly knew that "everything was [not] great" on ·January 29, 2014.

He actually knew it before then. In 2012, Pro Player commenced a lawsuit against the Debtor in the State Court, and, on October 8, 2012, the State Court entered a garnishment order requiring the Blue Jackets to garnish his salary. He would have been served with notice of the garnishment and would have been aware of the October 8, 2012 garnishment order. Then, on June 21, 2013, the State Court entered a Joint Stipulation and Consent Order Terminating Garnishment ("Consent Order") (copy attached to Mrs. Johnson's deposition). According to the Consent Order, Pro Player and the Debtor had entered into a "Confidential Settlement Agreement dated as of April 5, 2013 (the "[Pro Player] Settlement Agreement") pursuant to which the Parties ... agreed that the ... The Columbus Blue Jackets ... will be released from its obligations under the current garnishment order entered by this Court on October 8, 2012 in exchange for [the Debtor's] agreement to make certain payments in accordance with the terms of the [Pro Player] Settlement

Agreement." Consent Order at 1. The Debtor has conceded that he signed the Pro Player Settlement Agreement. Adv. Pro. No. 15–2186, Adv. Doc. 32 ¶ 56. Under the Pro Player Settlement Agreement, the Debtor "authorized and [the] Blue Jackets ... agreed to pay directly to Pro Player ... certain payments to be released from escrow or deducted from all future net compensation (including but not limited to all wages and bonuses) payable by the Blue Jackets to Johnson...." Consent Order at 2. That is, by the time the Debtor executed the Pro Player Settlement Agreement on April 5, 2013, he would have known that he had serious financial problems.

In fact, the Debtor almost certainly would have been aware of the problems sometime before April 5, 2013. Not only would he have been served with notice of the garnishment and the October 8, 2012 garnishment order, he also was aware by the fourth quarter of 2012 that he had problems relating to the notes issued to Capital Partners. During the deposition conducted by Capital Partners' counsel in January 2014, the Debtor was asked when his parents first advised him that the interest rates on the July 2012 Capital Partners notes were too high. In response, the Debtor testified that it was "[n]ot recently. A long time ago. Shortly after—I mean, a couple months after those were signed" in July 2012. Ex. NN at 49. In other words, the Debtor essentially testified that his parents had advised him no later than the fourth quarter of 2012 "[t]hat it could be trouble. That this could be trouble to get to be able to pay back"

and that it was "going to be tough to repay the money back." *Id.* Two circumstances—the Debtor's parents advising him of the concern over the interest rates on the July 2012 Capital Partners notes and the entry of the State Court's garnishment order in October 2012—lead the Court to find that the Debtor would have been aware by the sometime in the fourth quarter of 2012 that he had significant financial problems. Again, while his parent may well have advised the Debtor that they were working to try to fix the problems, it does not alter the fact that the problems existed and that he was aware of them. Even in the unlikely event that the Debtor had not known by the fourth quarter of 2012 that he was in financial trouble, it seems highly unlikely that he would not have known it by the time he signed the Pro Player Settlement Agreement on April 5, 2013—a full year before the April 2014 time frame testified to by the Debtor.

Despite knowing about his financial problems starting in the fourth quarter of 2012 and certainly no later than April 5, 2013, the Debtor continued to grant his parents full access to the Bank Accounts and his income well after that time. And he did so even while his salary was being heavily garnished by Pro Player from October 2013 through April 2014.[76] On October 31, 2013, Mrs. Johnson issued a $5,173.19 check to the Barton Hills County Club where the Johnsons were members, and on April 20, 2014 she issued a $3,170 check to Barton Hills Country Club. Ex. II at 1719; KJ Dep. at 143, 227–28; KJ Dep. Ex. 11 at 1799. In November 2013, she wrote two checks to "Cash" (dated Novem-

---

[76]. The Pro Player Settlement Agreement drastically reduced the amounts directly deposited by the Blue Jackets into the Debtor's Bank Accounts from October 2013 (the start of the 2013–14 season, the first full season after the Debtor signed the Pro Player Settlement Agreement) through April 2014 (the end of that season). *See* Ex. AA at 1447, 1454, 1462, 1471, 1479, 1492, 1501 (paychecks ranging from a low of $620.16 to a high of $33,603.61, much less than the amount of the paychecks the Debtor received before the garnishment began).

ber 2 and November 15, 2013) totaling $21,000. Ex. II at 1715, 1721. On November 19, 2013, Mrs. Johnson issued a $9,000 check to an individual for goods or services that, according to the memo line, related to the "Lowell Basement"—the basement of the Ann Arbor Property. Ex. II at 1723. On January 14, 2014, she wrote two separate $5,000 checks to Cash, Ex. II at 1751–52, and on April 26, 2014, she paid $13,975 by check to a company for goods or services related to the basement of the Ann Arbor Property. Ex. II at 1826. On May 2, 2014 she wrote another check to "English Gardens" in the amount of $21,316.48 for the Ann Arbor Property. Ex. II at 1834. These are just some of the checks that the Johnsons issued, and they would have used other methods to make purchases, such as debit card, credit card and cash. Again, this spending occurred because the Debtor—despite being aware of the significant financial issues he was facing—continued to allow his parents to have unrestricted access to his funds.

The Debtor also persisted in his own excessive spending after learning of his debt-service problems. For example, he continued to pay rent of $4,000 per month for his downtown penthouse apartment from late 2012 through early 2014. *See, e.g.,* Ex. HH at 2177 ($4,000 paid for November 2012 rent); Ex. II at 1700 ($4,000 paid for rent on October 9, 2013), Ex. II at 1725 ($4,000 paid on November 5, 2013 for "Nov. rent"); Ex. II at 1766 ($4,000 check issued on February 1, 2014 for "Feb rent"). These checks were issued to Roger Schaefer, an individual identified by Mrs. Johnson as the Debtor's landlord. KJ Dep. at 181–82.

In addition, on April 18, 2014, the Debtor made—by means of a check signed by Mrs. Johnson—what she described as a $27,000 "deposit" on wedding and engagement rings for the Debtor's fiancée, Ex. II at 1797, KJ Dep. at 227, which was just one of "several payments made for" those rings, KJ Dep. at 238. Making one of the other payments, the Debtor signed a $13,300 check for an "engagement ring" on May 23, 2014. Ex. II at 1844. In short, at a time when the Debtor knew that he was in serious financial distress, he spent more than $40,000 on his fiancée's wedding and engagement rings. Again, there were other methods that the Debtor used to make purchases. The evidence shows that before seeking bankruptcy relief the Debtor continued to live a luxurious lifestyle despite being aware of his significant debt-service problems.

### E. Summary of the Court's Findings Relating to the Debtor's Bad Faith

Before the Petition Date, the Debtor engaged in excessive spending, doing so even after he knew that he was having trouble servicing the debt he had incurred. He also gave his parents unfettered access to his income and to the loan proceeds—which facilitated their own extravagant expenditures—and he did so for at least a year after becoming aware of his debt-service problems.

After the Petition Date, the Debtor neglected his fiduciary duties and failed to conduct this case in a manner that might have provided his creditors with a meaningful recovery from his substantial income. He failed to retain the services of a forensic accountant before filing the Conversion Motion even after his own attorney stated that doing so was necessary to propose a plan of reorganization. Despite being obligated to object to claims if a purpose would be served by doing so, the Debtor did not seek to disallow the claims of the Objecting Creditors before he filed the Conversion Motion even though disallowance of the claims would have served the interests of other unsecured creditors.

And rather than making a serious attempt to reach a consensual resolution with the Objecting Creditors, he failed to negotiate with them in good faith. He also neglected to disclose transfers to his parents and failed to adequately investigate whether they might have assets that could augment the bankruptcy estate. At the same time, in violation of his duty to conserve property of the estate, he continued to provide support to his parents and his brother, including by making payments to or on their behalf. He also continued his own excessive spending and retained potentially depreciating assets that imposed additional costs on the bankruptcy estate. Taken together, the evidence demonstrates egregious conduct constituting bad faith on the Debtor's part.

The Debtor nonetheless requests conversion of his case to Chapter 7, taking the position that there would be no basis to dismiss the case if it were converted. But, as explained below, in light of the Debtor's bad faith, the Bankruptcy Code and governing case law do not support the Debtor's position that there would be no basis to dismiss his case. On the contrary, if the Debtor's case were converted to Chapter 7, his bad faith would constitute cause for its dismissal under § 707(a) of the Bankruptcy Code.

## V. Legal Analysis

### A. Section 707(a) of the Bankruptcy Code

■ Section 707(a) of the Bankruptcy Code provides for the dismissal of "a case under" Chapter 7 "only for cause." 11 U.S.C. § 707(a). Once a Chapter 11 case is converted to Chapter 7, it is "a case under" Chapter 7 that may be dismissed pursuant to § 707(a) if cause exists to do so. *See Blumenberg v. Yihye (In re Blumenberg)*, 263 B.R. 704, 715 (Bankr.

E.D.N.Y.2001) ("[T]he plain language of section 707(a) clearly permits dismissal of any case under chapter 7, regardless of whether or not it was initially filed under chapter 7 or if it was originally filed as a chapter 11 case and subsequently converted to chapter 7.").

Listing three examples of cause, § 707(a) provides:

(a) The court may dismiss a case under this chapter only after notice and a hearing and only for cause, including—

(1) unreasonable delay by the debtor that is prejudicial to creditors;

(2) nonpayment of any fees or charges required under chapter 123 of title 28; and

(3) failure of the debtor in a voluntary case to file, within fifteen days or such additional time as the court may allow after the filing of the petition commencing such case, the information required by paragraph (1) of section 521(a), but only on a motion by the United States trustee.

11 U.S.C. § 707(a).

■ Because § 707(a) uses the word "including" before it sets forth the three enumerated grounds for dismissal, and because "the word 'including' is not meant to be a limiting word," the specific grounds set forth in § 707(a)(1) through (a)(3) do not delineate the entire universe of "for cause" dismissals. *Indus. Ins. Servs., Inc. v. Zick (In re Zick)*, 931 F.2d 1124, 1126 (6th Cir.1991). In addition to the enumerated examples of cause, a debtor's "lack of good faith is a valid basis of decision in a 'for cause' dismissal by a bankruptcy court." *Id.* at 1127. While some courts have disagreed with *Zick* on this point,[77] the Court is bound to follow Sixth Circuit law.

---

77. *See, e.g, Neary v. Padilla (In re Padilla),* 222 F.3d 1184, 1191–93 (9th Cir.2000) (hold-

 In assessing whether a debtor has engaged in bad faith conduct warranting dismissal, courts are free to use the "smell test," which the Sixth Circuit has identified as having "particular merit." *Id.* Courts, however, are not permitted to simply declare that a debtor has failed the "smell test." Rather, courts must show that they have relied on objective factors, which "are essential in appellate review." *Id.* at 1128. That is, a court's "observation that [a debtor's] bankruptcy petition fails to pass the smell test [should not be an] arbitrary, unsupportable conclusion," but instead should be "based on numerous objective factors." *Merritt v. Franklin Bank, N.A. (In re Merritt),* No. 98–2399, 2000 WL 420681, at *3 (6th Cir. Apr. 12, 2000) (internal quotation marks omitted). Those factors, the Sixth Circuit explained in *Zick,* "are as varied as the number of cases," so that "[d]ismissal based on lack of good faith must be undertaken on an *ad hoc* basis." *Zick,* 931 F.2d at 1127, 1129.

 As the Debtor points out, Debtor Findings & Conclusions ¶¶ 83–84, dismissal based on a lack of good faith "should be confined carefully" and "utilized only in ... egregious cases." *Id.* at 1129. And egregious cases, the Sixth Circuit stated in *Zick,* "generally ... entail [1] concealed or misrepresented assets and/or sources of income, and [2] excessive and continued expenditures, lavish lifestyle, and [3] intention to avoid a large single debt based on conduct akin to fraud, misconduct, or gross negligence." *Id.*

Notwithstanding the Sixth Circuit's use of the conjunction "and" to join the three bad-faith factors it identified in *Zick,* the factors are just that—factors—and not elements of a test for bad faith. *See In re Stump,* 280 B.R. 208, 214 (Bankr.S.D.Ohio 2002) (describing the three grounds for finding cause set forth in *Zick* as "factors" and making clear that other factors may be considered). Contrary to the Debtor's suggestion, *see* Debtor Findings & Conclusions ¶¶ 83–84, the Sixth Circuit did not hold that a Chapter 7 case is subject to dismissal for bad faith only if all three types of conduct enumerated in *Zick* are present. After all, in *Zick* itself the bankruptcy court based its decision to dismiss the case on factors that had nothing to do with concealment or misrepresentation of assets or sources of income, which was one of the three bad-faith factors identified in *Zick.* In dismissing the debtor's case for bad faith, the bankruptcy court in *Zick* instead relied on factors that had nothing to do with concealment on the debtor's part. *See Zick,* 931 F.2d at 1128 (noting that the bankruptcy court had "based its decision on (1) the debtor's manipulations which reduced the creditors in this case to one;[ 78 ](2) the debtor's failure to make significant lifestyle adjustments or efforts to repay; (3) the fact that the petition was filed clearly in response to [a creditor's] obtaining a mediation award; and (4) the unfairness of the debtor's use of Chapter 7 under the facts in this case."). The Sixth Circuit affirmed the bankruptcy court's decision, holding that "[i]t was not [an] abuse

---

ing that bad faith does not constitute cause for dismissal under § 707(a)); *In re Lobera,* 454 B.R. 824, 843–49 (Bankr.D.N.M.2011) (same).

**78.** In *Merritt,* the Sixth Circuit, while stating that *"Zick* requires that the debtor evidence an intent to avoid a large single debt based on conduct akin to fraud, misconduct, or gross negligence," *Merritt,* 2000 WL 420681, at *3,

found that there "[c]learly [was] more than a single debt involved in this matter," concluding that the debtor was "effectively avoiding a single large debt." *Id.* In any event, *Zick* in fact does not make the existence of a single large debt that the debtor is trying to avoid a prerequisite to dismissal any more than it makes concealment a prerequisite.

of discretion to conclude that the factors found in this case amounted to a lack of good faith on the part of Zick." *Id.* at 1129. Because concealment or misrepresentation was not a factor on which the bankruptcy court relied, the Sixth Circuit would not have stated that the "factors found in this case amounted to a lack of good faith" if the Sixth Circuit required all three factors identified in *Zick* to be present in order for a case to be dismissed based on bad faith.[79]

A later-reported Sixth Circuit decision, *Michigan National Bank v. Charfoos (In re Charfoos)*, 979 F.2d 390 (6th Cir.1992), provides further support for this interpretation of *Zick*. In *Charfoos*, the Sixth Circuit addressed factors bearing on bad faith in the context of the dismissal of a Chapter 11 case. While referencing the three *Zick* factors, the Sixth Court also stated that " 'no list is exhaustive of all the conceivable factors that could be relevant in analyzing a particular debtor's good faith.' " *Charfoos*, 979 F.2d at 393 (quoting *In re Caldwell*, 851 F.2d 852, 860 (6th Cir.1988)). The Sixth Circuit would not have made that statement in *Charfoos* if it had viewed the three factors set forth in *Zick* as a three-part test for bad faith. Furthermore, reading *Zick* as establishing a three-part test for bad faith would be inconsistent with the Sixth Circuit's own statements in *Zick* that "[t]he facts required to mandate dismissal based upon a lack of good faith are as varied as the number of cases" and that "[d]ismissal based on lack of good faith must be undertaken on an *ad hoc* basis." *Zick*, 931 F.2d at 1127, 1129.

Rather than concealment, the Sixth Circuit relied on two other factors in upholding the bankruptcy court's decision in *Zick*. The first factor was the debtor's high income. The debtor had "a continuing monthly income of at least $7,000 [$84,000 per year] plus certain pension plan benefits," and his "gross business income was approximately $361,000 annually," while "his non-debtor spouse had additional income." *Zick*, 931 F.2d at 1128. Thus, the aggregate amount of income available to the debtor to repay his debt was the amount of his annual income ($445,000) plus the amount of his pension plan benefits and the amount of his spouse's income that she made available for his use. By comparison, the value of his unencumbered, non-exempt assets was relatively small. *See id.* ("Exclusive of real property and household goods, Zick listed other personal property of approximately $90,000.").

The second factor the Sixth Circuit considered in affirming the bankruptcy court was the debtor's failure to attempt to repay his creditors. The debtor appeared to have filed his bankruptcy case in order to avoid paying a creditor holding a $600,000 claim. And given that he had filed a Chapter 7 case, he apparently was willing to allow all of his creditors to take their share of his non-exempt assets in repayment of their claims rather than using his income to pay his creditors a higher dividend. According to the Sixth Circuit, "[t]he goals of bankruptcy are to provide an honest debtor with a fresh start and to provide for an equitable distribution to

---

79. In a footnote, the Sixth Circuit noted that Zick "listed 'salaries' of $9,100 per month paid by his wholly owned company, but did not otherwise indicate whether a part of this was his own salary" and that he "opposed in bankruptcy court revealing his 'post-petition earnings' as having 'absolutely no bearing on this bankruptcy case' despite the lack of clari-

ty and specification in his [filings with the bankruptcy court.]" *Id.* at 1128 n. 7. In dismissing the case, however, the bankruptcy court did not rely on Zick's failure to clarify the amount of his earnings, and the Sixth Circuit likewise did not rely on that failure in affirming the bankruptcy court's decision.

creditors. The debtor herein, although he has minimal assets, appears to be seeking a 'head start' with no attempt to deal with creditors on an equitable basis." *Id.* (quoting *In re Krohn,* 886 F.2d 123, 127–28 (6th Cir.1989)).

Continuing its comparison of the "fresh start" and "head start" concepts, the court of appeals ended its decision in *Zick* by pointing out that

[t]he Bankruptcy Code is intended to serve those persons who, despite their best efforts, find themselves hopelessly adrift in a sea of debt. Bankruptcy protection was not intended to assist those who, despite their own misconduct, are attempting to preserve a comfortable standard of living at the expense of their creditors. Good faith and candor are necessary prerequisites to obtaining a fresh start. The bankruptcy laws are grounded on the fresh start concept. There is no right, however, to a head start.

*Id.* at 1129–30 (quoting *McLaughlin v. Jones (In re Jones),* 114 B.R. 917, 926 (Bankr.N.D.Ohio 1990)).

A decade later, the Sixth Circuit again relied on a debtor's high income and limited efforts to repay his debt as grounds to uphold the bankruptcy court's dismissal of his case under § 707(a). *See Merritt,* 2000 WL 420681, at *2. In *Merritt,* the bankruptcy court had dismissed a debtor's Chapter 7 case for bad faith, stating only that

I think *Zick* applies. I think it's a clear case of abuse of the bankruptcy code. And it seems to me that the assets, income, and minimal effort to make a good faith attempt to resolve this, offer[ing] somebody $7,500 on a $45,000 debt when you got this kind of money and assets, it's ludicrous.

*Merritt,* 2000 WL 420681, at *2.

■ Noting that "[t]his passage constitute[d] the entirety of the bankruptcy

judge's bad faith analysis," the Sixth Circuit held that the bankruptcy court's "reli[ance] upon [the debtor's] assets, income, and minimal effort to settle or satisfy" judgments against him "was a proper application of the smell test." *Id.* at *3. The court of appeals also noted that, although " 'the post-petition ability to repay debts, standing alone, may not be cause to dismiss a petition under 11 U.S.C. § 707(a), it is a relevant inquiry into whether the petition was filed in good faith.' " *Id.* at *3 (quoting *In re Spagnolia,* 199 B.R. 362, 366 (Bankr.W.D.Ky. 1995)). And "[w]hen a debtor capable of at least partial repayment has made every effort to avoid payment of an obligation ... lack of good faith sufficient to justify dismissal may be found." *Zick,* 931 F.2d at 1127 n. 3 (quoting 4 *Collier on Bankruptcy,* ¶ 707.03 (15th ed.1989)).

Relying on *Zick,* a bankruptcy court within the Sixth Circuit held that cause existed to dismiss a case under § 707(a) where the debtors—self-employed physicians with annual income exceeding $500,-000—were unwilling to reduce their excessive expenditures in order to provide creditors with a recovery from their income. *In re Rahim,* 442 B.R. 578 (Bankr. E.D.Mich.2010), *aff'd,* 449 B.R. 527 (E.D.Mich.2011). According to the *Rahim* court, the debtors' monthly expenses were extravagant, and their refusal to reduce those expenses in order to repay creditors was egregious. *Id.* at 581–82. The bankruptcy court also examined creditors' potential recovery under a Chapter 11 plan: "If [the debtors] would take the steps necessary to reduce their yearly expenses ... they could commit the other half to a five year chapter 11 plan that would pay their creditors over $1,000,000" and "[i]f they further reduced their yearly expenses ... the dividend to creditors might

be $1,800,000." *Id.* at 581. By comparison, the debtors' non-exempt assets had an estimated liquidation value of $200,000, making it "clear that a chapter 11 plan would distribute much more to creditors than would chapter 7 administration[.]" *Id.* at 584. The bankruptcy court concluded that the debtors "could pay a meaningful dividend to their creditors if they would make the effort to reduce their lavish expenses that fairness to their creditors requires" and that they had exhibited a lack of good faith requiring dismissal of their case. *Id.*

While *Zick* and the decisions following it involved debtors who began their bankruptcy cases in Chapter 7, prepetition conduct remains relevant to the good-faith analysis when a debtor begins in another chapter and seeks to convert to Chapter 7. Otherwise, a debtor could avoid application of the Sixth Circuit's smell test simply by laundering his bad faith through the Chapter 11 process. When a debtor originally commences a Chapter 11 case and then seeks to convert it to Chapter 7, courts analyze the factors demonstrating bad faith—including a lack of candor, an ability to pay, and an unwillingness to reduce excessive spending and take the other steps necessary to provide creditors a meaningful recovery—through the lens of Chapter 11's purpose. And that purpose is to provide debtors an opportunity to reorganize and repay creditors more than they would receive in liquidation. Thus, when an individual debtor begins in Chapter 11, in addition to examining his prepetition conduct, courts also consider whether the debtor has conducted his Chapter 11 case in a manner suggestive of an intent to reorganize and repay his debts. *See In re Adler,* 329 B.R. 406, 410 (Bankr.S.D.N.Y. 2005).

Like the Debtor here, the individual Chapter 11 debtor in *Adler* took the position that, "[b]ecause [he did] not fall within one of the enumerated exceptions" set forth in § 1112(a) of the Bankruptcy Code, "his right to convert [was] absolute." *Adler,* 329 B.R. at 408. As discussed in Section V.C. below, the *Adler* court disagreed, as does this Court. But more to the point here, the *Adler* court, consistent with the Sixth Circuit case law on bad faith, held that a Chapter 11 debtor's request to convert his case to Chapter 7 can be denied under "extreme circumstances such as bad faith," with "such cases usually involv[ing] egregious conduct on the part of the debtor, who is seeking to use the bankruptcy process abusively and selfishly rather than for its intended purpose." *Id.* at 409. The bankruptcy court in *Adler* denied the debtor's request to convert his case after finding that he "earn[ed] a substantial income, and based upon an uncontroverted disclosure of large life style expenditure[s], ha[d] the ability to make the payments needed in order to confirm a plan under Chapter 11." *Id.* at 410. Further, in *Adler* the debtor had "failed to take the necessary steps to make any [of the several successive] plan[s] [he had proposed] confirmable ... and to make any reasonable efforts to provide a reasonable distribution to general unsecured creditors, (i.e. devote some portion of post-petition earnings)." *Id.*

In sum, when assessing whether a debtor who commenced a Chapter 11 case and who seeks to convert to Chapter 7 has conducted himself in good faith or not, the Court may consider all relevant factors. Under the circumstances of this case, five of those factors are: (1) whether the Debtor made a good-faith attempt to repay his debts prior to bankruptcy by reducing his excessive expenditures; (2) whether the Debtor has conducted his Chapter 11 case in a manner consistent with the purpose of reorganizing and repaying his debts; (3)

whether the Debtor has exhibited candor during the bankruptcy case; (4) whether the Debtor has made a good-faith attempt to repay his debts by eliminating his excessive expenditures while in bankruptcy; and (5) whether the Debtor, if he reduced his expenditures, would have sufficient income to repay creditors a dividend that would exceed what they would receive in a Chapter 7 liquidation of his non-exempt assets.

### B. Application of the Relevant Factors

Having given consideration to the factors discussed above, the Court concludes that the Debtor's bad faith would constitute cause to dismiss his case under § 707(a) of the Bankruptcy Code if the case were converted to Chapter 7. The Court reaches this conclusion based on the Debtor's conduct both before and after the Petition Date.

### 1. The Debtor's Conduct Prior to Bankruptcy

The most salient factor demonstrating the Debtor's bad faith before the Petition Date is that he did not act in a manner consistent with "the expectation that debt incurred must eventually be repaid." *In re Kamen*, 231 B.R. 275, 279 (Bankr. N.D.Ohio 1999) (dismissing Chapter 7 case under § 707(a) based on the debtors' bad faith). The Debtor did not read or even bother to learn the repayment or other terms of the loan documents before he signed them.[80] He then spent money without restraint and failed to check his exces-

sive expenditures even after he became aware—through litigation commenced by the Objecting Creditors—of his financial distress. In addition, he failed for more than a year after he became aware of his debt-service problems to rein in his parents' lavish spending. As was the case with the debtor in *Zick*, the Debtor failed to reduce his spending in order to service his debt before bankruptcy and instead continued his "excessive ... expenditures [and] lavish lifestyle." *Zick*, 931 F.2d at 1129.

While others no doubt share some of the blame for his financial situation, the Debtor also is responsible for the circumstances that led to his bankruptcy. In fact, his own counsel said as much when he stated early in the case that the Debtor "takes full responsibility for where he's at" and that he "is here understanding what his responsibilities are." Status Conference Tr. at 12–13. But then, by the time his proposed findings of fact and conclusions of law were filed, the Debtor appears to have backed away from taking responsibility: "The record is patently unblemished that Debtor's bankruptcy was precipitated by catastrophic financial events caused by the Johnsons—for which they belatedly appear to accept responsibility—and by others." Debtor Findings & Conclusions ¶ 75.

### 2. The Debtor's Conduct After Bankruptcy

Whether the Debtor truly felt a sense of responsibility or not, he unfortunately did

---

**80.** *See* Tr. I at 65 (testifying "I didn't know the terms of the loan" with respect to the Blum Note); Tr. I at 81 ("[In] March of 2011, I didn't ... know the terms of the [Blum] loan."); Tr. II at 71–72 (testifying with respect to the RFF Note that "I signed the document, but I didn't know the terms of the loan."). His parents confirmed that he did not review loan documents—or discuss the terms of the loans with them—before he

signed the documents. JJII Dep. at 85–86; KJ Dep. at 257, 272. Despite this, the Debtor knew that he was incurring debt when he signed the loan documents. Thus, the Debtor's contentions that his "financial hardship" arose from "debts created without his knowledge" and that he "is the victim of tragic events well beyond his own making," Debtor Findings & Conclusions ¶¶ 85, 107, are simply not true.

not conduct himself in this Chapter 11 case as though he did. Again, the principal goal of an individual Chapter 11 reorganization case is to provide creditors with a portion of the Debtor's income rather than the value that can be derived from liquidating property of his bankruptcy estate. *Canadian Pac. Forest Prods. Ltd. v. J.D. Irving, Ltd. (In re Gibson Grp., Inc.)*, 66 F.3d 1436, 1442 (6th Cir.1995). The Debtor, however, did not take the steps necessary to achieve that goal. As the Court detailed above, he did not:

 (1) retain the services of a forensic accountant before filing the Conversion Motion even after his own attorney stated that doing so was a necessary step toward confirmation of a Chapter 11 plan;

 (2) object to the claims of the Objecting Creditors before he filed the Conversion Motion even though doing so would have served the interests of the creditors whose claims he concedes are legitimate; or

 (3) negotiate with the Objecting Creditors in good faith.

As detailed above, several findings support the Court's conclusion that the Debtor failed to negotiate with the Objecting Creditors in good faith:

- The Debtor was considering the prospect of converting the case before he made his first offer to any of the Objecting Creditors.

- Neither the Debtor nor his attorneys advised the Objecting Creditors that he would immediately file the Conversion Motion if they failed to accept his proposal. Rather than using the prospect of conversion as leverage in his negotiations with the Objecting · Creditors, the Debtor treated it as a fait accompli.

- The Debtor made his first offer to each of the Objecting Creditors on the eve of filing the Conversion Motion, and he allowed little or no time for any meaningful negotiations to occur.

- The Debtor filed the Conversion Motion without awaiting a response from certain of the Objecting Creditors. His purported reason for not waiting to file the Conversion Motion—that he could confirm a Chapter 11 plan only with the Objecting Creditors' unanimous consent—is simply not true.

- When he had the opportunity to make another offer before the mediation, the Debtor made the very same offer to the Objecting Creditors he had made before filing the Conversion Motion, further suggesting that his offer was being made on a take-it-or-leave-it basis.

In short, like the debtor in *Adler*, the Debtor has failed to conduct this case in a manner consistent with the rehabilitative and debt-repayment purposes of Chapter 11.

The Debtor also failed to fully investigate whether his parents have assets that could be used to augment his bankruptcy estate, and he demonstrated a lack of candor by failing to disclose on a further amended statement of financial affairs any gifts or transfers he made to or on behalf of his parents. The Debtor attempts to justify his failures in this regard by pointing out that § 1107(a) of the Bankruptcy Code excuses a debtor in possession from the requirements of § 1106(a)(3) and (4) of the Bankruptcy Code. Based on those exclusions, the Debtor contends that a "debtor in possession [therefore] is not *required* to 'investigate the acts, conduct, assets, liabilities, and financial conditions of the debtor ... [,]' nor is the debtor in possession *required* to 'file a statement of any investigation conducted[,] ... including

any fact ascertained pertaining to ... a cause of action available to the estate....'" Debtor Pre–Hearing Brief at 2 & n.2 (quoting *Bonwit Teller v. Jewelmasters (In re Hooker Invs.)*, 162 B.R. 426, 434 (Bankr.S.D.N.Y.1993)).[81] The Debtor also suggests that he has gone above and beyond because he has "investigated, detailed, and disclosed potential estate claims, despite having no express duty to do so...." Debtor Pre–Hearing Brief at 2. The Court is not so sure that the exemption from § 1106(a)(3) means anything more than that a debtor in possession is not required to "investigate itself"—or in this case, himself. *Green Pastures Christian Ministries, Inc. v. United States (In re Green Pastures Christian Ministries, Inc.)*, 437 B.R. 465, 469 (Bankr.N.D.Ga.2010); *see also In re Princeton Square Assocs., L.P.*, 201 B.R. 90, 95 & n. 7 (Bankr.S.D.N.Y.1996) ("The debtor in possession has all of the rights and powers and is obligated to perform all of the functions and duties of a Chapter 11 trustee specified in Code § 1106.... There are certain obvious and immaterial exceptions. The debtor in possession does not have the trustee's entitlement to compensation. Nor is the debtor in possession expected to conduct an investigation of itself or file a report of such an investigation.").

■ But even if the § 1106(a)(3) exemption is as broad as the Debtor suggests, he nonetheless has a duty to investigate and disclose potential claims against—and transfers made to—his parents and other third parties. Whatever the exclusion from § 1106(a)(3) and (4) means for a debtor in possession—an issue the Court need not decide—the exclusion does not excuse the Debtor from fulfilling the requirements imposed by § 521(a)(1) of the Bankruptcy Code and Bankruptcy Rule 1007(b). Those obligations include not only filing schedules of assets and liabilities disclosing causes of action his bankruptcy estate has against third parties, but also filing a statement of financial affairs that fully discloses transfers made to third parties with the requisite detail. Sections 1106(a)(3) and (4) do not release the Debtor from his duty to conduct the investigation necessary to completely disclose those transfers under penalty of perjury as required by Bankruptcy Rule 1008. "[T]he proper administration of any bankruptcy case is utterly dependent upon the debtors and their counsel providing *complete*, accurate and truthful information about the debtor's assets, debts, and financial affairs." *In re Pigg*, No. 14–50266, 2015 WL 7424886, at *21 (Bankr.W.D.Mo. Nov. 20, 2015) (emphasis added). There is no justification for the Debtor's failure to disclose transfers to his parents and other third parties in violation of his duties under the Bankruptcy Code.

In addition to failing to disclose transfers to his parents, the Debtor also continued to provide support to his parents and his brother after the Petition Date using cash belonging to the bankruptcy estate. Using his income to support persons other

---

81. *See* 11 U.S.C. § 1107(a) (providing that the debtor in possession has certain of the duties of a Chapter 11 trustee, but not those set forth in § 1106(a)(2), (3) & (4)); § 1106(a)(3) (providing that a Chapter 11 trustee shall "investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan"); § 1106(a)(4)(A) (providing that a Chapter 11 trustee shall "file a statement of any investigation conducted under paragraph (3) of this subsection, including any fact ascertained pertaining to fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor, or to a cause of action available to the estate").

than himself or his dependents violated his fiduciary duties and constituted bad faith on his part. *See Garrett,* 2015 WL 1546149, at *7 ("Although the court is sympathetic to the Debtor's desires to help those who are unwilling or unable to support themselves, the Debtor's bankruptcy filing exhibits bad faith. Debtors cannot choose to give unreasonable amounts of money to friends and loved ones instead of paying debts on which they are legally obligated."); *see also In re Wahlie,* 417 B.R. 8, 11 (Bankr.N.D.Ohio 2009) (granting creditor's motion to dismiss individual Chapter 11 case where debtor, among other things, "found it acceptable to pay the debts of third-party family members"). ·

Not only that, but the Debtor's personal spending continued at an unreasonably high level under the circumstances of this case. Again, in the Chapter 11 case of an individual debtor, "earnings from services performed by the debtor after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7" are not the debtor's property, but instead are property of his bankruptcy estate. 11 U.S.C. § 1115(a)(2). Some courts have questioned whether individual Chapter 11 debtors have the right to use property of the estate—including their postpetition salary—to pay for their ordinary course living expenses without seeking and obtaining authority to do so by filing a motion under § 363 of the Bankruptcy Code. *See United States v. Villalobos (In re Villalobos),* No.11–1061, 2011 WL 4485793, at *8 (9th Cir. BAP Aug. 19, 2011) ("[W]ith BAPCPA's addition of § 1115, individual chapter 11 debtors no longer have the option to pay expenses with postpetition income because virtually all property, including postpetition income from personal services, is property of the estate. Instead, individual chapter 11 debtors must now seek payment of personal expenses from estate property ...."); *see also* William L. Norton III, *Post-petition Operations for Individual Chapter 11 Debtors* (2015) at 5–7 ("*Norton*").[82] This Court has never so held, and it assumes for purposes of its analysis here that the Debtor, despite not having requested approval of his expenses, was permitted to pay for his own reasonable, ordinary-course living expenses out of his postpetition income without requesting authority to do so.

But "the more difficult question is ... what expenses [should be considered] 'ordinary' living expenses"—a question that does not have "clear answers." *Norton* at 7, 8. "At least two commentators have suggested § 1129(a)(15)'s disposable income test is the proper test for approving pre-confirmation budgets and personal expenses of individual chapter 11 debtors under § 363."[83] Again, the Court has never followed that approach, and instead views the question as one that should be answered on a case-by-case basis. After all, this Court and others have presided over individual Chapter 11 cases in which debtors in possession expended tens of thousands of dollars on consumer goods and services but still were able to provide creditors with a 100% recovery on their allowed claims.

This is not such a case. As discussed above, the Debtor has acknowledged that he could not possibly pay creditors 100%.

82. *See* www.ca6.uscourts.gov/internet/judicial_conference/2015/presmaterials/smallbk/3.pdf.

83. *Villalobos,* 2011 WL 4485793, at *8 (citing 5 *Norton Bankr.L. & Prac.* 3d § 106:3 (Hon. William L. Norton, Jr. et al. eds.2011); Sally Neely, *How BAPCPA Changes Chapter 11 Cases for Individuals,* SS029 ALI–ABA 625, 647 (West 2011)).

He also has taken the position (in opposing the TCF Motion) that cash in the amount of $15,000—a relatively small amount compared to the excessive amounts he has spent during this case on himself and his family—is necessary to his effective reorganization. Furthermore, an awareness of his inability to fully satisfy creditors' claims, as well as the importance to his reorganization efforts of amounts such as the $15,000 referenced above, would have been apparent to him before he even filed the Conversion Motion. And yet the Debtor continued—and even increased— his excessive spending after he filed the Conversion Motion. In sum, the Debtor has not made a good-faith attempt to repay a portion of his debts by eliminating his excessive expenditures while in bankruptcy.

■ The Debtor also retained potentially depreciating assets—both for his own benefit and the benefit of his nondependent family members—that imposed additional costs on the bankruptcy estate. True, because the principal goal of an individual Chapter 11 reorganization case is to provide creditors with a portion of the debtor's future income rather than the value that can be derived from liquidating property of his bankruptcy estate, "the maximization of the value of the estate is not necessarily the primary goal of a Chapter 11 reorganization as it would be in a Chapter 7 liquidation." *Gibson Grp.*, 66 F.3d at 1442. But "this does not mean that the debtor-in-possession has no duty to conserve and protect the assets ... of the estate." *Id.* To the contrary, where the debtor "intend[s] to liquidate ... property[,] ... maximization of value should [be his] primary concern." *Tenn–Fla Partners v. First Union Nat'l Bank*, 229 B.R. 720, 736 (W.D.Tenn.1999), *aff'd*, 226 F.3d 746 (6th Cir.2000). The Debtor, however, failed to promptly sell assets (including his 2011 Ferrari) that he said he intended to liquidate. By not selling this depreciating property earlier, he failed to maximize the value of his bankruptcy estate. And he has imposed the cost of insuring those assets on his bankruptcy estate.

Finally, notwithstanding the Debtor's representations that "[h]e cannot repay a meaningful percentage of unsecured debts" and that "[a]fter factoring in anticipated taxes, player dues, fees, and living expenses, [he] plainly is unable to pay the claims asserted against him," Debtor Findings & Conclusions ¶¶ 76–77, his income in fact is more than sufficient to fund a Chapter 11 plan paying creditors a dividend far exceeding the recovery they could hope to receive in a Chapter 7 liquidation of his non-exempt assets. Yet he has "failed to take the necessary steps to [propose a] confirmable [plan] ... and to make any reasonable efforts to provide a reasonable distribution to general unsecured creditors, (i.e. devote some portion of post-petition earnings)." *Adler*, 329 B.R. at 410. Incredibly, the Debtor contends that converting his case would make more funds available for distribution to his legitimate unsecured creditors than he would be able to pay using his income. Tr. I at 152; *see also* Debtor Findings & Conclusions ¶ 56 ("The sad and unfortunate facts of this case plainly demonstrate that a Chapter 7 is the best way to preserve value and treat all similarly situated creditors equally.").

The Debtor is not the first to take such an untenable position in defending against allegations of bad faith, and this Court will not be the first to reject the position. Affirming the bankruptcy court's dismissal of the debtors' Chapter 7 case for bad faith, the district court in *Rahim* was equally incredulous: "Contrary to [the debtors'] position, an annual dividend to

[their] unsecured creditors of up to $1,800,000 [from their income after reducing their expenses] is considerably less prejudicial to the unsecured creditors than a one-time dividend of $200,000 from the liquidation of [their] assets." *Rahim v. Pacifica Loan Four, LLC (In re Rahim)*, 449 B.R. 527, 532 n. 2 (E.D.Mich.2011). The same is true here. During his first year in bankruptcy, the Debtor had approximately $1.83 million of net annual income after expenses, and he would have had more if he had cut back on his excessive expenditures. By contrast, the value of the Debtor's non-exempt assets (even when including those potentially subject to liens) is approximately $800,000, much less than the cash he has accumulated while in bankruptcy and will accumulate going forward. As in *Rahim,* an annual dividend to unsecured creditors out of the Debtor's income would be considerably more beneficial than a one-time recovery (if any) from the liquidation of his assets.

It is not for this Court to say whether it is prudent for persons who earn several million dollars per year and who are not in bankruptcy to spend the amounts the Debtor has chosen to expend on cars, houses, clothing, food, entertainment and other items. But because the Debtor has sought bankruptcy relief, it is the Court's role to decide whether the Debtor has conducted himself in bad faith under controlling Sixth Circuit law. And in applying that case law, it is evident that the Debtor exhibited bad faith before bankruptcy by neglecting—even after he became aware of his debt-service problems—to make adjustments in his own lifestyle or that of his parents in an effort to repay creditors. Furthermore, despite having approximately $7 million of claims against his estate

that he concedes are legitimate, and another $14 million or so that are prima facie valid,[84] the Debtor has expended more than the relatively small amount he contends is necessary to an effective reorganization ($15,000) on behalf of his parents and brother, and also has failed to curb his own profligate spending so as to conserve cash belonging to the bankruptcy estate. Moreover, rather than seeking to use his income to fund a plan of reorganization that would pay his creditors a significant dividend, the Debtor seeks to convert this case to Chapter 7 and leave even those creditors whose claims he concedes are legitimate with a minimal recovery from his non-exempt assets.

For all the reasons set forth above, the Court concludes that the Debtor's conduct both before and after the Petition Date makes this the kind of egregious case where his bad faith would constitute cause to dismiss the case under § 707(a) of the Bankruptcy Code if it were converted to Chapter 7.

**C. The Connection Between the Court's Bad–Faith Analysis and the Debtor's Request to Convert His Chapter 11 Case to Chapter 7**

Of course, the Debtor's case would be subject to dismissal under § 707(a) only if the case were first converted to Chapter 7. Why, then, is § 707(a) relevant at this stage of the Debtor's case? It is not, the Debtor contends, because of § 1112(a) of the Bankruptcy Code. To reiterate, § 1112(a) states:

> The debtor may convert a case under this chapter to a case under chapter 7 of this title unless—(1) the debtor is not a debtor in possession; (2) the case originally was commenced as an involuntary

**84.** Bankruptcy Rule 3001(f) provides that "[a] proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim." Fed. R. Bankr. P. 3001(f).

case under this chapter; or (3) the case was converted to a case under this chapter other than on the debtor's request. 11 U.S.C. § 1112(a).

As discussed above, the Objecting Creditors have stipulated that the Debtor is a debtor in possession, that his case was not originally commenced as an involuntary case under Chapter 11, and that the case was not converted to Chapter 11. According to the Debtor, because he has satisfied the elements of § 1112(a), he has an "absolute right to convert" his Chapter 11 case to Chapter 7 and the analysis should end there. Debtor Findings & Conclusions ¶ 46. But even if that were true—and for the reasons explained below, it is not—it would not help the Debtor here.

The Objecting Creditors have the burden of proving the grounds for their opposition to the Conversion Motion, and the burden of proving the Debtor's bad faith in the context of conversion therefore rests with them. They have carried their burden by a preponderance of the evidence—and would have done so even if the standard were clear and convincing evidence. If the Court granted the Debtor's request to convert his case to Chapter 7, the Objecting Creditors could file a motion to dismiss the case under § 707(a), and the Debtor arguably would have the burden of proving his good faith.[85] Even if the Objecting Creditors had the burden of proving the Debtor's bad faith under § 707(a) if the case were converted to Chapter 7, a motion to dismiss by the Objecting Creditors would result in the dismissal of the Debtor's Chapter 7 case for the same reasons set forth in this opinion—a result the Debtor has said he does not want. *See*

Debtor Findings & Conclusions ¶ 80 ("[D]ismissing this case benefits *nobody*. As to [the] Debtor, he would be left where he started: in an obviously hopeless situation."). As one court noted after holding that Chapter 11 debtors do not have an absolute right to convert their cases to Chapter 7, "the Bankruptcy Court could have granted the [debtors'] motion to convert [their Chapter 11 case to Chapter 7], and then promptly dismissed under § 707," making "any error by the Bankruptcy Court on this point . . . harmless." *Mahanna v. Bynum*, 465 B.R. 436, 440 (W.D.Tex.2011). In short, the Debtor's position that he has an absolute right to convert ultimately would be unavailing even if it were correct.

But the Debtor's position is incorrect. As the *Mahanna* court held, Chapter 11 debtors do not have an absolute right to convert their cases to Chapter 7 merely because they meet the prerequisites listed in § 1112(a). Like the Debtor, the debtors in *Mahanna* relied on *In re Texas Extrusion Corporation*, 844 F.2d 1142, 1161 (5th Cir.1988), in support of their argument that Chapter 11 debtors have an absolute right to convert their cases to Chapter 7. The district court noted that the debtors' "sole authority for this proposition is the following" sentence from *Texas Extrusion:* " 'A debtor has the absolute right to convert his or her Chapter 11 case to a Chapter 7 case. . . .' " *Mahanna*, 465 B.R. at 439 (quoting *Tex. Extrusion*, 844 F.2d at 1161). The court found the debtors' reliance on this sentence to be unpersuasive: "[T]his sentence is dicta: it could have been deleted without seriously impairing the analytical foundations of the holding—[and], being peripheral, may not have re-

---

**85.** *See Webber v. Giarratano (In re Giarratano)*, 299 B.R. 328, 339 (Bankr.D.Del.2003) ("Once brought into question, the Debtor has the burden of proof to show her good faith."), *aff'd*, 358 B.R. 106 (D.Del.2004); *Zick*, 931

F.2d at 1127 ("[W]here [the] debtor's good faith is put into question, the debtor bears the burden of proving that the filing was made in good faith.") (citing *In re Bingham*, 68 B.R. 933 (Bankr.M.D.Pa.987)).

168

ceived the full and careful consideration of the court that uttered it." *Mahanna*, 465 B.R. at 439 (internal quotation marks omitted).

Further, in *Texas Extrusion*, the Fifth Circuit was addressing whether a Chapter 11 case that has been converted to Chapter 7 can be reconverted by the bankruptcy court to Chapter 11 upon motion of a party-in-interest, and the Fifth Circuit held that "a debtor does not have the right to *keep* the case in Chapter 7, and upheld the bankruptcy court's decision to convert the case back to Chapter 11." *Id.* (internal quotation marks omitted). Like the debtors in *Mahanna*, the Debtor also relies exclusively on *Texas Extrusion* in support of his absolute right to convert to Chapter 7. *See* Debtor Findings & Conclusions ¶ 46. But just as the district court in *Mahanna* found *Texas Extrusion* to be unconvincing support for the debtor's asserted absolute right to convert, this Court likewise finds the statement in the Fifth Circuit opinion on which the Debtor here relies to be nothing more than unpersuasive dicta.

The Court instead must follow controlling Sixth Circuit case law, and the Sixth Circuit has held that bad faith constitutes cause to deny a debtor's request for conversion. *See Copper v. Copper (In re Copper)*, 426 F.3d 810 (6th Cir.2005). In *Copper*, a Chapter 7 debtor filed a motion to convert his case to Chapter 13 under § 706(a) of the Bankruptcy Code, which provides in pertinent part that "[t]he debtor may convert a case under this chapter to a case under chapter 11, 12, or 13 of this title at any time, if the case has not been converted under section 1112, 1208, or 1307 of this title." 11 U.S.C. § 706(a). The bankruptcy court denied the debtor's conversion motion based on the debtor's bad faith, and the bankruptcy appellate panel affirmed the bankruptcy court's deci-

sion. On appeal to the Sixth Circuit, the debtor argued that he had an absolute right to convert his case. In rejecting this argument and holding that debtors do not have an absolute right to convert under § 706(a), the Sixth Circuit reasoned that "§ 706 uses the word 'may' meaning 'might' or 'used to express possibility' or 'used to express opportunity or permission.'" *Copper*, 426 F.3d at 816 (quoting *Random House Unabridged Dictionary* 1189 (2d ed.1993)). According to the court of appeals, "[i]f Congress had intended to leave the bankruptcy courts with absolutely no discretion in the matter, it would have used the more mandatory phrase of 'shall be able to convert.'" *Id.* (contrasting § 706(a) with § 1307(b), which provides that "[o]n request of the debtor at any time ... the court shall dismiss a case under this chapter."). Based on this reasoning, the Sixth Circuit held that "[t]herefore ... the plain language of § 706(a) does not grant an absolute right to convert." *Id.*

The language of § 1112(a) on which the Debtor relies likewise provides that a Chapter 11 debtor "may" convert the case except under certain circumstances, meaning that it is not materially different from § 706(a). Thus, as a district court within the Sixth Circuit has pointed out, the same reasoning that the Sixth Circuit used in *Copper* to hold that there is no absolute right to convert from Chapter 7 to Chapter 13 supports the view that Chapter 11 debtors do not have an absolute right to convert to Chapter 7. *See Monroe Bank & Trust v. Pinnock*, 349 B.R. 493 (E.D.Mich. 2006). In *Monroe Bank*, the Chapter 11 debtors filed a motion to convert their case to chapter 7. A creditor objected to the motion, and the bankruptcy court entered an order overruling the objection, permitting the conversion to Chapter 7. On appeal, the district court vacated the bankruptcy court's order and held that Chapter

11 debtors do not have an absolute right to convert to Chapter 7. In so holding, the district court found the Sixth Circuit's rationale in *Copper* to be controlling even though "the statute in *Copper* involved a different section of the Bankruptcy Code and the debtor in that case was attempting to convert the proceedings from Chapter 7 to Chapter 13." *Id.* at 496. The district court found that the Sixth Circuit's reading of the language of § 706(a) applied in *Monroe Bank* given that, "[l]ike the provision in *Copper*, in this case § 1112(a) provides that the debtor 'may convert' the case." *Id.* at 496–97. Because "the statutory language [of § 1112(a) ] clearly states that a debtor 'may' convert his case, but does not state that the Court 'shall' honor his request ... the plain language of § 1112 does not grant the debtor an absolute right to convert." *Id.* at 497 (citations and internal quotation marks omitted). Likewise, consistent with the reasoning of the Sixth Circuit, the bankruptcy court in *Adler* relied on § 1112(a)'s use of the word "may" in rejecting a Chapter 11 debtor's contention that he had an absolute right to convert his case to Chapter 7. *See Adler*, 329 B.R. at 408.

It therefore has been clear since the time the Sixth Circuit issued *Copper* in 2005 that the Bankruptcy Code does not afford Chapter 11 debtors an absolute right to convert their cases to Chapter 7. And it certainly became no less clear when, in 2007, the Supreme Court held in *Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365, 127 S.Ct. 1105, 166 L.Ed.2d 956 (2007), that a bad-faith exception limits the right of debtors under § 706(a) of the Bankruptcy Code to convert their Chapter 7 cases to Chapter 13. *See Marrama*, 549 U.S. at 371–76, 127 S.Ct. 1105. In *Marrama*, the Chapter 7 debtor, despite having engaged in bad-faith conduct during his Chapter 7 case, nonetheless argued that he had an abso-

lute right to convert his case to Chapter 13. In so arguing, the debtor relied on § 706(a) of the Bankruptcy Code, which, as noted above, provides that "[t]he debtor may convert a case under this chapter to a case under chapter 11, 12, or 13 of this title at any time, if the case has not been converted under section 1112, 1208, or 1307 of this title." 11 U.S.C. § 706(a). The Supreme Court rejected the debtor's position, holding that conversion requests may be denied for bad faith. According to the Supreme Court, the authority to deny the debtor's conversion motion was provided by § 706(d), which states that "[n]otwithstanding any other provision of this section, a case may not be converted to a case under another chapter of this title unless the debtor may be a debtor under such chapter." 11 U.S.C. § 706(d). *See Marrama*, 549 U.S. at 374, 127 S.Ct. 1105 ("The text of § 706(d) ... provides adequate authority for the denial of [the debtor's] motion to convert."). Importantly, the language of § 706(d) tracks a parallel provision in Chapter 11 of the Bankruptcy Code providing that a Chapter 11 case "may not be converted to a case under another chapter of this title unless the debtor may be a debtor under such chapter." 11 U.S.C. § 1112(f).

In support of its view that the debtor in *Marrama* could not be a debtor under Chapter 13, the Supreme Court relied on § 1307(c). *See Marrama*, 549 U.S. at 373–74, 127 S.Ct. 1105. Section 1307(c) provides that "the court may convert a case under this chapter to a case under chapter 7 of this title, or may dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause." 11 U.S.C. § 1307(c). "In practical effect, a ruling that an individual's Chapter 13 case should be dismissed or converted to Chapter 7 [pursuant to § 1307(c) ] because of prepetition bad-faith conduct, including

fraudulent acts committed in an earlier Chapter 7 proceeding, is tantamount to a ruling that the individual does not qualify as a debtor under Chapter 13." *Marrama,* 549 U.S. at 373–74, 127 S.Ct. 1105. For present purposes, § 1307(c)'s "for cause" provision is not substantively different from § 707(a), which provides that courts may dismiss Chapter 7 cases for cause. In the same way that § 707(a) would result in the dismissal of the Debtor's case for bad faith if it were converted to Chapter 7 at this point, § 1307(c) would have resulted in the dismissal or reconversion of the debtor's case in *Marrama* if it had been converted to Chapter 13. According to the Supreme Court, given his bad faith, the debtor in *Marrama* was "not a member of the class of 'honest but unfortunate debtor[s]' that the bankruptcy laws were enacted to protect." *Id.* at 374, 127 S.Ct. 1105 (citations and internal quotation marks omitted).

The same is true for a Chapter 11 debtor who, like the Debtor here, has exhibited bad faith. Just as the debtor's right to convert in *Marrama* was limited by § 706(d), under the reasoning of *Marrama,* the Debtor's right to convert is limited by § 1112(f), which provides that a Chapter 11 case "may not be converted to a case under another chapter of this title unless the debtor may be a debtor under such chapter." 11 U.S.C. § 1112(f). As things stand, because the Debtor has exhibited bad faith, his case would be subject to dismissal under § 707(a) if it were converted to Chapter 7, meaning that he may not be a Chapter 7 debtor under the reasoning set forth in *Marrama.*

Other courts have held that the rationale of *Marrama* applies equally to attempted conversions from Chapter 11 to other chapters of the Bankruptcy Code, including Chapter 7. *See In re Schultz,* 436 B.R. 170, 179 (Bankr.M.D.Fla.2010) ("The Court

also finds that the Debtor's Motion to convert the case [from Chapter 11] to a case under Chapter 13 of the Bankruptcy Code should be denied, because the finding of bad faith is 'tantamount to a ruling that the individual does not qualify as a debtor under Chapter 13.' Pursuant to § 1112(f) of the Bankruptcy Code, therefore, the case may not be converted to a case under Chapter 13, since the Debtor may not 'be a debtor under such chapter.'" (quoting *Marrama,* 549 U.S. at 374, 127 S.Ct. 1105)); *In re Modern Metal Prods. Co.,* 422 B.R. 118 (Bankr.N.D.Ill.2009). In *Modern Metal,* the debtor sought to convert its case from Chapter 11 to Chapter 7. Although the bankruptcy court granted the motion under the circumstances of that case, it noted that "[i]f it is clear that the granting of the motion to convert would serve no other purpose than to waste time and resources, or that the Debtor's only purpose in filing the motion was to delay, then under the reasoning of *Marrama,* the Court could certainly deny the Debtor's motion." *Id.* at 122. Here, the Court finds that it would be a waste of time and resources—and contrary even to what the Debtor says is in his own best interests—for the Court to grant the Conversion Motion and then dismiss the case once the Objecting Creditors filed a motion to dismiss under § 707(a).

Arguing against *Marrama*'s applicability in this context, the Debtor relies in part on *Kimrow, Inc. v. Cohilas (In re Kimrow, Inc.),* 534 B.R. 219 (Bankr.M.D.Ga. 2015). *See* Debtor Findings & Conclusions ¶ 48. In *Kimrow,* the court stated that *"Marrama's* holding does not have a one-to-one application to this case. While the language of § 1112 and § 706 are similar ... in *Marrama,* the debtor was seeking conversion to Chapter 13, which—as recognized by ... the Eleventh Circuit— imposes a higher duty of good faith than Chapter 7." *Kimrow,* 534 B.R. at 225 (cit-

ing *Piazza v. Nueterra Healthcare Physical Therapy (In re Piazza)*, 719 F.3d 1253, 1265 (11th Cir.2013)). But the *Piazza* decision on which *Kimrow* relied was itself a Chapter 7 case in which the Eleventh Circuit rejected the debtor's argument that "the debtor's good or bad faith is immaterial" in Chapter 7. *Piazza*, 719 F.3d at 1265. As the Eleventh Circuit noted: "In *Marrama*, the Supreme Court made clear bad faith is pertinent in all Chapters of the Bankruptcy Code, regardless of whether a provision contains an explicit good-faith filing requirement." *Id.* The *Piazza* court concluded that there was "no basis for [the debtor's] assertion that bad faith is immaterial in one chapter simply because it is particularly salient in another." *Id.* In any event, Sixth Circuit law as expressed in *Zick* is clear: there is no less of a duty of good-faith in Chapter 7 than in other chapters of the Bankruptcy Code.

*Kimrow* is unpersuasive for another reason. In that case, the court noted that it was deciding the issue of the debtor's right to convert "in the context of a corporate liquidation where there is no equity for shareholders," also stating that "misconduct by the corporation's principals is rarely legitimate grounds to dismiss the bankruptcy where the bankruptcy case remains in the best interest of the creditors." *Kimrow*, 534 B.R. at 225. The court therefore found that "there are good reasons to hold that this case falls outside of *Marrama's* holding." *Id.* In addition, the court noted that the circumstances would not have warranted dismissal in *Kimrow* in any event because, "unlike *Monroe Bank*, the [d]ebtor is not an individual trying to convert in order to obtain earnings accrued during the pendency of the Chapter 11 case." *Id.* at 226. But this is precisely what is going on here—the Debtor is an individual trying to convert from Chapter 11 to Chapter 7 in order to protect the income he has earned during the pendency of his Chapter 11 case and is slated to earn going forward.

Even if there were a tenable argument against the application of *Marrama's* rationale in the context of conversions from Chapter 11 to Chapter 7, the Sixth Circuit's decision in *Copper* nonetheless would continue to apply. As discussed above, the provision on which the Debtor relies in support of his purported absolute right to convert—§ 1112(a)—provides that a Chapter 11 debtor "may" convert the case except under certain circumstances. Construing essentially the same language in § 706(a), the Sixth Circuit held that Chapter 7 debtors' right to convert their cases may be denied based on bad faith. *See Copper*, 426 F.3d at 816. Under the rationale of *Copper*, the Debtor's right to convert to Chapter 7 likewise is limited by his bad faith.

### D. Section 707(b) of the Bankruptcy Code

The Court will be issuing an order to show cause why a Chapter 11 trustee should not be appointed in the Debtor's case under § 1104(a) of the Bankruptcy Code based on the findings of fact set forth in this opinion. Depending on future developments in this case, any Chapter 11 trustee who might be appointed conceivably could later seek to convert the case to Chapter 7, and cause might then exist to convert the Debtor's case. And if the Debtor's case were converted to Chapter 7, based on the Court's findings in this opinion, there would be no basis to dismiss the case under § 707(b), which applies only if a debtor has "primarily consumer debts." 11 U.S.C. § 707(b)(1).

In order to establish that the Debtor's case would be subject to dismissal under § 707(b) if the case were converted to Chapter 7, the Objecting Creditors' burden

of proof was straightforward—show that the debts the Debtor incurred primarily for a consumer purpose comprise more than one-half of his total indebtedness. *See In re Hlavin*, 394 B.R. 441, 447 (Bankr.S.D.Ohio 2009) ("Based on the context in which § 707(b)(1) was passed and the policy concerns it was intended to address, the Court adopts the majority view and concludes that a debtor has 'primarily consumer debts' if the aggregate amount of his or her consumer debt exceeds 50% of the total debt."). The time to prove this was while they were litigating their objections to the Conversion Motion, and they fell far short. Furthermore, by basing their arguments on Schedule 1—a document riddled with errors and premised on faulty assumptions—they engaged in litigation conduct that was no less egregious than the Debtor's bad faith.

## VI. Conclusion

Again, a Chapter 11 petition is as "an invitation to a negotiation." *In re Tribune Co.*, 464 B.R. 126, 207 n. 93 (Bankr.D.Del. 2011). Given the history of this case, it would be reasonable for creditors to question the sincerity of the invitation they received. Nevertheless, the parties should undertake good-faith efforts to resolve their differences so that a consensual plan of reorganization for the Debtor may be confirmed. Failing that, what lies ahead does not look promising—for the Debtor a future clouded by uncertainty, for the Objecting Creditors further delay, and for all parties additional costly litigation. For all of the reasons set forth above, the Conversion Motion is **DENIED**.

**IT IS SO ORDERED.**